

1                UNITED STATES DISTRICT COURT

2                   DISTRICT OF MINNESOTA

3        ----------------------------------------------------

4      Michelle MacDonald Shimota,

5                    Plaintiff,

6

7      vs.                      Court No. 15-cv-1590 (JRT/FLN)

8

9      Bob Wegner, et. al,

10                   Defendants.

11       ----------------------------------------------------

12

13

14

15

16       ----------------------------------------------------

17                    DEPOSITION OF

18         DEPUTY SHERIFF TIMOTHY GONDER

19       ----------------------------------------------------

20

21

22

23

24

25     Taken November 30, 2016     By Ann Marie Holland, CSR

EXHIBIT
2

1        A.    Yes.

2        Q.    Who was with you at the time?

3        A.    Sergeant Melton.

4        Q.    Okay.  I'm just trying to get an idea of

5   the dynamics here.

6              Was Melton the person who was proactive in

7   terms of what was happening with Ms. MacDonald or were

8   you the person who was doing those kinds of activities?

9        A.    If you give me specific instances and ask

10  me who was in charge of a specific instance, I can do it

11  that way.

12  BY MR. PADDEN:

13       Q.    Let's do it this way then, who walked up to

14  her and said, "We've got to take you out of the

15  courtroom"?  Was that you or Melton?

16       A.    I believe it was Sergeant Melton.

17       Q.    Okay.  Did you say anything at that time,

18  sir?

19       A.    Not that I recall.

20       Q.    So Melton was the one doing the talking,

21  correct, at that time?

22       A.    I believe so.

23       Q.    Okay.  Do you know how it was -- was a

24  decision made who would do the talking or was it just

25  something that happened?  Could you describe that for

1   me, please?

2          A.   It is most likely just something that

3   happened.

4          Q.   So it was you and Melton that escorted her

5   out of the courtroom, correct?

6          A.   I believe it was just the two of us.

7          Q.   Okay.  And where did you take her, sir?

8          A.   To the upper level bailiff station holding

9   area.

10          Q.   Did she at that time get put into a holding

11   cell so-to-speak or the holding cell so-to-speak?

12          A.   No.

13          Q.   Alright.  We will get back to that.

14          Have you ever arrested an attorney before,

15   sir, before Ms. MacDonald?

16          A.   I don't believe it has ever been made known

17   to me if their occupation was an attorney, but I guess

18   it's possible.

19          Q.   Okay.  Had you ever been involved either

20   directly or assisting with the issuing of a citation to

21   an attorney at any time before September 12th, 2013?

22          A.   Specifically as it relates to a courthouse

23   or in general?

24          Q.   That's a good point.  Let me clarify that.

25   Issuing a citation to an attorney for something that

1          Q.   Do you remember what courtroom you were in

2    when -- well, strike that.

3               Ms. MacDonald took a picture of you,

4    correct?

5          A.   Correct.

6          Q.   And in what courtroom was that in, sir?

7          A.   I believe it was 1-F.

8          Q.   Okay.  And when you say, "upper level" --

9    did you say, "upper level bail station"?

10         A.   Bailiff.

11         Q.   Bailiff station?

12         A.   Correct.

13         Q.   That's the second floor, correct?

14         A.   Correct.

15         Q.   And when the picture was taken of you,

16   was any other member of the Dakota County Sheriff's

17   Department in the courtroom?

18         A.   Taken of me?

19         Q.   Yes.

20         A.   No.

21         Q.   Okay.  You recall a picture being taken of

22   you, correct?

23         A.   I do.

24         Q.   Okay.  Were you looking at Ms. MacDonald

25   when she took the picture?

1          A.    I don't recall.

2          Q.    Did she give you advance notice that she

3    was taking a picture of you?

4          A.    No.

5          Q.    Did she say why she was taking a picture of

6    you at any time?

7          A.    Yes.

8          Q.    Okay.  What did she say?

9          A.    She told me she was keeping her own record

10   of events in the courtroom.

11         Q.    When she took the picture of you was the

12   judge in the courtroom?

13         A.    No.

14         Q.    Was court in session so-to-speak?

15         A.    Yes.

16         Q.    Tell me what you mean by that, court is

17   "in session."

18              I just asked you the question, "Was court

19   in session?"  How did you interpret that?

20         A.    The calendar had been called for the day.

21   The case had already begun is my understanding; there

22   had already been testimony.  There was some sort of

23   short recess.  And I am assuming that court would have

24   continued throughout the day in that manner.

