# Police and Jail Procedures, Inc.

### Richard Lichten, CLS

January 16, 2017

Mr. Michael B. Padden, Esq.
Padden Law Firm, PLLC
Eagle Business Park
8673 Eagle Point Boulevard
Lake Elmo, MN  55042

Dear Mr. Padden:

Regarding: Rule 26 report for the case of:

Michelle MacDonald, Shimota and Thomas G. Shimota, Plaintiffs,

V.

Bob Wegner, individually, and in his official capacity; Christopher Melton, individually, and in his official capacity, Timothy Gonder, individually, and in his official capacity, Jon Napper, individually and in his official capacity, Daniel Fluegel, Fluegel Law Firm P.A., Dakota County, and John and/or Jane Does 1-19, Defendants

Case number: 0:15-cv-01590-JRT-JJK, in the United States District Court, District of Minnesota.

## Introduction:

I have been retained as an expert in the above case.

I am a thirty year law enforcement veteran.  Twenty of my thirty years were in supervisor and management positions.  I have 30 years of experience in patrol, detectives, narcotics, and large jails (over 4,000 inmates).  I have investigated crimes that occurred in patrol and in the jails including experience responding, handling, and supervising calls involving mentally ill persons.  In my career as a sergeant and watch commander I have amassed years of experience in analyzing use of force by my subordinates in patrol and in the jails to determine if the force used was proper, reasonable, and within policy.  I have held many in-service emergency response training sessions in jails and in patrol. I have commanded scenes at officer involved shootings and have been involved in the shooting investigation process. I have lectured to the American Jail Association in other states about inmate riots, removal of hostile inmates from their cells, less than lethal weapons, and other jail emergencies.

EXHIBIT

I have also lectured to the LASD Supervisor Jail Incident Command School on the handling of major inmate disturbances (riots) and other emergencies, including medical emergencies.

I have expertise in the manufacture, possession, and use of jail/prison-made weapons. I am a requested lecturer to investigator and attorney groups in the area of police use of force in patrol and in the jails.

I have testified as an expert in United States District Court and in California and Nevada state courts in:

> Use of force   (California, Arizona, and Federal District Court)
> Use of the TASER   (California and Arizona Courts + in a Published Opinion)
> Police practices   (California, Nevada, and in Federal Courts)
> Arrest Warrant Operations   (Nevada Courts)
> Exigent v. Non-Exigent police entry (California Courts)
> Citizen's right to resist excessive force by the police (California Courts)
> Citizen vs. citizen self defense (Nevada Evidentiary hearing)
> Emergency Vehicle Operations   (California Courts)
> Narcotics (California and Nevada Courts)
> Sexual assault investigations   (Federal Courts)
> Evidence collection in firearms cases   (California Courts)
> Use of private security guards   (California Courts)
> Prison inmate culture:   (California and Federal Courts)
  - Jail-made weapons  (carrying, using, and manufacture)
  - Gang vs. non-gang attacks on staff
  - Contraband and other topics
  - Food service – safety concerns (Federal Courts)
  - Safety checks and California Title-15 safety checks (Federal Courts)
  - Sick call and inmate refusing medical care (Federal Courts)
  - Solicited v. non-solicited inmate reading material (Federal Courts)
  - Possession of drugs for sale vs. personal use in state prison (CA Ct)

I have been accepted as a police practices expert by the Los Angeles County Superior Court Committee of Superior Court Judges who have been appointed to maintain a Panel of Expert Witnesses. I am a member of the Public Defender's Office police experts' databases in Riverside County, San Bernardino County, San Diego County, Kern County, and Orange County. I am a member of the Federal Court Defender's office police experts' database. I have lectured many public defenders in various counties about the use of force and other topics including the use of the Taser and jail topics as well.

I have earned the designation of Certified Litigation Specialist (CLS) from the Americans for Effective Law Enforcement (AELE). The Americans for Effective Law Enforcement was formed in 1966 and opened the Law Enforcement Legal Center in 1973. AELE is a research driven educational organization that produces and disseminates legal information through traditional seminars, via electronic media, and direct contact. I received my certification after completing the following litigation-related required training in:

> ➤ Lethal and Less Lethal Use of Force
> ➤ Arrest-Related, Excited Delirium, Sudden In-Custody Death, Jail Suicide
> ➤ Management, Oversight, and Monitoring of Use of Force, including ECW (TASER) Operations and Post-Incident Forensics
> ➤ Discipline and Internal Investigations

The Institute for the Prevention of In-Custody Deaths (IPICD) certified me as an instructor in the <u>Prevention and Management of Suicide</u> in Law Enforcement (both in patrol and in the jails). The Institute for the Prevention of In-Custody Deaths (IPICD) certified me as an instructor in Excited Delirium and Agitated Chaotic Events, Recognition Responding, Managing, and Investigating Arrest-Related and Sudden, In-Custody Deaths. I have experience in jail suicide prevention, responding to, and investigating attempted as well as completed jail suicides.

I have considerable experience in day to day jail operations in large county jails with average daily inmate counts from 1,500, to 5,000, inmates. The jails I have been assigned to are medium to maximum security jails with upwards of 200 sworn and civilian staff per shift. I have experience as the jail risk manager.

As a jail sergeant and lieutenant, I have experience in developing and/or overseeing jail policies and procedures. These include, but are not limited to, jail intake procedures, classification process (including upgrading inmate security levels to administrative segregation and housing area racial demographics), housing of inmates and protecting inmates from harm by other inmates (PC inmates), mitigating feint inmate suicide attempts, and handling violent inmates with the goal of reducing use of force. I have experience in ensuring that mandated security checks and inmate medical care policies and procedures were followed. As part of my daily duties as a jail watch commander was to spot check various inmates to make sure they were properly classified.

As a lieutenant, I have lectured to the American Jail Association annual convention in other states and to the LASD Supervisor Jail Incident Command School on polices and procedures for handling major inmate disturbances (riots) and other emergencies, including medical emergencies.

My use of force and Taser use expert testimony was cited in the May 30, 2012, published opinion of the Court of Appeal of the State of California, Second Appellate District, Division Eight, Alma Mendoza v. City of West Covina, et al., B227812, (Los Angeles County, Superior Court. Number: BC387119).   In this opinion, the judgment was affirmed.

