1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF MINNESOTA

3        ---------------------------------------------------------

4        Michelle MacDonald Shimota,

5                        Plaintiff,

6

7        vs.                      Court No. 15-cv-1590 (JRT/FLN)

8

9        Bob Wegner, et. al,

10                       Defendants.

11       ---------------------------------------------------------

12

13

14

15

16       ---------------------------------------------------------

17                          DEPOSITION OF

18               SERGEANT CHRISTOPHER MELTON

19       ---------------------------------------------------------

20

21

22

23

24

25       Taken November 30, 2016      By Ann Marie Holland, CSR

EXHIBIT

3

1        A.   Right.

2        Q.   I get to deal with that every time I enter

3   a courthouse.  It's real fun.  But then you have people

4   that work in the courtrooms, too, right?

5        A.   Yes.

6        Q.   And you don't always have a deputy in a

7   courtroom, right?  It just kind of depends on the

8   situation, correct?

9        A.   Yes.

10       Q.   And how many personnel were there that day

11  that were available for courthouse or courtroom duty,

12  sir, or that morning I should say?

13       A.   I -- I don't remember that.  I just know

14  that Deputy Napper came into the courtroom with me when

15  we went down there.

16       Q.   Okay.  So, Gonder reached out to you, I

17  take it, with questions as to how to handle the

18  situation; is that fair?

19       A.   He made me aware of the situation.

20       Q.   I mean wasn't this kind of a unique

21  situation?

22       A.   Yes.

23       Q.   Okay.  Had a lawyer ever taken a picture in

24  a courtroom before during your tenure with the agency?

25       A.   I'm not aware of that.

1              Can I backtrack a little bit, too?

2              As far as the situation, it was unique in

3    the fact that an attorney was involved with the picture

4    taking.  We have had contacts with the general public

5    who were taking pictures of their loved ones when they

6    were on trial and stuff like that.

7         Q.    And pictures nowadays, with the technology,

8    are a lot easier to take today than perhaps maybe twenty

9    years ago, right?  I mean with cell phones, you can

10   easily take a picture surreptitiously, without anybody

11   knowing, right?

12        A.    That's correct.

13        Q.    Okay.  So, he reached out to you, it sounds

14   like, because he needed assistance, correct?

15        A.    Yes.

16        Q.    Was there any question or concern about

17   whether this was a violation of the law in the first

18   instance?

19        A.    No.

20        Q.    Well, isn't there a distinction of when

21   court is in session and when it is not in session with

22   this particular rule?

23        A.    Not that I'm aware of.

24        Q.    Well, there's no dispute, was there, that

25   the picture was taken when the judge was not in the

SERGEANT CHRISTOPHER MELTON                    12

1          A.   No.

2          Q.   Do you like them?

3          A.   Yes.

4          Q.   You like them?

5          A.   Yes.

6          Q.   Some people don't like attorneys, right?

7          A.   Correct.

8          Q.   Okay.  But you are in the category where

9     you are okay with attorneys?

10         A.   Yeah.

11         Q.   Okay.  Had you ever issued a citation to an

12    attorney before in the courtroom or in the holding area?

13         A.   No.

14         Q.   Okay.  So this was the first time, right?

15         A.   Correct.

16         Q.   So, it sounds to me like your involvement

17    with this situation with escorting the attorney out of

18    the courtroom into an area to give her a citation was

19    a unique situation for you, correct?

20         A.   Yes.

21         Q.   Okay.  Do you know how much time elapsed

22    from the time that the picture was taken of Deputy

23    Gonder up until the time she was escorted out of the

24    courtroom?

25         A.   I believe I was notified at 9:16 and then

1    we approached her in the courtroom during a recess,

2    which was about 10/28.

3         Q.   So when you approached her in the

4    courtroom, the judge wasn't in the courtroom, correct?

5         A.   They had recessed, so.

6         Q.   So he wasn't in there?

7         A.   I don't know where he was at.  I assume he

8    was walking out or he was out of the courtroom.

9         Q.   Okay.  Do you know what time Gonder called

10   you or contacted you, I don't mean called, but contacted

11   you about the fact that the picture had been taken?