25         Q.    So that's how you describe court being in

1        A.    -- prior to her arriving at the upper level

2   bailiff station area.

3        Q.    Alright.  Thank you, sir.

4              Do you recall what day of the week

5   September 12, 2013 was?

6        A.    I do not.

7        Q.    Okay.  Were you disciplined at all for the

8   circumstances of what happened on September 12th, 2013

9   and September 13th, 2013?

10       A.    No.

11       Q.    To your knowledge was there an internal

12   investigation?

13       A.    No.

14       Q.    Okay.  Who made the decision that she had

15   to stay in jail overnight?

16       A.    Sergeant Melton.

17       Q.    Okay.  Who made the decision to take a

18   mugshot of her?

19       A.    The Dakota County Jail.

20       Q.    Okay.  Do you know specifically which

21   person in the jail?

22       A.    I do not.

23       Q.    Okay.  Do you know who made the decision to

24   put her in the cell that she was in in the jail?

25       A.    As far as specifically which area of the

1    jail she would be held in, no, I do not recall who made

2    the decision as to where she would end up eventually.

3          Q.   But that wasn't your decision?

4          A.   No, sir.

5          Q.   Okay.  What time did your work shift begin

6    on September 12th, 2013, sir?

7          A.   Oh, I would have to say around 8:00 in the

8    morning.

9          Q.   Okay.  Do you recall what time your workday

10   ended that day, sir?

11         A.   At the courthouse?  I would have gotten

12   done, oh, sometime around 4:30 maybe.

13         Q.   Okay.  And did you then go home for the

14   day?

15         A.   I did not.

16         Q.   Okay. Were you involved at all with any of

17   the events that occurred after Ms. MacDonald was put

18   into the jail?

19         A.   Yes.

20         Q.   Okay.  So you were still with her at that

21   time, correct?

22         A.   I was not with her, but I did work in the

23   Dakota County Jail, correct.

24         Q.   Okay.  Do you recall how much of your

25   workday that day was in the jail, sir?

1          A.   I do not recall specifically if I went

2     straight to the jail after my courthouse shift ended or

3     if there was a lapse in time, but I do know that it

4     would have started no later than 6:00 p.m.

5          Q.   Okay.

6          A.   And I do not recall what time I left.

7          Q.   So did you work overtime that day?

8          A.   I did.

9          Q.   Okay.  Why was that?

10         A.   The jail at the time was short staffed.

11    The Department of Corrections has minimum officer

12    requirements based on the size of your jail.  When

13    the jail is not able to meet those minimum staffing

14    requirements required by the Department of Corrections,

15    they fill those spots with overtime, either with jail

16    staff or licensed deputies.

17         Q.   Okay.

18         A.   On this day, I was working one of those

19    shifts coincidentally in the jail that afternoon.

20         Q.   Okay.  Fair enough.

21              So the fact that you ended up working in

22    the jail later that day had nothing to do with the fact

23    that Ms. MacDonald was apparently going to be going into

24    the jail, correct?

25         A.   It was determined days, if not a week

1    prior.

2            Q.    Fair enough.

3                  Did you consider a lawyer taking a picture

4    of you in a courtroom a significant offense, sir?

5                       MR. TIMMERMAN:  Objection to the form

6    of the question.  The term "significant offense" is

7    vague and ambiguous.  You can answer, if you can.

8                       THE WITNESS:  I don't know what you

9    mean necessarily by "significant."

10   BY MR. PADDEN:

11           Q.    Was this really that big of a deal, sir?

12           A.    I don't know if you are looking for a one

13   to ten scale or if you just want to know in general is

14   it the largest crime I have ever observed?  I don't know

15   what you are asking me.

16           Q.    You know what, I think that's a fair

17   response.  How would you rate it on a scale of one to

18   ten in terms of criminal offenses?

19           A.    As far as at the courthouse, it would be a

20   pretty significant offense.  I mean it's something that

21   typically doesn't happen, and when it does, it's

22   something that we don't allow.

23           Q.    Okay.

24           A.    As far as a criminal offense that may occur

25   on patrol, it may not be that significant, but then

1  speak to it now, but at the time it was separated into

2  five areas.  There are three smaller holding cells, one

3  larger holding cell, and what we will refer to as an

4  intake area.

5          Q.   Okay.

6          A.   Ms. MacDonald was brought into the intake

7  area.

8          Q.   And then what happened next?

9          A.   That was when the continuation of the

10 citation occurred.