Unless otherwise indicated I assume that the evidence and circumstances as presented by the defendants, plaintiff and witnesses are correct, based on their sworn statements and testimony under penalty of perjury. I also assume that unsworn statements made by the plaintiff, defendants, and witnesses are correct unless otherwise indicated.

After careful evaluation of all the evidence and circumstances that are known to the defendants, plaintiff, and witnesses at the time of this incident, I formed a number of opinions as to the actions of the personnel involved in this case and procedures and accepted practices that were and were not followed in this case.

I based my opinions on the materials I have identified. I applied my training, knowledge, and experience concerning proper police/jail practices in considering the evidence. My opinions are expressed to a reasonable degree of professional certainty or probability.

Pursuant to the requirements of Rule 26, I have studied the reports and other material provided to me and listed them below regarding this case. Please be advised that if there are any additional depositions, investigations, policies, reports, memos, video recordings, photos, or other materials produced in this case, a supplemental report may be necessary; thus I reserve the right to supplement my opinions and/or this report.

## Retention:

On November 25, 2016, I was retained by attorney Mr. Michael Padden on behalf of the plaintiffs. I was asked to review documents and render expert opinions about this case.

## Primary opinions:

Based on my understanding and my review of the listed materials, my primary opinions are:

## Opinion #1:

- Deputy Gonder and Sergeant Melton had the capability to issue a citation to the plaintiff instead of bringing her to the jail where she spent the night.

- o Because there was sufficient information available to issue the plaintiff a citation and because there was also the likely ability to forgo the citation process entirely and simply seek a criminal charge via the filing of a police report, in all probability it was the intended aim of Deputy Gonder and Sergeant Melton to keep the plaintiff in custody.

- o Keeping the plaintiff in jail when she could have been released on a citation was unreasonable, unnecessary, and below the professional standard of care expected of a professionally trained, reasonable deputy and sergeant.

## Opinion #2:

- Correctional Deputy Dillard and Corporal Byrd had the capability to issue a citation to the plaintiff instead of keeping her in jail.

  - o Because there was sufficient information available to issue the plaintiff a citation in all probability it was the intended aim of Correctional Deputy Dillard, Corporal Byrd, and possibly other jail staff to keep the plaintiff in custody.

  - o Keeping the plaintiff in jail when she could have been released on a citation was unreasonable, unnecessary, and below the professional standard of care expected of professionally trained, reasonable correctional deputies and corporal.

## Opinion #3:

- Unless there are objective reasons why the plaintiff's roll of toilet paper, mattress, and possibly her pillow were taken away; and unless there are objective reasons why the plaintiff was not given a blanket, then the plaintiff's treatment in jail would be unreasonable, unnecessary, excessive, and below the professional standard of care expected of a professionally trained, reasonable deputy.

## Opinion #4:

- Since the plaintiff was photographed and fingerprinted and since her identity was known to the jail staff at intake, coupled with the fact that the plaintiff was issued a booking number and Jacket ID number, there was no reason not to allow the plaintiff access to a telephone to call her loved ones and arrange bail or bond.

o  Not allowing access to a telephone in this case was unreasonable,
   unnecessary, excessive, and below the professional standard of
   care when a prisoner processes into a jail.

Opinion #5:

▪  Unless there are objective reasons why the plaintiff could not simply be
   released from the courtroom at the time the judge ordered her released,
   then bringing her back to the jail and keeping her in custody for hours
   before finally being released would be unreasonable, unnecessary,
   excessive, and below the professional standard of care expected of
   professionally trained, reasonable deputies.

Opinion #6:

▪  If the Dakota County Jail must follow the United States Department of
   Justice Prison Rape Elimination Act, or what is commonly called PREA,
   then the jail is in violation of the PREA rules as there is no evidence the
   plaintiff was assessed or educated about PREA at her intake.

**Summary of the Plaintiff's version of this incident :**

The plaintiff contends in her complaint that this incident began on September 11,
2013, wherein the plaintiff, attorney Ms. Michelle MacDonald (herein referred to
as the plaintiff), filed an action against a Dakota County judge at the Dakota
County Courthouse located at 1580 Highway 55, Hastings, MN.

On September 12, 2013, the plaintiff was called to that judge's courtroom where
the defendant Dakota County deputy sheriffs handcuffed and detained the
plaintiff for hours at the courthouse and a courthouse holding cell.  The plaintiff
was then transported in a wheelchair to Dakota County Jail where she spent the
night.  The next day, on September 13, 2013, in the late afternoon, another judge
ordered the plaintiff released from custody.  The plaintiff contends she was
released hours later.

The plaintiff contends she was subjected to a number of abuses by the deputies
at the courthouse and at the jail.  Among the abuses identified by the plaintiff
include but are not limited to the following:

**While inside the courtroom:**

▪  On September 12, 2013, before court was in session, the plaintiff took a
   photo of defendant Deputy Gonder while the plaintiff was inside the
   courtroom.  The plaintiff contends taking photographs when court *was not*

*in session* was not a violation of law and contends there was no rule prohibiting taking cameras into the courthouse.

- The plaintiff contends deputies illegally seized and searched her camera and then illegally seized and detained her in a holding area next to the courtroom and was subsequently placed in a solitary cell without warning or apparent cause. The plaintiff's cell phone was also seized.

- The plaintiff maintains the deputies were retaliating against her for criticizing and filing a lawsuit against Judge Knutson.

- The plaintiff contends Judge Knutson ordered the deputies to bring her back into the courtroom. The deputies brought the plaintiff into the courtroom in a wheelchair with her hands handcuffed to a waist belt.

- The plaintiff contends when the judge took the bench, he instructed the plaintiff to either enter a default on her client's behalf or continue the trial. The plaintiff contends she was forced to conduct court business in handcuffs attached to her waist throughout the day, even after the lunch break.

- The plaintiff contends that after the trial concluded on September 12, 2013, she was further detained by the deputies without ever being booked on any criminal charge.

## While at the jail:

- The plaintiff contends that from the courthouse she was wheeled in a wheelchair through a tunnel to the adjacent jail. The plaintiff was still handcuffed to her waist.

- The plaintiff contends she was not allowed the opportunity to be released on bond or bail.

- The plaintiff contends that once at the jail she was placed into a solitary cell where she remained over night. The plaintiff contends that during that night the cell's toilet paper, mattress, and pillow were removed by defendant Deputy Gonder. The plaintiff contends she was shown blankets, but was not provided a blanket.

- The defendants contend that she was placed in solitary because she would not say whether or not she had tuberculosis.