12        A.   It was around 9:16.

13        Q.   So it was around the same time?

14        A.   Yeah.

15        Q.   Okay.  Was there any reason why she wasn't

16   dealt with sooner or were you just waiting for a recess?

17        A.   I was waiting for a recess.  I didn't want

18   to interrupt court proceedings.

19        Q.   From the time that Gonder contacted you up

20   until the time that Ms. MacDonald was escorted out of

21   the courtroom did you contact anyone about how to deal

22   with the situation?

23        A.   No.

24        Q.   Did you let the judge know that you were

25   going to do this?

1           A.    At some point I did speak with the judge,

2     yes.

3           Q.    Was that after or before she was escorted

4     out of the courtroom?

5           A.    I think it was before.

6           Q.    And what did he say?

7           A.    Um, I told him I was going to wait until a

8     break, and he was fine with that, because it was an

9     important trial to him.

10          Q.    But the bottom line was you told him what

11    you were going to do and you weren't seeking his

12    permission, correct?

13          A.    No.

14          Q.    So it was your decision, and your decision

15    alone, to decide to issue a citation, correct?

16          A.    Yes.

17          Q.    Okay.  When you came up to her, what did

18    you say to her?

19                MR. TIMMERMAN:  I will just clarify,

20    are you talking about the first encounter?

21                MR. PADDEN:  Yes, sir.  Thanks.

22                MR. TIMMERMAN:  The first encounter

23    that you had with her, that's what he is asking about.

24                THE WITNESS:  Deputy Gonder had taken

25    the camera already and I went up to her, and she had her

1    cell phone laying up on the table and she was swiping on

2    it, and I told her that we weren't -- she wasn't allowed

3    to take pictures in the courtroom.  And she said

4    something about she wanted to make her own record and

5    she is going to take pictures with her cell phone.

6    BY MR. PADDEN:

7         Q.   Okay.  And then what did you do?

8         A.   I think Deputy Gonder took the cell phone

9    and then --

10        Q.   And then you escorted her out of the

11   courtroom?

12        A.   No.

13        Q.   So this was the first time?

14        A.   Correct.

15        Q.   Okay.  Well, there was a second time then?

16        A.   Yes.

17        Q.   Okay.  Tell me about that.

18        A.   That was about 10:28.

19        Q.   How much time elapsed from the first time

20   to the second time?

21        A.   About an hour and 15 minutes.

22        Q.   Okay.  So, at that time she no longer had

23   her camera and her cell phone?

24        A.   Correct.

25        Q.   But she wasn't escorted out of the

1    courtroom then?

2         A.   No.

3         Q.   Well, why was she escorted out of the

4    courtroom 75 minutes later then?

5         A.   I asked her if she would come to the

6    hallway with me because I was going to issue her a

7    ticket for violating the Court Order.  And then she

8    wasn't coming with me.  So then when she didn't

9    cooperate, I told her she was under arrest.

10        Q.   Why didn't you just give her the citation

11   right there?

12        A.   Because I didn't know her true legal name.

13        Q.   Okay.  But couldn't you have figured that

14   out, sir, from other sources, if she didn't tell it to

15   you?

16        A.   I tried.

17        Q.   And what did you try?

18        A.   I went into the Department of Vehicle

19   Services' website and I entered "Michelle MacDonald,"

20   and I did not get any returns.

21        Q.   Okay.

22        A.   So then I went into the Odyssey court

23   website and found a couple of different names that she

24   had cases under.

25        Q.   So, your intent was simply to put her name

1    on the citation, put her date of birth and her address,

2    and then give her the citation, right?

3           A.   Yes.

4           Q.   Okay.  And you would have done that but for

5    the fact that apparently you had trouble ascertaining

6    what her name was?

7           A.   Her legal name, yes.

8           Q.   Couldn't you have just asked the clerk in

9    the courtroom what name she was appearing on for that

10   day in the courtroom?

11          I mean it wasn't any great secret, was it?

12          A.   There is a couple of questions in there.

13          Q.   Okay.  Let me break it down.

14          Couldn't you have just gone up to the

15   court clerk who was in the courtroom and said, "What is

16   that attorney's name?"