11         Q.   Okay.  And then what happened next?

12         A.   That was where, I believe it was Sergeant

13 Melton and I, and I don't recall if there was anyone

14 else involved, attempted to gain information from

15 Ms. MacDonald to complete the citation.

16         Q.   Okay.  And then what happened?

17         A.   After not giving us the information that

18 was requested, I believe at some point she was seated

19 in a holding cell.

20         Q.   Okay.  And what information was requested?

21         A.   The full name, date of birth and an

22 address.

23         Q.   Okay.  And she would not provide that?

24         A.   And I'm not sure if a phone number was

25 requested.  And no, she would not.

1          Q.    Alright.  Did you know her name?

2          A.    No.

3          Q.    You had no idea who she was?

4          A.    That's not 100 percent true either.  I knew

5    a name that she had used, I also knew several others.

6          Q.    Okay.  So it's your testimony that when

7    you -- did you ask the name or did Melton?

8          A.    I don't recall.

9          Q.    Okay.  But, nonetheless, when her name was

10   asked, is it your testimony that you did not know her

11   name?

12         A.    No, that's not my testimony.  My testimony

13   is I knew a name that she used.  I had also learned that

14   there was more than one that she had used.  And I didn't

15   know which one she used specifically, but I wasn't the

16   one completing the citation either, so.

17         Q.    Okay.  Melton was?

18         A.    Correct.

19         Q.    I'm a little confused.  I thought you said

20   earlier that you gave answers to the effect that you

21   barely knew who she was?

22         A.    No, I didn't say I barely knew who she was.

23   I knew who she was and I knew her name, but I had not

24   specifically had any interactions with her prior to this

25   day.

1          Q.    But as 9/12/13 it was your belief that this

2    woman had been known by other names, and not just one

3    name?

4          A.    It was I had heard, and I don't recall if

5    it was during this process, when they asked -- when her

6    name was asked of her, it was discovered that there was

7    more than one name.  I don't recall specifically when I

8    learned that information.

9          Q.    Okay.

10         A.    But I do know that that was eventually

11   given to me.

12         Q.    Okay.  Did you and Sergeant Melton have the

13   ability to ascertain what you were asking her from other

14   sources?  In other words, she wasn't providing it, but

15   could you have gotten it from other sources?

16         A.    Partially, and more than one version of the

17   same.

18         Q.    What does that mean?

19         A.    There would have been more than one

20   address, there would have been more than one name, there

21   most likely would have been more than one phone number.

22   All of those things we would have needed to determine

23   which one to use.

24         Q.    Okay.  Was that done?  Did you seek an

25   alternative source to get that information at that time,

1      to ask Melton?  Melton presumably would know that?

2              A.    I would imagine so.  I don't know that the

3      citation was ever formally completed.

4              Q.    Okay.  Who made the decision to bring her

5      back in the courtroom in a wheelchair?

6              A.    Ms. MacDonald.

7              Q.    Okay.  But didn't you guys put her in a

8      wheelchair?

9              A.    Not specifically, no.

10             Q.    How did she get into a wheelchair, sir?

11             A.    We stood her up from where she was, she

12     walked over to it and we sat her down.

13             Q.    And who brought the wheelchair over?

14             A.    I did.

15             Q.    Okay.  But who made the decision to put her

16     in a wheelchair?  I realize you may have physically

17     brought the wheelchair, but who made the decision to

18     bring the wheelchair into the mix?

19             A.    I did.

20             Q.    Okay.  Why was that, sir?

21             A.    Ms. MacDonald would not speak.  When asked

22     if she would go back to the courtroom, she would not

23     answer our questions.  When asked anything, she would

24     not answer, so --

25             Q.    Go ahead.

1          A.   She was -- I believe her presence was

2     requested back in the courtroom by the judge.  That the

3     trial, or whatever the proceeding would be labeled as,

4     needed to continue.

5               When we, meaning I don't specifically know

6     which one of us or all of us, had made comments to her

7     about the fact that this needed to occur, there was no

8     response.

9          Q.   Who was present at the time, sir, that that

10    was going on?

11         A.   What's "that"?

12         Q.   The process of the decision to bring her

13    back into the courtroom in a wheelchair and then you

14    mentioned that the judge wanted her back in the

15    courtroom, during that time frame?

16         A.   I don't recall who spoke to the judge, it

17    was just made aware to me that the proceedings needed to

18    continue.