MacDonald, et al, v. Dakota County, et al. Civil No. 0:15-cv-01590-JRT-JJK (Minnesota)
Expert report by Richard Lichten, CLS, dated January 16, 2017

7

- The plaintiff contends she was told by the staff at the jail that she would not be able to make a telephone call until after she was booked.  The plaintiff contends since she was never booked, she was not permitted to make a telephone call.

- The plaintiff contends she was threatened with being strip searched (in a custody setting this means striped naked and seached), placed in a straight-jacket, and being put into a padded cell.

- The plaintiff contends that she told the deputies at the jail that she was suicidal so they would stop causing her distress.

- The plaintiff maintains she was never issued a citation for any criminal contempt of court or any other criminal charge.

## While inside the courtroom the next day:

- On September 13, 2013, the plaintiff, while in handcuffs and in a wheelchair, was brought before Judge Tim Wermager.  The plaintiff contends the judge signed an order to have her released immediately.

- The plaintiff contends that instead of being released at once, the deputies sought advice from the defendant Fluegel Law Firm while she remained in custody.

## The plaintiff is returned to jail and later released:

- The plaintiff contends the deputies threatened her with more time in jail and *then brought her back to a cell.*

- The plaintiff contends that after she was brought back to a jail cell, she was then released.

- The plaintiff contends that once she examined her jail property bag, she noted her camera and jewelry were missing among other items.

- The plaintiff contends that inside her property bag was a citation for contempt and obstruction of justice and a calendar that she maintains the defendant deputies had slipped into her bag without her knowledge.  The contempt charge was for taking a photograph within the courtroom. This citation was never signed by the plaintiff.

## The plaintiff's constitutional rights had been violated:

- The plaintiff contends that Judge Lesie Metzen determined that her constitutional rights had been violated and dismissed the criminal charge against her. The judge also ordered her camera to be returned but that did not occur until after her federal lawsuit was field.

## Summary of the Defendant's version of this incident :

According to the September 12, 2013, incident report written by Sergeant Chris Melton, he stated Deputy Tim Gonder reported to him that the plaintiff in courtroom 1F had taken a photograph of him while he was going into the courtroom. Sergeant Melton's report states the following:

## While inside the courtroom:

- After Deputy Gonder had his picture taken, he approached the plaintiff while the plaintiff was at the counsel table and told her that she was not allowed to take photos inside of the courtroom. Deputy Gonder then seized the camera. See item 4.

- Sergeant Melton and Deputy Napper entered the courtroom at 0916 hours and took possession of the plaintiff's camera from Deputy Gonder. Sergeant Melton stated he then spoke with Judge Knutson and asked him for a verbal court order to look at the photos. Once the judge gave the verbal order, Sergeant Melton turned on the camera and saw the photo that had been taken by the plaintiff.

- Sergeant Melton approached the plaintiff inside of the courtroom, gave her a copy of the Minnesota Court Rule 4.01. During this time the plaintiff had her cell phone in her hand and Sergeant Melton asked her if she was recording the conversation. The plaintiff stated she was not and stated she was going to take pictures with her cell phone. She stated she was taking photos for her own court record.

- Deputy Gonder took the plaintiff's cell phone from her and handed it to Sergeant Melton who told her he would hold on to it until the court proceeding was over. The plaintiff asked the sergeant what would happen if she took more photos and the sergeant told her she would be arrested for violating the contempt statute.

- Sergeant Melton stated he spoke with Judge Knutson and informed the judge that the plaintiff was in violation of the court statute for taking

pictures in the courtroom. Sergeant Melton told the judge he would issue the plaintiff a citation for the misdemeanor offense.

- Sergeant Melton reported that Deputy Napper had told the plaintiff to leave the courtroom due to her being disruptive. The plaintiff and her client, Ms. Grazzinei-Rucki, did leave when asked and then returned to the courtroom a few minutes later to conduct the trial.

- During a court recess Sergeant Melton contacted the plaintiff and told her she was under arrest for contempt of court and was told she would be receiving a citation and would then be released.

## The plaintiff is taken out of the courtroom and into a holding area:

- Sergeant Melton stated the plaintiff refused to go to the back hallway with him (to be cited out) and then stood closer to her client. Sergeant Melton took the plaintiff by the hand and escorted her to the courtroom holding area. At this time, the plaintiff's client packed up the court files and left the courtroom.

- The plaintiff refused to provide her full name and date of birth, etc., despite being asked many times by the sergeant and other deputies. The plaintiff was told she would be released as soon as she supplied her information. She still refused. Sergeant Melton stated he tried to get her information from the Department of Vehicles; however, he was not able to accurately determine the plaintiff's full legal name.

- When it came time to appear in court, the plaintiff refused to go because she stated she was under arrest. The plaintiff again was told she would be released as soon as she provided her information and she still refused. Sergeant Melton stated he and Deputy Napper had to place her in a wheelchair and wheel her into the courtroom.

- The plaintiff remained in the courtroom in the wheelchair and in a handcuff belt while court was in session. During the lunch break she refused to eat the lunch that was given to her. Sergeant Melton stated the plaintiff refused to allow him to remove her handcuff belt. Sergeant Melton stated the plaintiff told him that she had to use the bathroom but refused to stand up so her handcuff belt could be removed. She was wheeled back into the courtroom. More attempts were made to get her to cooperate but she still refused.

- At 1440 hours, because the court proceeding was over and because the plaintiff still refused to give her name, etc., she was transported in a wheelchair to the jail to be booked.

## While at the jail:

According to the September 12, 2013, incident reports written by Dakota County Correctional Deputies S. Dillard and Daniel Hoover, they were assigned to the intake area when the plaintiff was brought in my Deputy Gonder. The reports by Correctional Deputies Dillard and Hoover state the following:

## During the plaintiff's intake and placement into a jail cell:

- The plaintiff refused to answer questions about her identification and refused to stand up to be patted down. She had to be patted down while in the wheelchair after he handcuff belt was removed.

- The medical staff tried asking her questions about any medical concerns or about possible TB infections. The plaintiff refused to answer any questions. Because she would not answer questions about whether or not she had TB, she was placed in a negative pressure room to prevent the spread of possible TB. The plaintiff was told she would be able to make a phone call once the booking process was completed.

- Deputy Hoover was able to obtain the plaintiff's positive identification.