17          A.   I already had tried to find her, so the

18   name that was on there for the attorney wouldn't give

19   her date of birth or her full legal name.

20          Q.   Well, I know that part.  But couldn't you

21   have gone on a computer and gotten her driver's license

22   information off of a computer?

23          A.   I did.

24          Q.   So you would have her date of birth and her

25   address, right?

1              A.    Her -- yes.

2              Q.    Sir, here is the thing, okay?  It looks

3       like to me that you guys were kind of mad that she

4       wasn't voluntarily giving you information.

5                    Would you agree with that?

6              A.    I wasn't mad.

7              Q.    It didn't upset you at all?

8              A.    I felt frustrated.

9              Q.    Okay.  Well, were you angry with her?

10             A.    No.

11             Q.    Okay.  Well, it sounds to me like it was

12      three pieces of information that you needed for the

13      citation, you give her the citation and everybody goes

14      on with the rest of their lives, right?

15             A.    Right.

16             Q.    And you even said that, when you were

17      responding to Judge Knutson and questions on the record

18      that day, didn't you?

19                    MR. TIMMERMAN:  Do you want to show him

20      what you are referencing?

21             Q.    Sir, do you recall being asked questions by

22      Judge Knutson on 9/12/13 on the record in the courtroom?

23             A.    I gave a statement on the record.

24             Q.    No, I -- okay.  You prepared an incident

25      report, correct?

1        A.   Yes.

2        Q.   Okay.  Do you recall being in the courtroom

3   when the judge was asking you questions on 9/12/13?

4        A.   Yes.

5        Q.   And you provided answers, correct?

6        A.   Yes.

7        Q.   And you made it clear what the situation

8   was, right?

9        A.   Yes.

10        Q.   And you were looking for three pieces of

11   information for that citation, right?

12        A.   Correct.

13        Q.   Okay.  And if you could have obtained that

14   information from other sources, you would have just

15   given her the citation and that would have been the end

16   of it, right?

17        A.   If I could verify it, yes.

18        Q.   And would you agree with me that the

19   situation escalated?

20        A.   Yes.

21        Q.   Sir, this attorney ended up back in a

22   holding area, right?

23        A.   Right.

24        Q.   And eventually came back in the courtroom

25   in a wheelchair, right?

1    A.    Yes.

2    Q.    Were you aware of what happened then after

3    the judge signed the order releasing her, as to what

4    happened in her interactions with members of your agency

5    after that?

6    A.    I know that there was something or she

7    didn't get released right away, but that's the extent of

8    it.

9    Q.    But you don't have firsthand knowledge of

10   what happened in that regard?

11   A.    No.

12   Q.    What time did your work shift end on

13   9/12/13, sir?

14   A.    Um, I worked 7:30 to 3:30.  And I think I

15   probably stayed late.  I'm not sure though.

16   Q.    But you didn't go to the jail, right?

17   A.    I think I escorted her over initially and

18   then left her in the jail staff custody.

19   Q.    So, I mean you took her over to the jail

20   and kind of dealt with some paperwork there, but then

21   you pretty much boogied, and you were gone?

22   A.    Correct.

23   Q.    Okay.  So you don't really know the

24   specifics of what happened in the jail other than what

25   people might have told you, right?

1          A.    Exactly.

2          Q.    Alright.  That just helps me, sir, and sort

3    of limits my questioning.  That's all.

4                So let's go chronologically with this.

5                She refused to give you her name and then

6    you decided to take her out of the courtroom, correct?

7          A.    No.  I asked her to come out into the

8    hallway with me because I just wanted to -- I told her

9    that I was going to issue her a citation and then she

10   could go back to court.

11         Q.    Okay.  And then what happened?

12         A.    And she didn't want to go.  She wanted to

13   stay in the courtroom.  She wanted to make a record of

14   what I was doing.

15         Q.    Okay.  Did she seem upset?

16         A.    More hesitant to go with me.

17         Q.    Okay.  Did she seem nervous?

18         A.    It looked like a deer in the headlights

19   look.