19         Q.   Okay.

20         A.   So when that was related to Ms. MacDonald,

21    she was nonresponsive.  So our decision was in lieu of

22    carrying her to the courtroom, a wheelchair could be

23    used.

24         Q.   Who is the "our" part?  You said "our."

25    Who is the "our" part?  That means more than one person

1      I presume?

2              A.    I was there, involved in this situation.

3              Q.    Sure.

4              A.    It would have been myself, Sergeant Melton,

5      Deputy Napper.  I don't recall if there was anyone else.

6      I'm sure there were other people involved, but I don't

7      recall specifically.

8              Q.    Okay.  During that time frame how would you

9      describe Ms. MacDonald's demeanor?

10             A.    Nonresponsive.

11             Q.    Did she seem upset?

12             A.    Not terribly.

13             Q.    Did she seem surprised?

14             A.    Not terribly.

15             Q.    Was she crying?

16             A.    I don't recall.  I don't believe she was.

17             Q.    What's that?

18             A.    I don't recall, but I don't believe she

19     was.

20             Q.    I mean was she like catatonic or what?  I'm

21     trying to get an idea of what her demeanor was.  It

22     sounds like she wasn't responding, so.

23             A.    She would sit and stair blankly when

24     questions were asked of her.

25             Q.    Did she appear to be in a state of shock

1    from what you observed, sir?

2         A.   No.

3         Q.   Okay.  Well, how would you describe her?

4         A.   As someone sitting in a room, staring at

5    you when questions were asked of her.

6         Q.   Okay.  Sergeant Melton went into the

7    courtroom and was asked questions by the judge later.

8    And I have a transcript of that.  Okay?  I want to ask

9    you about this.

10             He said that, and I'm looking at Exhibit 4

11   from my client's deposition, Counsel, that -- I will

12   just read to you what it says.

13             And this is quoting Melton.  "I went up to

14   her during break and told her she was under arrest for

15   the offense of Contempt of Court.  Told her she was not

16   going to be handcuffed, we just needed to get her name,

17   date of birth and address for the ticket and she would

18   be released.  She had refused.  She is still refusing."

19   (Reviewing.)

20             Do you agree with what he said there, sir?

21        A.   Yes.

22        Q.   Was the offense of Contempt of Court the

23   taking of the picture?  Is that how it was labeled;

24   Contempt of Court?

25        A.   Well, for this offense, yes, sir.

1          Q.   Well, then he says, "I will give her a

2   citation and she will be released.  I will take her

3   camera as evidence to see and verify that pictures were

4   taken in the courtroom, but as soon as she gives me the

5   information, she will be released."  (Reading.)

6               That's what Melton said.  Do you agree with

7   that?

8          A.   That's my understanding.

9          Q.   So is the only reason that Michelle

10  MacDonald was not released was she refused to provide

11  her name, date of birth and address for the ticket?

12  Would you agree with that?

13         A.   Obstruction, yes, sir.

14         Q.   Okay.  So her refusal to answer those three

15  questions were not only why she was brought back in the

16  courtroom in a wheelchair, but also why she was detained

17  and held in the jail; is that correct?

18         A.   Correct.

19         Q.   Alright.  So if she provided those three

20  pieces of information, this whole situation doesn't

21  continue, correct?

22         A.   Correct.

23         Q.   Okay.  Are you familiar with the concept of

24  "deescalation," sir?  Do you know what that is?

25         A.   Yes.

1          We have these three, four, however many

2     different names, we'll use a combination of any one of

3     those, and tried to make a concession with her that way

4     to deescalate the situation.  We even, I think, agreed

5     at one point, "Okay, we'll use your office phone number.

6     An office number that we can pull off a court record

7     somewhere or off of a prior arrest record," or something

8     like that.  We could use that information.  We tried to

9     have those conversations with her, but again, we were

10    getting no response whatsoever.

11         Q.   When you said three or four names, how did

12    you know she had three or four names?

13         A.   After trying to look up exactly who she

14    was, we learned that there was more than one version of

15    her name.

16         Q.   Okay.  So somebody did look up from another

17    source what her name was, correct?

18         A.   Correct.  And I believe it was listed

19    somewhere on the Court documents for that day, and that

20    was different than a name that someone else had thought

21    she had.  So that was kind of, well, there is two now,

22    and started looking at other things, and there was

23    another one, and we learned that there was several

24    different ways that she used her name.

25         Q.   Sure.  But was that done with the

1   senior deputy in that group.