- The plaintiff asked if she could leave and was told that she would first have to complete the booking and intake process.

- The plaintiff refused to eat her dinner which was served to her at 1700 hours.

## My analysis, basis, and findings for my opinions:

## Plaintiff MacDonald's deposition:

## The identification of the plaintiff:

1. On page 41 of the plaintiff's deposition she stated that when Sergeant Melton asked her for her name, she told him that he knows her name.

2. The plaintiff stated that when asked if the sergeant told her she would be released on a ticket, she replied that the sergeant did not explain it that way.

---

3. The plaintiff stated she did not give her name to the defendants but did announce her name in court.  See page 42:23.

4. On page 43, the plaintiff stated she did not give her date of birth or address to the defendants.

5. On page 44, the plaintiff was asked if she was told that she would be released as soon as she gave her information needed for the citation and the plaintiff replied that she does not recall having been told.  The plaintiff did state that they were "almost trying to negotiate" with her.

<u>The wheelchair issue:</u>

6. On page 82, the plaintiff was asked about her refusing to stand and walk (from the holding cell back to the courtroom) and the plaintiff stated that she was under arrest and was immobilized.

7. On page 84 and 85 that she did not remember if she could stand or walk but does remember being in a state of immobilization and in shock.  She does not know why a wheelchair was brought in.

<u>During the booking process at the jail:</u>

<u>Refusal to answer booking questions and her placement in the negative pressure room:</u>

8. The plaintiff stated on page 123 that it was probable that she refused to answer questions at the jail and she added that she was not talking sometimes and was crying.

9. On page 125 the plaintiff stated she does not remember if she was asked if she had tuberculosis and does not remember being told she was going to be placed in the negative pressure room.  The plaintiff does recall a female deputy leaving a mattress in the cell for her.

   9.1. Note: I have not been provided any intake booking forms or any medical intake booking forms and/or records to review.

<u>The negative pressure room was freezing:</u>

10. On page 130 of the plaintiff's deposition she stated that the room was freezing cold and "that somebody must have done something.  It wasn't as cold as when I first got in there.  It froze.  It became more cold [sic]."

**The plaintiff's toilet paper was taken from her:**

11. The plaintiff explained on pages 148 – 151 that she used toilet paper to wrap herself in to keep warm. The plaintiff stated that they took her mattress and all of her toilet paper from her and did not give her a blanket. The plaintiff added she used the toilet paper to wrap around her head so she could not see due to the lights being bright.

   11.1.   In my years of jail experience I have seen inmates cover their eyes with toilet paper blindfolds. This is not uncommon.

**The plaintiff's mattress was taken from her:**

12. On page 154-156 the plaintiff stated that when Deputy Gonder returned her from having her photo taken he or someone else took her mattress out of her cell. The plaintiff stated the removal of her mattress was on purpose. The plaintiff stated she does not recall about having a pillow.

   12.1.   If the Dakota County Jail has policies and procedures about the use of the negative pressure room that states mattresses and blankets are not allowed, I request to see a copy of the policy.

   12.2.   Unless there was justification to remove the mattress and withhold a blanket, doing so would be unreasonable, excessive and below the standard of care expected of professionally trained reasonable deputies.

   12.3.   There is no mention of mattress removal on the cell check log.

**The talk of suicide:**

13. On pages 172 - 173, the plaintiff stated the jail staff thought she was going to commit suicide. When asked why the staff would think that, the plaintiff stated she felt the staff would treat her better if she was said she was suicidal.

14. The plaintiff stated she was told if she was suicidal she would be stripped down (naked) and placed in a straight-jacket.

15. When she was asked if she was suicidal, she stated, "What if I was?"

16. Based on my background and experience in preventing and responding to jail suicides, it would not have been unreasonable for the jail staff to consider an

inmate who responded as the plaintiff responded to possibly having suicidal ideation. If that was indeed the case, then I would expect to see documentation from the jail.   See the section later in this report about the plaintiff's talk of suicide.

## Deputy Gonder's deposition:

### The plaintiff is escorted out of the courtroom:

17. According to Deputy Gonder's deposition on page 40, he knew it was against the law to take photos inside of the courthouse.

   17.1.   I am not opining on whether or not the plaintiff was guilty of the crime of contempt of court - taking a photograph inside of the courtroom. The court will instruct the jury on the law and the jury will resolve this issue.

18. Deputy Gonder stated that Sergeant Melton told him to escort the plaintiff out of courtroom 1-F to the upper level bailiff station for issuance of the citation.

19. The reason the plaintiff was taken out of the courtroom was to avoid a disruption in the courtroom.

20. Deputy Gonder stated the plaintiff was not placed into a holding cell at that time. Page 10-12 and 31-33.

   20.1.   It was reasonable to have the plaintiff step out of the courtroom so she could be issued a citation. Issuing a citation inside of the courtroom could have delayed other court business as well as possibly embarrassed the plaintiff in open court.

### The plaintiff was seated in a holding cell:

21. On page 45 of Deputy Gonder's deposition he stated that he and Sergeant Melton attempted to gain the needed information from the plaintiff for the citation but the plaintiff would not provide the information so at that time she was placed inside a holding cell.

   21.1.   Deputy Gonder stated on page 46 that he knew who the plaintiff was and knew she had more that one name. Deputy Gonder stated on page 48 that while he did not have the ability to use a computer to verify the identity of the plaintiff, Sergeant Melton did have the ability to use a computer.

**The plaintiff was not issued a citation:**

22. On page 53 of Deputy Gonder's deposition he explained that since the plaintiff would not state her name, date of birth, and address, the citation could not be issued and that is why the plaintiff was detained in jail.

    22.1.  According to Sergeant Melton's deposition on pages 23-24, he had the plaintiff's name and date of birth, etc, from accessing a database for the plaintiff's valid driver's license information.

23. Deputy Gonder stated on page 56 that they tried to make concessions with the plaintiff and use her business address and information from a prior record (57:7).

24. Deputy Gonder stated that the plaintiff was told, "You don't even have to make a concession to speak to us about it...." Page 56:23.

    24.1.  This statement is important because the plaintiff was repeatedly asked to verbally identify herself.

25. On page 59, Deputy Gonder was asked if in order to deescalate the situation, if the needed information for the citation could be obtained from other sources, couldn't a citation then be issued? Deputy Gonder replied, "No." He stated "...that is not how we do things."