20         Q.    Right.  That's nervous, right?  That's a

21   yes?

22         A.    Yes.

23         Q.    Okay.  When you took her back, and the

24   place you took her to was behind the courtroom, sir?

25         A.    Yeah, it goes to the second floor.  There

1    was a bailiff holding area.

2         Q.   Alright.  And then when you took her up

3    there, she refused to give you her information?

4         A.   Yes.

5         Q.   And did that upset you?

6         A.   I felt frustrated.

7         Q.   Okay.  And it was only because apparently

8    this woman had, from your investigation, multiple names?

9         A.   Correct.

10        Q.   But she had a name that she was using in

11   court that day, correct?

12        A.   Yes.

13        Q.   Okay.  Did you ever go to the Court

14   Reporter and ask the Court Reporter what this lawyer's

15   name was?

16        A.   No.

17        Q.   How come?

18        A.   Because I have access to the databases.

19        Q.   Okay.  And weren't you able to access her

20   current driver's license?

21        A.   Yes.

22        Q.   Okay.  Didn't that have a name?

23        A.   It did have a name.

24        Q.   And that was an active, valid driver's

25   license, correct?

SERGEANT CHRISTOPHER MELTON                    24

1          A.    Correct.

2          Q.    And it had an address?

3          A.    Yes.

4          Q.    Okay.  Nonetheless, when you went back to

5     her, you still asked her for her name?

6          A.    Yes.

7          Q.    Did you ask her for the other information

8     or did you already have that?

9          A.    The information?

10         Q.    The date of birth, address, right?

11         A.    Right.

12         Q.    You had that anyway, right?

13         A.    I -- I -- I had it, but I didn't know if it

14    was correct.

15         Q.    Well, you got it off of the active driver's

16    license data, right?

17         A.    I did.

18         Q.    Did you attempt to get her driver's license

19    from her?

20         A.    No.

21         Q.    How come?

22         A.    I just asked her to step out into the

23    hallway with me.

24         Q.    Okay.  But you never asked her for her

25    driver's license, correct?

1          A.    I don't know if I did or not.

2          Q.    Okay.  Do you know why it was her client

3     left the courthouse that day?

4          A.    I have no idea.

5          Q.    So, it would be your testimony that you are

6     not aware of any member of your agency telling her

7     client to leave the courthouse?

8          A.    No.

9          Q.    What about her file?  How did her file end

10    up out of the courtroom?

11         A.    After I watched the video, I saw that the

12    client and some other people cleaned everything off the

13    desk and cleared it out.

14         Q.    Okay.  So, at some point in time you made a

15    decision that she was in custody?

16         A.    Well, once she wouldn't cooperate with me

17    to go out into the back hallway, I told her she was

18    under arrest, so she was in custody at that point.

19         Q.    You didn't tell her she was under arrest in

20    the courtroom, correct?

21         A.    I did.

22         Q.    You told her she was under arrest in the

23    courtroom?

24         A.    Yes.

25         Q.    Why was that, sir?

1          A.    Because I asked her to come out into the

2    hallway with me.  I told her that I was going to issue

3    a ticket to her and release her back so that she could

4    finish the trial.

5          Q.    Okay.  But you didn't exercise the option

6    of just giving her the citation in the courtroom,

7    correct?

8          A.    I didn't have her legal name, no.

9          Q.    And the only reason you didn't do that was

10   because in your opinion you didn't have her legal name?

11         A.    Correct.

12         Q.    Okay.  Was it at that point that you told

13   her she was under arrest because she would not give her

14   legal name?

15         A.    No.

16         Q.    Where was it that you told her she was

17   under arrest?

18         A.    When I went out to the table and I told her

19   that I wanted her to go out to the back hallway with me

20   so that I could issue her a citation.  And she didn't

21   want to come with me.  And I ended up holding on to her

22   arm and escorting her out, and I told her that she was

23   under arrest at that point.