2          Q.   Okay.  Who was in that group that

3   physically brought her out?  Well, out was you and

4   Melton, correct?

5          A.   Correct.  And Deputy Napper was there, but

6   I believe he might have stayed in the courtroom as we

7   walked her out.

8          Q.   Okay.  And who brought her back in?

9          A.   I know I was there.

10         Q.   Okay.

11         A.   I know Sergeant Melton was there.

12         Q.   Okay.

13         A.   And I don't recall if Deputy Napper was

14   there or not.

15         Q.   Did you physically lift her up and put her

16   in a wheelchair?

17         A.   No.

18         Q.   How did she get in the wheelchair?

19         A.   So that's why I paused, because I'm trying

20   to think of a way to word it aside from "picked up,"

21   because "picked up" implies lifted as opposed to helped.

22         Q.   So what was it?

23         A.   She was seated on the stool in the holding

24   cell.  She was told that the proceedings needed to

25   continue.  Being the attorney of record in the

1   helped stand up.

2           Q.   Okay.

3           A.   At that point, once she was up and mobile,

4   she was able to walk herself the few steps and be seated

5   in the wheelchair.

6           Q.   Okay.  So she wasn't resistant, correct?

7           A.   Passively.

8           Q.   In what sense?

9           A.   She was refusing to cooperate with the

10  process unless she was physically assisted.

11          Q.   When she was put in the wheelchair, was she

12  then handcuffed?

13          A.   She may have been handcuffed already.  I

14  don't recall.

15          Q.   Okay.  Was she handcuffed to a device that

16  was around her waist?

17          A.   I don't know.

18          Q.   Well, when she went back in the courtroom,

19  sir, was she handcuffed?

20          A.   Yes.

21          Q.   Why was she handcuffed?

22          A.   She was in custody.

23          Q.   Okay.  So you put her in handcuffs because

24  she was in custody?

25          A.   Correct.

1          Q.    For the crime of taking a picture of you in

2    the courtroom?

3          A.    No.

4          Q.    What was the crime?

5          A.    Misdemeanor Contempt of Court.

6          Q.    Okay.  So, you had handcuffed her because

7    she had engaged in the crime of Contempt of Court,

8    correct?

9          A.    Correct.

10         Q.    Okay.  By taking the picture?

11         A.    Yes.  And I believe at this point we can

12   argue the instruction (phonetic), but the initial

13   offense would have been misdemeanor Contempt of Court,

14   correct.

15         Q.    Did you feel that she was a threat to

16   anyone physically?

17         A.    I don't recall.

18         Q.    Deputy, did you really need handcuffs?

19         A.    Yes.

20         Q.    Why?

21         A.    Policy.

22         Q.    Okay.  So that was the policy of the Dakota

23   County Sheriff's Department.  Tell me what that policy

24   was, sir.

25         A.    The Dakota County Sheriff's Office, when

1      they are in custody it's -- I should clarify whether it

2      is a policy or standard operating procedure or if it's

3      a type of order that we received directly from one of

4      the captains or commanders in charge of detention

5      services, but the standard practice, whether it's

6      derived from policy or from a directive, is when someone

7      is in custody, as a detainee of the Dakota County

8      Sheriff's Office and they are appearing in a courtroom,

9      they are handcuffed.

10           Q.   So was that decision made by you and/or

11     Melton?

12           A.   That decision was made for both of us by

13     the directive or the policy or the standard operating

14     procedure.

15           Q.   But I mean you didn't have to go outside or

16     nobody contacted somebody else to say if it's okay, you

17     just did that kind of unilaterally, correct, on your

18     own?

19           A.   We made the decision, either independently

20     or together, the decision was made by us.

21           Q.   And Judge Knutson had nothing to do with

22     that decision, correct?

23           A.   Not at all.

24           Q.   And Judge Knutson was not contacted at all

25     for this process that was going on?  In other words,

1      this decision to take her out of the courtroom, asking

2      her questions, the citation, the decision to put her in

3      a wheelchair, handcuff her, bringing her out into the

4      courtroom, Judge Knutson had nothing to do with that

5      ever, did he?

6             A.    I don't believe I ever specifically

7      contacted Judge Knutson about this at any point at all.

8             Q.    Although, at some point, as you were kind

9      enough to note earlier, Judge Knutson said, "We need her

10     back in the courtroom," correct?

11            A.    Someone had contacted Judge Knutson to let

12     him know what events had taken place during the recess

13     that had been taken in the courtroom, when Ms. MacDonald

14     was escorted out of the courtroom, that was during a

15     recess.  Presumably court would begin at some time.