    25.1.  Deputy Gonder's replies make no sense, are in conflict, and are unreasonable.

    25.2.  On one hand Deputy Gonder stated they tried to obtain the plaintiff's information from other sources (since the stated objective was to cite her out) but on the other hand Deputy Gonder stated a citation would still not be issued.

26. Based on my background and experience there ought not to have been an issue identifying the plaintiff for the purposes of writing a citation.  She was a known lawyer in court on an active case.  Even if the motor vehicle database could not verify the plaintiff's identity, the Minnesota Judicial Branch certainly could have as well as prior court records.  None of the involved defendants bothered to ask the court reporter or the court clerk for the name the plaintiff gave for the record.

    26.1.  On January 4, 2017, I simply searched for the Minnesota State Bar Association and was led to the Minnesota Judicial Branch attorney search page.  It took seconds to find that the plaintiff was listed and then it took a

few more seconds to find other links to the plaintiff's identity, including photos of her.

26.1.1.   While the plaintiff's date of birth is not listed in the attorney search, phone calls to the Bar Association could have been made and other court records could have been checked.

26.2.   Further, I know from my years as a detective that it is not always necessary to issue a citation to a person to charge them with a crime. Instead of detaining or citing out the person in jail a police report can be written and once the prosecutor files a criminal case, either an appearance letter is sent to the plaintiff or an arrest warrant is issued and served.

26.2.1.   My point is to deescalate the situation, the deputies and the sergeant had other options instead of keeping the plaintiff in jail for the crime of taking one photograph of Deputy Gonder inside of the courtroom.

27. The evidence shows it was not necessary for the plaintiff to *verbally* state her name, date of birth, and address to have a citation issued.

28. On page 36 of Deputy Gonder's deposition he was asked who made the decision to keep the plaintiff in jail and he replied that it was Sergeant Melton's decision.

**The plaintiff was handcuffed and taken back to the courtroom in a wheelchair:**

29. On page 50 of Deputy Gonder's deposition he was asked who made the decision to bring the plaintiff into the courtroom in a wheelchair.  Deputy Gonder stated, "She did."

30. Deputy Gonder stated that he brought in the wheelchair and when asked why, he stated it was because the plaintiff would not speak when she was asked questions.

30.1.   The deputy is in conflict.  Recall that Deputy Gonder had stated that the plaintiff was told, "You don't even have to make a concession to speak to us about it...." Page 56:23.

31. On page 70 Deputy Gonder explained that the plaintiff was seated on a stool in the holding cell and would not stand up to return to the courtroom.  Deputy Gonder stated once the wheelchair was bright in, the plaintiff was helped to

stand up by the arms or shoulders and once she stood up she got into the wheelchair.

32. Deputy Gonder stated the plaintiff was in handcuffs because she was in custody. Deputy Gonder stated on page 73 that it is policy or standard operating procedure to handcuff a person in custody.

33. Deputy Gonder stated on page 69 that it was he and Sergeant Melton who brought the plaintiff into the courtroom in a wheelchair while Deputy Napper remained in the courtroom.

## Deputy Gonder worked a shift at the jail that night:

34. On page 107, Deputy Gonder stated the Dakota County jail houses females as needed.

 34.1. The plaintiff disputes this. The plaintiff believes that no females were to be housed at this jail at anytime.

35. Deputy Gonder explained in his deposition on pages 38 and 98 that due to staffing regulations he worked a shift at the jail starting at 1800 hours. He explained that he had been assigned this shift well before the incident with the plaintiff occurred. He stated it was his job to act as an escort, to perform rounds, and to check on the inmates in the intake area.

 35.1. If Deputy Gonder had jail duties in the intake area he would have been in close proximity to where the plaintiff was being held in the negative pressure room.

## Sergeant Melton's deposition:

## The sergeant contacts the plaintiff and arrests her:

36. Sergeant Melton stated on page 12 that he was notified to come to the courtroom at 0916 hours and that he approached the plaintiff at 1028 hours during a courtroom recess.

37. The sergeant stated, "Yes" when asked on page 14 if it was his decision to issue the plaintiff a citation.

38. On page 16 Sergeant Melton stated that he had asked the plaintiff to come out to the hallway with him so he could issue her the citation for violating "Court Order."

39. The sergeant stated that the plaintiff "...wasn't coming with me. So I told her she was under arrest."

40. The sergeant added that because he did not know "her true legal name" he could not give her the citation at that time.

**The sergeant searched databases:**

41. On page 16 of the sergeant's deposition he stated he searched the Department of Vehicles Services website and did not get any returns with the name, "Michelle MacDonald."

42. The sergeant stated he checked the court's Odyssey website and found "a couple of different names she had cases under."

43. On page 17, when asked if he had asked the court clerk for the plaintiff's name, the sergeant stated that he had "already tried to find her."

44. On page 19, the sergeant was asked, "And you were looking for three pieces of information for that citation, right?" The sergeant stated, "Correct." The sergeant was then asked if he had that information would he have given her the citation and the sergeant stated, "If I could verify it, yes."

   44.1.   This statement from the sergeant is in conflict with Deputy Gonder's testimony on pages 53 -59, where the deputy stated a citation would not be given because, "That is not how we do things." See Deputy Gonder's deposition statements above.

**The sergeant had adequate amount information to issue a citation:**

45. On pages 23 – 24, the sergeant replied to these questions during his deposition:

   45.1.   Q: "Okay. Did you ever go to the Court Reporter and ask the Court Reporter what the lawyer's name was?"

   45.2.   A: "No."

   45.3.   Q: "How come?"

   45.4.   A: "Because I have access to the databases."

   45.5.   Q: "Okay. And weren't you able to access her current driver's license?"

45.6.  A: "Yes."

45.7.  Q: "Okay. Didn't that have a name?"

45.8.  A: "It did have a name."

45.9.  Q: "And that was an <u>active, valid driver's license</u>, correct?"

45.10. A: "Correct."

45.11. Q: "And it had an address?"

45.12. A: "Yes."

45.13. Q: "Okay. Nonetheless, when you went back to her, you still asked her for her name?"

45.14. A: "Yes."

45.15. Q: "Did you ask her for the other information or did you already have that?"

45.16. A: "The information?"

45.17. Q: "The date of birth, address, right?"

45.18. A: "Right."

45.19. Q: "<u>You had that anyway, right</u>?"

45.20. A: "I - - I - - I had it, but I didn't know if it was correct."

45.21. Q: "Well, you got it off of the active driver's license data, right?"

45.22. A: "I did."

45.23. Q: "Did you attempt to get her driver's license from her?"

45.24. A: "No."

46. Hypothetically, if a reasonable officer has valid driver's license information from an official driver's license database such as a Department of Vehicles database, and the reasonable officer then asks the person if the information

in the driver's license database is correct, even if the person refuses to answer or lies about that information, the reasonable officer would still go with the valid information contained in the database.