24         Q.    But she did go with you voluntarily,

25   correct?

```
 1              A.   Yes.  She walked with me, yes.

 2              Q.   Alright.  And so then you took her in that

 3      back room, correct?

 4              A.   Yes.

 5              Q.   And then took her up to the second floor,

 6      correct?

 7              A.   Yes.

 8              Q.   So, now that she was under arrest, that set

 9      off other events, correct?

10              A.   Yes.

11              Q.   You already had her camera and her cell

12      phone, right?

13              A.   Correct.

14              Q.   And you had to get all of her jewelry,

15      correct?

16              A.   At some point.

17              Q.   Okay.  Let me ask it this way, she

18      eventually came back into the courtroom, right?

19              A.   Yes.

20              Q.   Do you remember what she didn't have at

21      that time in terms of her personal property, sir?

22              A.   She probably at that point had her jewelry

23      removed and her shoes removed.

24              Q.   And she was in a wheelchair?

25              A.   Correct.
```

1          Q.   Handcuffed?

2          A.   Correct.

3          Q.   Okay.  And you thought that was perfectly

4    fine?

5                    MR. TIMMERMAN:  Objection;

6    argumentative.

7    BY MR. PADDEN:

8          Q.   You are okay with that?

9          A.   It was her decision to not cooperate.

10   I asked her multiple times.  She said at one point she

11   wanted to go to the bathroom and I wanted to take her

12   handcuffs off, she wouldn't cooperate.  She just shut

13   down on me.

14         Q.   Yeah, but, sir, the decision to handcuff

15   her, that wasn't her decision, was it?

16         A.   That's our standard operating practice.

17         Q.   Who made the decision to handcuff her, sir?

18         A.   That's our policy.  That's what we do.

19         Q.   No, no.  Who?  Is it you or is it Gonder?

20   Who?

21                   MR. TIMMERMAN:  Objection; asked and

22   answered.

23                   MR. PADDEN:  Well, I'm just trying to

24   get some clarity on this.

25                   THE WITNESS:  I don't know who

1        Q.   Okay.  What are you saying then?

2        A.   She shut town.  I told her that court was

3 reconvening and the judge wanted her in the courtroom

4 and she just sat and she wouldn't stand up.  She

5 wouldn't cooperate, so we got a wheelchair, and I

6 believe that I and another deputy ended up lifting her

7 up into the wheelchair.

8        Q.   Was it clear to you, Sergeant, that this

9 was a person who was not responding well to the

10 situation?  Was that apparent?

11       A.   She was not responding to the situation and

12 I did not understand why.

13       Q.   Did she seem scared?

14       A.   The conversations that I had with her, we

15 were in the holding area for, I guess, with the passage

16 of time, 20 minutes or so.  I had all of the paperwork

17 there for her.  I had the ticket, I had the Rule 4.01,

18 I had the statute for the contempt, and I explained

19 everything to her.  I just needed her name and date of

20 birth.

21          And so as far as being scared, she was

22 upset, but I don't -- I don't know how she was feeling

23 on the inside.

24       Q.   You weren't intimidated by her, were you?

25       A.   No.

SERGEANT CHRISTOPHER MELTON                                    33

1    To just kind of call off the dogs and just give her the

2    citation and just be done with it?

3          A.    No.

4          Q.    So you felt that everything that happened

5    from the point you told her she was under arrest, up

6    until the time she was released the next day was all

7    fair?

8          A.    Yes.

9          Q.    Okay.

10         A.    That's the way I would treat anyone, yes.

11         Q.    Okay.  And you're okay with the notion that

12   she had to go to jail and had to spend the night in

13   jail?  You felt that was fine, under the circumstances?

14         A.    If she would have cooperated, excuse me,

15   cooperated, she wouldn't have been in jail.  She put

16   herself in jail.

17         Q.    But you said earlier that the only issue

18   was you were having trouble ascertaining her name.  So

19   if when you went to these other sources and you had no

20   ambiguity as to what her name was, you would have just

21   issued the citation and that would have been the end of

22   it, right?

23         A.    If there would have been no ambiguity, yes.

24         Q.    Alright.

25              MR. PADDEN:  Off the record.

1   was, did you ever look at her phone after it was taken

2   into custody?

3          A.    No.

4          Q.    Did you ever look at her camera after it

5   was taken into custody?