16            Q.    Okay.

17            A.    And as Ms. MacDonald is still upstairs with

18     us, someone, whether it was Sergeant Melton or someone

19     else, would have contacted either the judge or someone

20     in the judge's courtroom or chambers to let him know

21     it is possible this recess may be longer than he had

22     initially intended when he left the courtroom.

23            Q.    Okay.

24            A.    I don't recall who did that and I don't

25     recall who they contacted.

1   related to this specific event.  That's the reason why

2   I'm asking.  Because you said it was a policy, and it's

3   really, this specific event, the answer would be no.

4           Q.   Okay.  Was this event unique?

5           A.   In what aspect?

6           Q.   You've got a lawyer trying a case, who is

7   now in a courtroom in a wheelchair and in handcuffs.

8   Isn't that unique?

9           A.   That is unique, yes.

10          Q.   Was it the policy in a situation like that,

11  if in fact a policy existed, for a member of your agency

12  to be present in the courtroom with that person?

13          A.   Again, there is no policies specifically

14  regarding this incident or instances where attorneys are

15  handcuffed and in wheelchairs in the courtroom.

16               What I can tell you is, if someone is in

17  custody and detained by the Dakota County Sheriff's

18  Office for whatever reason, and they are appearing in

19  front of a judge in a courtroom, they will be handcuffed

20  and there will be a deputy with them.

21               Does that help?

22          Q.   It does.  No, I appreciate that, sir.

23  Thank you.

24               But the notion of a lawyer, being back in

25  the courtroom, in a wheelchair and handcuffed, who was

1    trying a case earlier, that had never happened in your

2    experience before, had it?

3          A.   Not in my experience, no.

4          Q.   Okay.  Were any of her personal possessions

5    taken away from her before she came back into the

6    courtroom other than the camera?

7          A.   Yes.

8          Q.   What?

9          A.   All of them.

10         Q.   Meaning jewelry?

11         A.   Well, your question was personal

12   possessions; that's pretty broad, sir.  So, when we left

13   the courtroom with her, the people she was with gathered

14   all of her personal possessions out of the courtroom and

15   left.

16         Q.   Why did they do that?

17         A.   I have essentially no idea.

18         Q.   Were they told to do that by any member of

19   your agency?

20         A.   No.

21         Q.   Okay.  Are you sure of that?

22         A.   I'm one hundred percent positive.

23         Q.   Okay.  So they just left on their own,

24   correct?

25         A.   I don't know why they left.  I just know

1    concerned, correct?

2          A.    No.

3          Q.    Well, what do you call it then?

4          A.    The purpose of Ms. MacDonald leaving the

5    courtroom was to issue her a citation and return her to

6    the courtroom.

7          Q.    Well, at some point was she considered to

8    be in custody?

9          A.    Yes.

10         Q.    When?

11         A.    When she refused to cooperate with the

12   process and it became clear that continued detention was

13   needed.

14         Q.    Was that when her jewelry was taken?

15         A.    Yes.

16         Q.    And was that also when her cell phone was

17   taken?

18         A.    Yes.

19         Q.    Was the intention at that time, sir, by

20   taking her jewelry and her cell phone, for example, that

21   when the court day was over, she was going to go to

22   jail?

23         A.    No.

24         Q.    Okay.  Well, when was the decision made

25   that she was going to go to jail?

1          A.   When she continued to refuse to cooperate
2     with the process.
3          Q.   And it was the answers to those three
4     questions that she didn't provide?
5          A.   Correct.
6          Q.   I didn't ask you this question and I want
7     to ask it.
8               When you first took her out of the
9     courtroom, you and Sergeant Melton, did she resist?
10         A.   I would say yes.
11         Q.   How?
12         A.   It was pretty clear she didn't want to go.
13    She wanted to stay in the courtroom.  She wanted other
14    people to come with her, and that wasn't an option.
15    So I belive at some point Sergeant Melton had to either
16    put one hand on her arm or one on her back or her
17    shoulder and guide her towards the door.
18              I know at least at one time she turned back
19    towards the people she was with and said something.  I
20    don't know if it was in relation to leaving or not
21    wanting to leave or "Come with me."  What was said, I
22    don't know.
23         Q.   Did you tell her why she was being taken
24    out of the courtroom?
25         A.   Yes.