46.1.   It bears repeating that Deputy Gonder stated that the plaintiff was told, "You don't even have to make a concession to speak to us about it...." Page 56:23.

### The issue of handcuffing the plaintiff:

47. On page 28 the sergeant stated it is policy to handcuff persons in custody. The sergeant stated on page 29 that he does not know who placed the handcuffs on the plaintiff.  On page 51 the sergeant stated that handcuffing prevents escapes.

47.1.   I am requesting a copy of this handcuffing policy to review.

### Deputy Napper's deposition:

### The deputy saw the plaintiff take a photo inside the courtroom:

48. On page 9 of Deputy Napper's deposition he stated he saw the plaintiff take a photo inside of the courtroom via the video camera from upstairs.

49. On page 14 Deputy Napper stated he had asked the plaintiff to exit the courtroom because she was not following directions and had told Sergeant Melton about it.  This occurred before the sergeant arrested the plaintiff.

### The plaintiff's name was known to Deputy Napper:

50. On page 23 of Deputy Napper's deposition he stated that he knew the name the plaintiff goes by.

51. On page 24 Deputy Napper agreed when asked if they could have gotten the plaintiff's name off of the trial transcript and could have asked the Court Reporter for the name.  Deputy Napper stated, "We could have gotten the name she put on the Court records when she filed a Certificate of Representation, sure."

52. On page 25, Deputy Napper stated Sergeant Melton had access to the Department of Vehicles database.

53. On page 28, Deputy Napper stated that they did not have the plaintiff's full name and address that was needed for the citation.

    53.1.   This is in conflict with the sergeant's deposition on pages 23-24, where the sergeant stated he had that information.

54. The evidence continues to show that despite testimony to the contrary, there was enough information available to the defendants to have cited out the plaintiff. There was no legitimate reason to keep the plaintiff in custody.

**Best practice for issuing a citation:**

55. It is best practice that if the stated goal of reasonable deputies is to cite out the arrestee, then once professionally trained, reasonable deputies obtain the minimally needed information to issue a citation rather then keep a citable person in jail, they would issue the citation.

56. Reasonable deputies know when the needed citation information is obtained it is not always necessary to have the person to be cited answer questions and verbally concur with the information obtained by the reasonable deputy.

    56.1.   Reasonable deputies know that the person to be cited may choose, for whatever the reason, to remain silent.

57. Reasonable deputies also know that if the person to be cited refuses to sign the citation, then reasonable deputies would have cause to keep the person in custody until the person can appear in court.

**The plaintiff is taken to and housed at the jail:**

**The plaintiff is positively identified, yet was still not released on a citation:**

58. According to the report by Correctional Deputy S. Dillard, item 2, bates DC-42, the plaintiff was escorted to the jail at 1515 hours by Deputy Gonder.

59. This report showed the plaintiff's name and date of birth was <u>known</u> before the plaintiff was fingerprinted.

    59.1.   This means that the identification of the plaintiff was known <u>before</u> she was taken to the jail. If that was the case, then the plaintiff ought to have been issued a citation and released at the courthouse and not taken to the jail in the first place.

60. According to this report, Deputy Gonder told Correctional Deputy S. Dillard that the plaintiff was "passive aggressive." There is no explanation in this report of what Deputy Gonder meant by "passive aggressive."

61. This report states that once at the intake area of the jail the plaintiff refused to respond to questions and refused to give "proper identification."

62. Correctional Deputy S. Dillard wrote in this report that, "Deputy Hoover #213 was able to obtain both index prints on the IBIS Machine to obtain a positive identification on MacDonald." If that was the case, then the plaintiff ought to have been issued a citation and released immediately and not kept in jail.

63. The plaintiff contends she was not allowed the opportunity to be released on bond or bail. Since the identification of the plaintiff was known, there was no reason not to allow the plaintiff the opportunity to arrange bail or bond.

64. I know from my background and experience that keeping the plaintiff in jail when she could have and should have been cited out or allowed to arrange bail or bond, was unreasonable, unnecessary, and below the professional standard of care expected of a professionally trained, reasonable correctional deputy and correctional supervisor (Corporal Byrd was present during the intake process).

65. The plaintiff's property was taken from her at the jail which is standard procedure and her property was listed on a property form which is also standard procedure. What is important to note is that the plaintiff's identification (name, DOB, address, and DL) is shown on this property form along with a booking number and jacket ID number which indicates the plaintiff had been identified and booked at the jail. Item 13.

**The plaintiff was not allowed to make telephone calls until booked:**

66. The report written by Deputy Dillard, item 2, states that Corporal Byrd told the plaintiff that she would not be able to make a telephone call until after she was booked. The plaintiff contends since she was never booked, she was not permitted to make a telephone call.

67. Since the plaintiff's identify was known and since she was fingerprinted and photographed, and since the plaintiff had her booking number assigned to her (see the Inmate Property form, item 13) the plaintiff should have and could have been released on a citation, there was no justification not to allow her the use of a telephone.

67.1.  Once a prisoner is photographed and fingerprinted, once their identity is known, and once they have an official booking number assigned then based on my background and experience in booking prisoners, I know that reasonable deputies would have considered the plaintiff booked for all intents and purposes.

67.2.  Not allowing a newly arrived prisoner access to a telephone, especially if the identity of the person is known, as in this case, is below the standard of care of professional trained, reasonable correctional deputy.

68. Hypothetically, if a person is brought to jail and for whatever the reason refuses to speak or physically cannot speak and there is no way to ascertain the true identify of the person so the person has to be booked as a John/Jane Doe, does this mean this person is never allowed to use a telephone at anytime?  Of course not.

**The plaintiff was placed into a negative pressure room:**

69. The report by Correctional Deputy S. Dillard states that because the plaintiff would not answer the nursing staff's questions about her medical condition and about possible TB infections, the plaintiff was placed into a negative pressure room.

69.1.  I know from my background and experience that the use of the negative pressure room is appropriate when the TB status of a prisoner is not known.