6          A.    Yes.

7          Q.    Okay.  Did you have a warrant for that?

8          A.    No.

9          Q.    Okay.  Why did you do that then?

10         A.    Because I asked Judge Knutson if I could

11  have a verbal Court Order to look at the phone -- I'm

12  sorry, the camera.

13                  MR. PADDEN:    I know, it gets me.  I

14  know I have done the same thing in this case, because

15  nowadays it is almost like cameras and phones are one

16  in the same thing.

17                  (Off the record.)

18  BY MR. PADDEN:

19         Q.    So you felt it was okay to look at the

20  phone because the judge said it was okay?

21         A.    Correct.

22         Q.    And what was your purpose in looking at the

23  phone?  The phone first and then we will talk about the

24  camera.

25                  Wait a minute.  You told me that Judge

1      Knutson gave you permission to look at the camera?

2             A.   Yes.

3             Q.   I apologize, sir.  And what was your

4      purpose in looking at the camera?

5             A.   Because Deputy Gonder said that he saw a

6      flash when he entered the courtroom, so we had reason to

7      believe that she had taken a picture in the courtroom,

8      specifically of Deputy Gonder.

9             Q.   Okay.  So you thought it was okay to look

10     at the camera after the judge said it was okay?

11            A.   Correct.

12            Q.   Okay.  Alright.  So, eventually she came

13     back into the courtroom in a wheelchair, without her

14     glasses and handcuffed, right?

15            A.   Yes.

16            Q.   Okay.  And this was an officer of the

17     court, right?

18            A.   Yes.

19            Q.   A licensed attorney?

20            A.   Yes.

21            Q.   Okay.  Have you read the transcript of the

22     questions that Judge Knutson asked you on 9/12/13

23     recently?

24            A.   With my attorney I went over it.

25                      MR. TIMMERMAN:  We are not going to

1      Q.    And you were waiting for a recess to

2 approach Ms. MacDonald?

3      A.    Yes.

4      Q.    Okay.  You told her she was under arrest

5 for the Contempt of Court violation and she needed to go

6 with you to the back hallway, correct?

7      A.    Yes.

8      Q.    And you told her, before you took her back

9 there, that she would be getting a ticket and then she

10 would be released, correct?

11      A.    Yes.

12      Q.    Okay.  Did you escort her out of the

13 courtroom in handcuffs?

14      A.    No.

15      Q.    Okay.  Were you concerned about any of the

16 people that Ms. MacDonald was with, in terms of whether

17 they could be potentially a problem for you from a

18 security perspective?

19      A.    I was more concerned about recording in the

20 courtroom.

21      Q.    Okay.  Did any member of your agency ask --

22 I may have asked this, Counsel, and I apologize, asked

23 Ms. Grazzini-Rucki to leave the courtroom with the file?

24      A.    No.

25      Q.    Do you know who took the file out of the

1          Q.   Okay.  So she was under arrest as you

2     actually escorted her out of the courtroom, correct?

3          A.   Yes.

4          Q.   Okay.  I apologize.

5               How much time elapsed from the time you

6     escorted her out of the courtroom up until the time she

7     started crying?

8          A.   I don't remember.

9          Q.   Did anybody ever mention the name of a

10    person Nelson Mandela during the time you interacted

11    with Ms. MacDonald on 9/12/13?

12         A.   I don't remember.

13         Q.   Okay.  How long was the lunch break, sir?

14         A.   For specifics, I would have to look at the

15    report, if I put it in there.

16         Q.   That's okay.  How quickly was she

17    handcuffed, in terms of time, after the time that she

18    was taken out of the courtroom?

19         A.   It was a significant period of time.

20         Q.   Meaning over an hour?

21         A.   Over an hour.

22         Q.   Okay.  Did you bring her back in the

23    courtroom only because the judge asked that she be

24    brought back into the courtroom?