1          Q.    What did you say?

2          A.    Oh, me specifically?

3          Q.    Yes.

4          A.    I don't know if it was me specifically.  I

5    believe it was Sergeant Melton.

6          Q.    Did you hear what he said, sir?

7          A.    I know that it was something to the effect

8    of, "Our intention is to bring you back to our bailiff

9    station, issue you a citation and return you promptly

10   back down here."  As far as the exact words, I do not

11   recall, but I know that throughout this entire process,

12   that was our initial intention and that would have been

13   conveyed to her.

14         Q.    When that was conveyed to her in the

15   courtroom did she respond?

16         A.    I don't recall what she said.  Again,

17   that's Sergeant Melton had a conversation with her, so

18   any responses would have been directed to him.

19         Q.    I know but you were standing right there,

20   weren't you?

21         A.    I don't know.  Again, like I told you

22   earlier, I don't know if we were shoulder to shoulder

23   the entire day.  I may have been standing over with some

24   of the people she was with, I may have been over closer

25   to the door that we were going to be leaving out of.

1    I don't recall where I was standing in relation to

2    Sergeant Melton.

3         Q.   Have you seen any video regarding this

4    incident, sir?

5         A.   I believe I watched the holding cell video

6    from the upper level bailiff station area.

7         Q.   Did you ever see the courtroom video?

8         A.   No.

9         Q.   Did you review any documents in preparation

10   for your deposition today?

11        A.   I reviewed my statement.  I believe it's

12   this document, my statement in the courtroom.  I did

13   review that, sir.

14        Q.   The transcript?

15        A.   Yes.

16        Q.   And you didn't review your report because

17   you never prepared one, right?

18        A.   I read Sergeant Melton's report but I did

19   not write one, no, sir.

20        Q.   Fair enough.  Who was it that looked at her

21   camera?

22        A.   I know I looked at it.  I know Sergeant

23   Melton looked at it.

24        Q.   Did you have a warrant?

25        A.   No.

1          Q.   Why didn't you get a warrant?

2          A.   Why didn't I get a warrant?

3          Q.   Yes.

4          A.   I wasn't the one dealing with the warrant

5     and the permission for the search of the camera.

6          Q.   Do you know why Melton didn't get a

7     warrant?

8          A.   He got a verbal Court Order instead.

9          Q.   Okay.  So the judge said, "Go ahead and

10    look at the camera"?

11         A.   That's not a fair representation.  I wasn't

12    there during that conversation, so I don't know the

13    words that were said.

14         Q.   So Melton would be the person to talk to

15    about that?

16         A.   Correct.  He was the one that had the

17    conversation with the judge.

18         Q.   Okay.  Were her glasses removed from her

19    face, sir?

20         A.   Yes.

21         Q.   Why?

22         A.   All property is removed from people when

23    they are arrested and placed in jail.

24         Q.   Were you aware of the fact that when she

25    was going to be taken back into the courtroom that she

1    was going to have to continue to try her case?

2           A.   Yes.

3           Q.   But that didn't matter to you?

4           A.   It's a pretty broad statement.  Could you

5    be a little more specific?  Which parts?

6           Q.   Well, she is apparently somebody who needs

7    glasses, right?

8           A.   I don't know if she needs glasses or not, I

9    know she had them on her face.

10          Q.   Okay.  But when you brought her back in the

11   courtroom was it your understanding that this attorney

12   was going to continue to litigate her case or did you

13   not have an understanding in that regard?

14          A.   I did believe that she would need to

15   continue.  I believe it was, again, like I stated, at

16   some point there was a conversation that someone had

17   with the judge about her needing to come back in the

18   courtroom and that her case needing to continue.  So I

19   did know that that was a possibility.

20          Q.   But nobody in your agency asked the judge

21   if it was okay to bring her in the courtroom without her

22   glasses, right?  That was a decision that you guys made,

23   right?

24          A.   No.

25          Q.   Did you ever ask Ms. MacDonald, "Are you

1   going to need your glasses to be able to handle court in

2   the afternoon?"  Or is that a question that just never

3   came up?

4          A.    Yes.

5          Q.    Who asked that question?

6          A.    I did.

7          Q.    When?

8          A.    When we were bringing her down into the

9   courtroom.

10         Q.    Okay.  And what was her response?

11         A.    There was none.

12         Q.    And, sir, you know that the surveillance

13   system in the holding cell area and in the courtroom

14   unfortunately doesn't have audio, correct?  You can just

15   see things, but you can't hear things, correct?