70. The plaintiff contends that during that night her toilet paper, mattress, and pillow were removed by Deputy Gonder.  The plaintiff also contends she was shown blankets but was not provided a blanket.

70.1.  If this did take place, unless there are objective reasons why the plaintiff's toilet paper, mattress, and pillow where removed, then doing so would be unreasonable, unnecessary, excessive, and below the professional standard of care expected of a professionally trained, reasonable deputy.

**The issue of the plaintiff's talk of suicide:**

71. The plaintiff contends in the lawsuit complaint, item 1, that at one point she indicated she was suicidal "with the hopes that they would stop causing her severe physical and mental suffering."

72. If a prisoner states they are suicidal, then the jail's suicide prevention policies and procedures must be followed. It is not unusual for a suicidal prisoner's toilet paper, mattress, and pillow to be taken away.

73. If these items were taken away due to the plaintiff's threat of self-harm then one would expect there to be complete documentation from the jail staff, nursing staff, and mental health staff about the plaintiff's threat of suicide and what was done about it. I know from my years of experience in responding to and investigating attempted and completed jail suicides that there should always be comprehensive documentation.

   73.1.   I would expect there would be reports written, medical and mental health records made, a suicide watch log that would have been kept while the plaintiff was in custody, and of course supervisor involvement.

      73.1.1.    There was a negative pressure room cell check log kept, item 12. The plaintiff's actions were documented approximately every 30 minutes or so throughout her stay in the cell. There is no mention of a threat of suicide on this log.

   73.2.   At this time, other than the plaintiff's own statements, there is no evidence from the jail staff of any threat of suicide and there is no evidence of any suicide prevention plan being followed.

   73.3.   To state again, unless there are objective reasons why a prisoner's toilet paper, mattress, and pillow are taken away and unless there are objective reasons why a prisoner would not be given a blanket, then the plaintiff's treatment in jail would be unreasonable, unnecessary, excessive, and below the professional standard of care expected of a professionally trained, reasonable deputy.

## The Prison Rape Elimination Act (PREA):

74. If the Dakota County Jail accepts federal funding, then the jail must follow the rules under the United States Department of Justice, Prison Rape Elimination Act or what is commonly called PREA. If the jail is mandated to follow PREA, then under section 115.33, Inmate Education, the plaintiff would have received information explaining the agency's zero-tolerance policy abut sexual abuse, etc., at intake. In addition, the plaintiff would have been assessed at intake for risk of sexual abuse under section 115.41.

   74.1.   If the jail must follow PREA, then they are in violation of the PREA rules as there is no evidence the plaintiff was assessed or educated about PREA.

---

### The plaintiff is returned to jail and later released:

75. The evidence shows that on September 13, 2013, the plaintiff was brought before Judge Tim Wermager who signed an order to have her released immediately.  The plaintiff contends she was brought back to the jail and released hours later.

76. I know from my background and experience that in some cases there are policies and procedures that require a prisoner to be released from the jail and not directly from the courthouse.

77. If the Sheriff's Department has such policies and procedures, I request to see them.  Unless there are objective reasons why the plaintiff could not simply be released from the courtroom, then keeping her in custody for hours before finally being released would be unreasonable, unnecessary, excessive, and below the professional standard of care expected of professionally trained, reasonable deputies.

### No Internal Affairs investigation or administrative investigation:

78. If the Dakota County Sheriff's Department supervisors and managers failed to conduct an objective and thorough Internal Affairs investigation or administrative investigation into any and all policy violations in this case then this tends to reflect a continuing pattern and practice of the Dakota County Sheriff's Department to excuse the actions of the court deputies and sergeant, the jail staff, and jail medical staff involved.  The failure of the law enforcement agency to investigate those actions is a ratification of the involved personnel.

### The issue of retaliation:

79. The plaintiff contends she was retaliated against for her criticizing and filing a lawsuit against Judge Knutson.

   79.1.  I am not opining on this issue.  The jury will decide if there was retaliation by not issuing the plaintiff a citation when it was possible to do so and thereby causing the plaintiff to spend the night in jail for the crime of taking a photograph of a deputy inside a courtroom.

80. In my expert opinion, the evidence in this case demonstrates that even though the plaintiff chose not to verbally state her name, date of birth, and address, etc., the defendants did have the information needed to issue the

citation and release the plaintiff from custody. I've seen no evidence to justify keeping the plaintiff in jail since she was certainly citable.

80.1.  Keep in mind, the defendants stated many times it was their objective to release the plaintiff on a citation.

80.2.  Because the plaintiff was not released on a citation when she could have been, the stated objective of the defendants is inconsistent with their actions.

**Materials and items considered in forming opinions and exhibits to be used in support of Findings and Opinions:**

1. Copy of lawsuit
2. Correctional Deputies' Dillard and Hoover's report, bates DC-42-DC-44
3. Affidavit of Judge Knutson along with the court transcript of the morning session on September 12, 2013, in the case of Sandra Sue Grazzini-Rucki v. David Victor Rucki. This transcript goes from pages 1–9; 44-47; 51-55; 97-99.
4.  Sergeant Chris Melton's report, bates DC-56-DC-59
5. Photos of the plaintiff's jail cell
6. Deposition of Deputy Gonder
7. Page from the on-line attorney search from the Minnesota Judicial Branch
8. Deposition of Sergeant Melton
9. Deposition of Deputy Wegner – read buy not used in my analysis
10. Deposition of Deputy Napper
11. PREA standards
12. Cell check log
13. Inmate property log with the plaintiff's identification
14. Court transcript, Morning Session, Sept. 12, 2013, 25 pages
15. Plaintiff's amended answers to Defendant interrogatives
16. :First Letter" – MacDonald Hearing
17. Plaintiff deposition, 278 pages and exhibits

**The following are my qualifications for reviewing, consulting, and issuing opinions:**

See attached CV.

**Prior cases in which I testified as an expert in a deposition and/or at trial in the last (4) four years:**

**Depositions:**

2012 (Plaintiff) Mares v. Los Angeles County. Case number: CV10-10077-RSWL-(FFMx).

2012 (Plaintiff) Lewis v. Tazewell County. Case number: 1:10-cv-01268-MMM-BGC #1. Federal Case.

2012 (Plaintiff) Payne v. City of Chicago. Case number: 10L7442. Deposition testimony.