25         A.   I know he did ask, so we brought her down.

1          Q.   Okay.  But you wouldn't have done that but
2     for the judge asking that she be brought back in?
3          A.   Correct.
4          Q.   Okay.  After she was brought back in the
5     courtroom, the judge continued with the trial, correct?
6          A.   Yes.
7          Q.   How long did that go on for?
8          A.   I don't know how long the whole trial went.
9     I left the courtroom.
10         Q.   So you -- after she was brought back in the
11    courtroom, you did not stay with her, correct?
12         A.   Correct.
13         Q.   Did you order someone to be in the
14    courtroom the whole time she was in there?
15         A.   Yes.
16         Q.   So, once she was under arrest and detained,
17    in a wheelchair, handcuffed and back in the courtroom,
18    it would not be appropriate for her to ever be alone
19    without a member of law enforcement, correct?
20         A.   Correct.
21         Q.   Did you designate a particular person to
22    handle those duties, sir?
23         A.   Deputy Gonder brought her back down.  And
24    then if we have a person that's in custody, a deputy has
25    to stay with that person.

1          Q.    Okay.  I mean you probably had kind of a

2     general idea of what you were dealing with here, right?

3          A.    She had shut down, yes.

4          Q.    Alright.  A female attorney who was maybe

5     110 pounds, I mean was she really a threat to you guys?

6               MR. TIMMERMAN:  Objection; asked and

7     answered and argumentative.

8     BY MR. PADDEN:

9          Q.    Go ahead.

10         A.    Yes.  I've had physical encounters with

11    women her size and it's -- it's a use of force and it

12    can go bad.

13         Q.    Did you have any interaction with Attorney

14    Fluegel at all on 9/12/13 or 9/13/13?

15         A.    No.

16         Q.    Have you ever been trained in PREA, sir?

17         A.    Yes.

18         Q.    Okay.  Have you ever been trained in

19    deescalation techniques?  I don't know if I asked that

20    one.

21               MR. TIMMERMAN:  You have.

22               MR. PADDEN:  I did?  Okay.

23    BY MR. PADDEN:

24         Q.    Can you tell me?

25         A.    Yes.

1          A.    That's our protocol.

2          Q.    So no matter who it is, whether it is a

3    misdemeanor or up, you handcuff them?

4          A.    Right, it prevents escape.

5          Q.    I know.  But isn't there a big difference

6    between an attorney taking a picture of a deputy in a

7    courtroom versus a guy in custody for armed robbery or

8    something?  Or do you not make any distinction that way?

9          A.    I do make a distinction.  A person that

10   would be held in custody for a violent felony would

11   probably have an ankle bracelet and be more severely

12   restrained.

13         Q.    Michelle MacDonald wasn't a security risk,

14   was she?

15         A.    Can you specifically say what type of

16   security?  To harm me maybe?

17         Q.    Yes.  Was she a threat to harm you?

18         A.    She could be, yes.

19         Q.    Okay.  And did she have a criminal record?

20   Did you ascertain whether she had a criminal record

21   while all of this was going on?

22         A.    I know that she had a DWI.

23         Q.    Okay.  But no crimes of -- how do I say

24   this?  There were no serious felonies, correct?

25         A.    Correct.

1   keep men at the jail and we forward female inmates to

2   the Ramsey County Workhouse.  Women do stay overnight.

3   They stay for days.  I don't know the policies regarding

4   the females that get to stay and the durations.

5        Q.  Was a female member of your agency involved

6   with Ms. MacDonald with the process of handcuffing her

7   and putting her in the wheelchair before she came back

8   in the courtroom?

9        A.  Sergeant Jennifer Cho, who is no longer

10  with us, she -- I know she did the pat search on

11  Ms. MacDonald.

12       Q.  Okay.  Other than that, was it men that

13  were involved with physically putting her in the

14  wheelchair?

15       A.  Yes, I was.

16       Q.  It wasn't a female?

17       A.  I don't remember whether Sergeant Cho was

18  involved.  I'm not sure.

19       Q.  Did someone assist you in putting Ms.

20  MacDonald in the wheelchair?

21       A.  Yes.  I believe -- I believe it was Deputy

22  Napper or Deputy Gonder, but I think it was Deputy

23  Napper that helped.

24       Q.  Do you have any knowledge of how it was

25  that the photo or the mugshot that day of Ms. MacDonald