16         A.    I don't know that I knew those areas had no

17   audio, no, sir.

18         Q.    As of 9/12/13 were you aware that the

19   surveillance system in the courthouse did not have the

20   ability to do audio?  You could only see things where

21   you were?

22         A.    I know that I had watched camera footage

23   from areas of the Government Center in the past and I

24   have watched videos that have not had sound.

25         Q.    Okay.

1    she?

2           A.   We are probably about the same size,

3    generally speaking.

4           Q.   Okay.  Did you have the discretion to let

5    her go at the end of the court day?

6           A.   It was not my decision.

7           Q.   Whose was it?

8           A.   Sergeant Melton's.

9           Q.   Okay.  When was she first given an

10   opportunity to make a phone call, if you know?

11          A.   I don't know it she ever asked me to make a

12   phone call, so I don't know when that would have been

13   provided to her.

14          Q.   Did you ever ask her if she had a purse in

15   the courtroom?

16          A.   I know that there was some reference to a

17   purse made in one of the -- in the transcript that I

18   reviewed.  I believe watching the footage back of her

19   items being removed from the courtroom, when we noticed

20   they were gone, someone went and watched that footage

21   to determine how they had disappeared while we were

22   upstairs with Ms. MacDonald.  And I believe that was

23   when it was noticed that her purse was one of the items

24   removed.

25               Before that, watching that video and seeing

1    to the second floor, right?

2         A.   Yes.

3         Q.   Okay.  So, is it possible for a judge then

4    to have walked by during that process?

5         A.   I'm sorry, when you asked me the question,

6    I thought you were talking about the upper level bailiff

7    station holding area and I apologize.

8         Q.   It's okay.

9         A.   Is it possible to have seen another judge

10   in the secure hall that the judge's have access to while

11   we walked her from one place to another?  Yes.

12        Q.   Did that happen?

13        A.   Not that I recall.

14        Q.   Okay.  Fair enough.

15             Were you present when the mugshot was taken

16   of Ms. MacDonald in the jail?

17        A.   I was.

18        Q.   Okay.  Did anybody say anything about how

19   she looked before that picture was taken?

20        A.   No.

21        Q.   Did anybody say words to the effect of,

22   "You look beautiful," before that picture was taken?

23        A.   No.

24        Q.   Why was a mugshot taken of her?

25        A.   She was in jail.

1          A.    I have absolutely no idea.

2          Q.    Okay.  You have no idea what your weight

3    is?

4          A.    I know what my weight is now, but I don't

5    know what it was then.

6          Q.    What is your weight now, if you don't mind

7    me asking?

8          A.    I do.

9          Q.    You do mind?

10         A.    I do mind.

11         Q.    You won't tell me what your weight is?

12         A.    I don't know that I have to, but I can tell

13   you that I am less than 200 and more than 150.  It is

14   somewhere in between there.

15         Q.    Okay.  Alright.  What time did your work

16   shift end that day, sir?

17               MR. TIMMERMAN:  Could I just clarify?

18   I think he has testified already about his work shift on

19   9/12 at the courthouse.  Are you talking about his work

20   shift at the jail in the evening?

21               MR. PADDEN:  Yes, jail.  Thanks.

22         A.    I don't know.  It is all documented, but I

23   specifically right now couldn't recall.

24   BY MR. PADDEN:

25         Q.    But I think you said, sir, that you came

1    back at 6:00 or 6:30.  I don't want to misquote you.

2         A.   No, what I actually said was I don't recall

3    if I went straight from the end of my shift around 4:30

4    into the jail, but I said that I know for sure that I

5    would have started by 6:00.

6         Q.   Okay.

7         A.   Because the shifts in the jail are 12-hour

8    shifts and they run from 6:00 to 6:00.  So I would have

9    needed to be there for those minimums we discussed

10   earlier, starting at 6:00.  However, there are times

11   when they are busy and I get down to the courthouse at

12   4:30, and if I called in there and I said, to a

13   supervisor in the jail, if they needed help right now,

14   and they may say, "We do. You can either wait until 6:00

15   or you can come now," again, I don't recall which one of

16   those things took place, but I know I would have been

17   there by 6:00.

18              I can tell you that I believe I worked the

19   next day, so I would probably not have stayed much past

20   1:00ish.

21        Q.   Fair enough.  It sounds like you had a long

22   workday that day, correct?

23        A.   Not terribly longer than on most days, no,

24   sir.

25        Q.   Okay.  But when Judge Wermager issued an