5/2012 (Plaintiff) Stewart v. County of Del Norte. Case number CVUJ-10-1258.

4/2012 (Defense - Civil) Colarossi v. Caltrans, et al. Case number SC109408.

2012 (Plaintiff) Ruth Hall v. Imperial County. Case number 12CV0432 DMS RBB.

2012 (Plaintiff) Tapia v. Skarupinski (City of Chicago) et al. Case number 11C7997. Federal Case.

2012 (Defense - Civil) Harb v. City of Bakersfield and Hall Ambulance. Case number: KCSC, S-1500-CV-265887-SPC.

2012 (Plaintiff) Leocadio Figueroa v. Los Angeles County. Case number CV-11-06228 DMG (FFMx).

08/2013 (Plaintiff) Cox v. State of California (CHP). Case number BC473308.

07/2013 (Plaintiff) Xu v. City of Monterey Park. Case number CV12-7043 PSG (JEMx), United States District Court, Central District of California.

03/2014 (Plaintiff) Bosch v. Riverside Sheriff. Case # EDCV-13-2352 SVW (FFMx).

08/2014 (Plaintiff) Rivera v. City of Azusa. Case number: 2:13-cv-01510-DMG (VBKx)

08/2014 (Plaintiff) Brummett v. County of San Diego. Case number: 12CV1428 LAB BGS.

08/2014 (Plaintiff) Lundell v. County of Sacramento. Case: 2:12-CV-02832-MCE-AC.

09/2014 (Defense – civil) Frary v. County of Marin. Case number C 12-3928 MEJ.

10/2014 (Plaintiff)  Armstrong v. Del Amo mall.  Case number BC517064.

02/2015 (Plaintiff) Morgan v. CDCR (State prison).  Case #CIV 1202861,  San Quentin Prison.

04/2015  (Plaintiff)  Tony McGee v. LACO.  Case: CV13-5816 BRO (MANx).

11/2014  (Plaintiff)  Laurie Allen v. CHP.  Case #2:13-CV-01821-GEB-EFB.

06/2015  (Plaintiff)  Leon v. City of Santa Ana.  Case #8:14-cv-00387-JLS-DFM.

06/2015 (Plaintiff) Pierre Moradian v. City of Glendale.  Case #CV14-01178.

06/2015 (Plaintiff) Crawley v. King's County.  Case #1:13-CV-02042 LJO-SAB.

07/2015 (Plaintiff)  Rosales v. City of Chico.  Case #2:14-CV-02152-WBS (CMK).

08/2015 (Plaintiff) Forester v. LACO.  Case # CV14-07231-ODW (Jemx)

02/2016  (Plaintiff)  Borges v. City of Eureka.  Case #15-cv-00846-YGR.

02/2016 (Plaintiff) Amili/Chappelle v. City of Tukwila, Washington State. Case #2:13-cv-1299

03/2016  (Plaintiff)  Berman v. County of Fresno. Case # CV-F-130597 LJO SAB

03/2016 (Civil – Defense)  Garcia v. El Presidente + Sergio Jolon. Case #  #BC524824

04/2016 (Plaintiff) Deshazo v. City of Rochelle, Illinois.  Case # 14-CV-5139.

06/2016  (Plaintiff) Angela and Danroy Henry, Sr. v. Arron Hess and the Village of Pleasantville (New York State). Case number 11-CIV-02707.

06/2016 (Plaintiff) Benton v. Los Angeles County. Case number: TC027002.

10/2016 (Plaintiff) Dinnan v. City of Honolulu.  Case: CV 14-00286- DKW RLP.

11/2016 (Plaintiff) Moreno-Jimenez v. City of San Jose. Case #1:14-cvc-274260.

**Civil trial:**

2012 (Plaintiff) Leocadio Figueroa v. Los Angeles County.  Case number CV-11-06228 DMG (FFMx).

05/2014  (Plaintiff)  Cox v. State of California (CHP).  Case number BC473308.  Deposition testimony.

11/2014 (Plaintiff)  Brummett v. County of San Diego jail.  Case number 12CV1428 LAB BGS.

11/2014  (Plaintiff)  Crime, Justice & America, Inc., v. Jerry Smith, Sheriff of Butte County.  Case number 2:08-cv-00343 TLN EFB.

06/2015 (Plaintiff) Pierre Moradian v. City of Glendale.  Case #CV14-01178.

09/2015 (Plaintiff)  Leon v. City of Santa Ana. Case #8:14-cv-00387-JLS-DFM.

09/2015   (Plaintiff)  Espinoza v. Riverside County.  Case #EDCV 14-00085-JGB (SPx)

02/2016  (Plaintiff)  Jones v. County of San Bernardino. Case # EDCV–15–00080–DTB.

12/2016 (Plaintiff) Jimenez-Moreno v. San Jose.  Case #1:14-cvc-274260.

**Civil Service Commission Hearing:**

03/2015 (Defense – civil service hearing) Deputy Eric Kabota v. County of Marin.  There is no case number.

**Criminal trials:**

2012 (Defense – Criminal) People v. Morales.  Case number: BA388483.

2012 (Defense – Criminal)  Nevada v. Pringle.  Case number: CR6487A.

08/2013  (Defense – Criminal) People v. German. Trial testimony.  Case number 1EA10820.

01/2014 (Defense – Criminal)  People v. Leon.  case: 12CF1106.  Trail testimony.

10/2014  (Defense – Criminal)  People v. Arrellano.  Case #VA131304.

04/2014 (Defense – Criminal) People v. Goncher. This is an Arizona case.  Case #CR2013-428028-001 DT.

10/2014 (Defense – Criminal) People v. Picardo.  Case number 4FF00698

04/2015 (Defense – Criminal) People v. Kinney.  Case #4CP04594.

07/2015 (Defense – Criminal) People v. Carpenter.  Case BLF1300185.

09/2015  (Defense – Criminal) People v. Bloodworth. Case #BA433512.

**Evidence hearing:**

7/2013 (Defense – Criminal – Evidence Hearing) State of Nevada v. Villagrana. Case number CR11-1718.  Civilian on Civilian.  Evidence hearing.  (trial 7/2013)

**Compensation:**

$4,000.00 initial retainer, $300.00/hour case work, $400.00/hour testimony (four hour minimum), $100.00/hour travel, $.60/miles driven, Reasonable lodging, airfare, etc.

**Signature:**

Richard Lichten, CLS

X _____          Date: _____