1         UNITED STATES DISTRICT COURT

2          DISTRICT OF MINNESOTA

3    - - - - - - - - - - - - - - - - - - - - - - - - -

4    Michelle MacDonald Shimota, et al.,

5              Plaintiffs,

6         vs.              CASE NO. 15-CV-1590-JRT-KMM

7    Bob Wegner, et al.,

8              Defendants.

9    - - - - - - - - - - - - - - - - - - - - - - - - -

10

11         VIDEOTAPED DEPOSITION OF

12      MICHELLE MACDONALD SHIMOTA

13

14       Taken October 20, 2016

15      Commencing at 8:38 a.m.

16

17

18

19

20

21

22

23

24

25       REPORTED BY:  AMY KRISTINA LIZOTTE

```
 1              Videotaped Deposition of MICHELLE

 2   MACDONALD SHIMOTA taken on October 20, 2016,

 3   commencing at 8:38 a.m., at Dakota County

 4   Administration Center, 1590 Highway 55, Hastings,

 5   Minnesota, before Amy Kristina Lizotte, Notary

 6   Public of and for the State of Minnesota.

 7

 8                      * * * * * * * * *

 9

10                      APPEARANCES

11

12   On Behalf of the Plaintiffs:

13         Michael B. Padden, Esq.

14         mike.padden@paddenlaw.com

15         PADDEN & McCOLLISTER, PLLC

16         8673 Eagle Point Boulevard

17         Lake Elmo, Minnesota 55042

18         612-669-4542

19

20

21

22

23

24

25
```

```
 1    On Behalf of the Defendants:

 2            Jeffrey A. Timmerman, Esq.

 3            jeff.timmerman@co.dakota.mn.us

 4            Assistant County Attorney

 5            Dakota County Judicial Center

 6            1560 Highway 55

 7            Hastings, Minnesota 55033

 8            651-438-4438

 9

10

11

12    VIDEOGRAPHER:  Pat Curto

13

14

15

16            NOTE:  The original transcript will be filed

17    with Jeffrey Timmerman, Assistant County Attorney,

18    pursuant to the applicable Rules of Civil Procedure.

19

20

21

22

23

24

25
```

1                         INDEX

2

3      WITNESS:  MICHELLE MACDONALD SHIMOTA            PAGE

4

5      EXAMINATION BY MR. TIMMERMAN.................        9

6

7

8      OBJECTIONS:

9           BY MR. PADDEN:  58, 84, 85, 99, 124, 131,

10                      230, 231, 232, 252

11

12

13     INSTRUCTIONS NOT TO ANSWER:   (NONE)

14

15

16     PRODUCTION REQUESTS:   (NONE)

17

18

19     EXHIBITS MARKED AND REFERRED TO:

20     Exhibit 1:  Jared, The Galleria of Jewelry

21          receipt = Bates MacDonald 00502-00510...  16

22     Exhibit 2:  Judicial Election Committee of the

23          2014 RPM State Convention = Bates

24          MacDonald 00655-00674.......... 29, 127, 140

25

```
 1    Exhibit 3:   Incident, Dakota Sheriff, Case Number
 2                 13001625 = Bates DC 00056-00059...... 35, 91
 3    Exhibit 4:   Affidavit of David Knutson...... 46, 187
 4    Exhibit 5:   Plaintiff's Amended Answers to
 5                 Defendants' Interrogatories............  56
 6    Exhibit 6:   Movement log for Michelle MacDonald   98
 7    Exhibit 7:   Deputy Roster, Dakota County = Bates
 8                 DC 00002-00003, CONFIDENTIAL........... 105
 9    Exhibit 8:   Police Central - Full Incident Report
10                 Dakota County Jail, 9-12-13 = Bates
11                 DC 00042-00044........................ 116
12    Exhibit 9:   Report, actual date and time, category,
13                 comments, name, staff description = Bates
14                 DC 00032-00036.................... 138, 143
15    Exhibit 10:  Color copies of photos, Negative
16                 Pressure room, Bates DC 00070-00073,
17                 CONFIDENTIAL.......................... 159
18    Exhibit 11:  Re:  First Letter - MacDonald
19                 hearing Oct. 1 at 1:30 = Bates
20                 MacDonald 00581-00585................. 167
21    Exhibit 12:  First Amended Complaint........... 182
22    Exhibit 13:  Police Central - Inmate Property =
23                 DC 00053-00054................... 182, 193
24
25
```

1  Exhibit 14:   11-4-14 letter to Dakota County

2            District Court from Associated Clinic of

3            Psychology, Gregory Hanson, PhD......... 223

4  Exhibit 15:   Petition for Disciplinary Action

5            against Michelle Lowney MacDonald....... 243

6  Exhibit 16:   YouTube - Michelle MacDonald for

7            Justice................................. 261

8  Exhibit 17:   State of Minnesota v Michelle

9            MacDonald Shimota, motion hearing....... 263

10 Exhibit 18:   "Sandra Grazzini-Rucki and the World's

11            Last Custody Trial," by Attorney Michelle

12            MacDonald and Michael Volpe............. 272

13

14

15

16

17

18

19

20  (Original exhibits attached to original transcript;

21  copies attached to transcript copies.)

22

23

24

25

1          MR. PADDEN:  Today's deposition is

2    being videotaped.  And I'd like an agreement that

3    this video will only be used for purposes of this

4    litigation, will not be disseminated publicly to

5    media or anyone outside of this lawsuit.  And I'd

6    like that agreement to extend to Counsel's

7    employees.

8          The reason I mention that is because -- and

9    I'm not critical of this at all, but images taken

10   earlier that are the subject of this case have ended

11   up in the public domain, that I've made clear in

12   communications.  And I realize there may be issues

13   pertaining to the freedom of information.  I'm not

14   going to get into all of that.  But I want an

15   understanding that this video deposition will not be

16   disseminated publicly.

17          I assume that's agreeable, Counsel?

18          MR. TIMMERMAN:  Yes, that's agreeable.

19   Just one clarification in terms of showing it to my

20   staff, I can -- with the understanding that it's not

21   going to be publicly disseminated, I may show it to

22   my coworkers.

23          MR. PADDEN:  Absolutely, that's fine.

24   And obviously if we had a trial you're going to be

25   playing it in the courtroom, I get all that.

1          MR. TIMMERMAN:  Correct.

2          MR. PADDEN:  I just don't want the

3    physical video disseminated publicly.  I take it we

4    have an agreement in that regard?

5          MR. TIMMERMAN:  Absolutely.

6          MR. PADDEN:  And I would provide the

7    same agreement to you if I take video depositions of

8    your witnesses.  I don't plan on doing that, but I

9    could change my mind.  But I just want to make sure

10   that you understand that would be reciprocal.

11         MR. TIMMERMAN:  Yeah, that makes sense.

12         MR. PADDEN:  Okay.  All right.

13         MR. TIMMERMAN:  I appreciate it.

14         MR. PADDEN:  Okay.  Fair enough.

15         THE VIDEOGRAPHER:  Here begins disc

16   number one in the deposition of Michelle MacDonald

17   Shimota, taken in the matter of Michelle MacDonald

18   Shimota, et al., versus Bob Wegner, et al., United

19   States District Court for the District of Minnesota,

20   case number 15-CV-1590-JTR [sic] KMM.  Today's date,

21   as indicated, is October 20, 2016.  The time as

22   indicated is 8:42 a.m.

23         My name is Pat Curto.  I'm a certified legal

24   video specialist in association with Paradigm

25   Digital Videography.

1            Would counsel please state their appearances

2      for the record, starting with the noticing attorney.

3            MR. TIMMERMAN:  Good morning.  I'm Jeff

4      Timmerman, and I represent defendants, Dakota

5      County, Bob Wegner, Christopher Melton, Timothy

6      Gonder, and Jon Napper.

7            MR. PADDEN:  Michael Padden on behalf

8      of plaintiff.

9            THE VIDEOGRAPHER:  Thank you.  The

10     court reporter is Amy Lizotte of Paradigm Reporting

11     and Captioning.  Ms. Shimota, you may remain --

12     Ms. MacDonald, I'm sorry, you may remain seated and

13     the court reporter will swear you in.

14           MICHELLE SHIMOTA MACDONALD,

15     duly sworn, was examined and testified as follows:

16                      EXAMINATION

17     BY MR. TIMMERMAN:

18        Q.  Good morning.  Would you prefer that I call

19     you Ms. MacDonald or Ms. Shimota today?

20        A.  Ms. MacDonald.

21        Q.  Ms. MacDonald, okay.  Could you please state

22     your full legal name for the record.

23        A.  It's Michelle Lowney MacDonald Shimota.

24        Q.  And, Ms. MacDonald, what is your address?

25        A.  It's 2800 - 130th Street West, Rosemount,

1   Minnesota, 55068.

2       Q.  Thank you.  Now, I understand you've gone by

3   Michelle Lowney, correct, in the past?

4       A.  I -- that was my maiden name.

5       Q.  Maiden name.  And then MacDonald, which you

6   go by now, and Shimota as well.  Are there any other

7   names that you've gone by other than those three

8   names?

9       A.  No.

10      Q.  Have you ever given a deposition before?

11      A.  Yes.

12      Q.  And when was that?

13      A.  It was in 2012, I'm not sure exactly when.

14      Q.  Was that in a civil lawsuit?

15      A.  Might be in -- yes.

16      Q.  What kind of a lawsuit was that?

17      A.  It was a lawsuit brought against Family

18  Innocence Project, when we were Family Innocence

19  Project, by the Innocence Project for trademark and

20  name change.

21      Q.  Okay.  I'm familiar with that lawsuit.  And

22  as a result the name was changed to Family

23  Innocence, correct?

24      A.  Correct.

25      Q.  Okay.  Any other depositions that you've

1   given before in the past?

2      A.   Not that I recall.

3      Q.   Okay.  Well, I just want to go over a couple

4   of ground rules that I go over with everyone just to

5   try and keep us on the same page here today.

6   Obviously we have a court reporter here today and a

7   videographer.  If you could refrain from answering

8   questions by nodding or shaking your head, I would

9   appreciate it.  Okay?

10      A.   Okay.

11      Q.   Okay.  I'll do the same thing at some point

12   I'm sure.  It's inevitable I think.  If you need to

13   take a break today at any point, we certainly can.

14   This is not a marathon and I'm not trying to trick

15   you.  If you need to take a break, let me know, and

16   we can accommodate that.  Okay?

17      A.   Thank you.

18      Q.   If you don't understand a question that I

19   ask, just tell me and I'll try my best to ask a

20   better question.  Okay?

21      A.   Thank you.

22      Q.   Likewise, if I'm confusing, and I'm going to

23   try not be confusing, but if I am just let me know.

24   Okay?

25      A.   Thank you.  Yes.

1    Q.   If you answer a question I will assume that

2   you understood the question.   Is that fair?

3    A.   Thank you.   Yes.

4    Q.   And the last two kind of ground rules here,

5   if you want to correct an answer at any point today

6   just let me know.   Okay?

7    A.   Okay.

8    Q.   And likewise, if you want to supplement or

9   add to an answer at any point today, just let me

10   know and we can do that.   Okay?

11    A.   Okay.

12    Q.   Is there any reason why you would be unable

13   to answer my questions truthfully today?

14    A.   No.

15    Q.   Are you presently on any medications that

16   affect your memory at all?

17    A.   No.

18    Q.   If at any point today you believe you are

19   unable to continue answering my questions, just let

20   me know that.   Okay?

21    A.   Okay.

22    Q.   What did you do to prepare for your

23   deposition today?

24    A.   Prayed.

25    Q.   Anything else?

1     A.   Thought about things.

2     Q.   Prayed and thought about things.  Anything

3 else?

4     A.   No.

5     Q.   Okay.  And I want to make one additional

6 ground rule clear today.  I don't want to know about

7 anything that you discussed with your lawyer.  My

8 questions are not intended to infringe upon the

9 attorney/client privilege.  So I just want to make

10 that clear.  If there is any information I'm seeking

11 from that you does, just let me know.  Okay?

12          MR. PADDEN:  To be clear, Michelle, I

13 think what Jeff is asking about is any preparation

14 you would have done other than speaking with me.  I

15 think that was presumed in the question, so.

16     Q.   Correct.

17     A.   Thank you.

18     Q.   Did you review any documents to prepare for

19 your deposition today?

20     A.   I didn't.  I didn't have time unfortunate --

21 you know, I just didn't have time, so I didn't.

22     Q.   Other than your attorneys, with whom have

23 you discussed the fact that you were being deposed

24 today?

25     A.   That I was being deposed today?  My husband,

1    my attorneys, my paralegal, because she had to

2    schedule it.  I can't think of anyone else.

3        Q.  Okay.  And this question is not meant to be

4    offensive, I ask everyone this, but are you

5    presently in bankruptcy?

6        A.  No.

7        Q.  Any plans to file bankruptcy in the future?

8        A.  No.

9        Q.  I'm planning today to limit the scope of my

10   questions to your four remaining claims in this

11   lawsuit.  Do you understand that you have four

12   remaining claims in this lawsuit?

13       A.  Yes.

14       Q.  Okay.  I just want to quickly go over those

15   so that we're on the same page.  The first is a

16   Fourth Amendment claim relating to the search of a

17   digital camera, correct?

18       A.  Yes.

19       Q.  And the second remaining claim is a

20   Fourteenth Amendment substantive due process claim

21   relating to the conditions of your confinement.  Do

22   you understand that?

23       A.  Yes.

24       Q.  And the third claim is a theft or taking

25   claim relating to the gold cross pendant you claim

1   was lost while you were confined.  Do you understand

2   that as well?

3        A.   Yes.

4        Q.   And the fourth claim is a respondeat

5   superior claim against Dakota County based on the

6   loss of that pendant.  Do you understand that as

7   well?

8        A.   Yes.

9        Q.   Now, you've produced some documentation in

10  this litigation concerning the gold cross pendant.

11  It looks like a Jared Galleria receipt.  I have to

12  be honest, I can't make out the numbers on it or

13  really anything on it.  Can you tell me how much

14  that gold cross pendant cost?

15       A.   Well, my husband bought it for me for my

16  birthday.  And if I saw the receipt, I could help

17  you out with the date.  He bought it, so he paid for

18  it.

19       Q.   Okay.  I think it was 2008.  Does that sound

20  correct?

21       A.   I'll have to look at the receipt.

22       Q.   Okay.

23       A.   But it was, you know, several years before

24  this incident.

25            MR. TIMMERMAN:  Could you please mark

```
 1    this as Exhibit 1 to the deposition.
 2                 (MacDonald Deposition Exhibit No. 1
 3                 marked for identification.)
 4                 MR. PADDEN:  Madam Court Reporter, did
 5    you get Jeff saying he has copies for me?
 6                 THE REPORTER:  No, I didn't.
 7                 MR. PADDEN:  Okay.  And my response?
 8                 THE REPORTER:  No.
 9                 MR. PADDEN:  I said, thank you.
10    BY MR. TIMMERMAN:
11        Q.  Ms. MacDonald, these are documents you
12    produced in this litigation relating to the gold
13    cross pendant.  In reviewing these documents, does
14    this refresh your recollection regarding when the
15    pendant was purchased and the purchase price of the
16    pendant?
17        A.  I can't read it very well either, but in my
18    interrogatories I wrote down the numbers.
19        Q.  You did?
20        A.  Yes.
21        Q.  Okay.  In your original interrogatory
22    answers you did?
23        A.  I believe I did.
24        Q.  Pardon me while I take a look here.
25    Interrogatory number 4 asks, identify the monetary
```

1   value of the necklace, necklace defined to mean the

2   gold cross pendant, and every document that

3   evidences the value of the necklace.

4          And your answer to that interrogatory was,

5   see the receipt which is part of this answering

6   parties response to defendant's document request

7   pleading.

8          A.  Oh, I'm sorry about that.  I thought I had

9   written the number down.  And I have a clearer copy

10  of the receipt.  But I thought it was around you

11  know, 500 and some odd dollars.

12         Q.  Around $500?

13         A.  A little more than $500.

14         Q.  Is that including the service plan that was

15  purchased for it or exclusive of that service plan?

16         A.  Exclusive.  And then it says 219.99 here as

17  well.  I don't know that that was the service plan.

18         Q.  So that may be the service plan, but it may

19  not, we just don't know?

20         A.  Right, right.

21         Q.  Could you give me an estimated value, and I

22  understand that this receipt is not entirely

23  legible, to the best of your recollection an

24  estimated value of the cost of the service plan?

25         A.  I don't know.  My husband bought it.

1      Q.   Okay.

2      A.   He'd be a better witness for that because he

3   bought it --

4      Q.   Sure.

5      A.   -- for me.

6      Q.   And the digital camera that is the subject

7   of your Fourth Amendment claim, is it your

8   understanding that I returned that to your lawyers

9   in this lawsuit?

10      A.   After several years, yes.

11      Q.   Okay.  And do you have that camera now?

12      A.   Yes.  And there were many photographs in the

13   camera, thousands of them, that you finally

14   returned, you slipped it to one of my attorneys at a

15   hearing was my understanding.

16      Q.   Yes, I had made an agreement with your

17   attorney that I would personally look for the camera

18   and return it if I found it.  And then I did, so.

19          Any pictures on that camera that you claim

20   were deleted at all while it was in the custody of

21   the Dakota County Sheriff's Office?

22      A.   I don't know.  I haven't looked at all the

23   pictures.

24      Q.   Okay.  Now, it's my understanding --

25      A.   I think I gave you all the pictures in

1    discovery.

2        Q.  You did, you did produce a lot of pictures.

3    I'm just wondering if you're claiming in the lawsuit

4    that any photos were deleted from that camera while

5    it was in my client's possession.

6        A.  It was gone for so long I can't answer that.

7    I just know that there were thousands of pictures,

8    and I did provide you with all of those that were in

9    my camera.

10       Q.  Fair enough.  And I understand that you've

11   alleged in this lawsuit that on September 12, 2013

12   your cell phone was seized as well, correct?

13       A.  Yes.

14       Q.  For how long was your cell phone seized?

15       A.  Hours, until -- let's see, I want to say 30

16   hours.

17       Q.  Was it returned to you when you were

18   released from the Dakota County jail?

19       A.  It was in my property bag.

20       Q.  The property bag that you received upon

21   being released from the jail?

22       A.  Right.

23       Q.  I'm going to refer just -- I'm going to

24   refer to the Dakota County jail just as the jail

25   today.  Is that okay with you?

1       A.   Yes.

2       Q.   Okay.   Are you claiming in the lawsuit that

3    your cell phone was searched at all?

4       A.   It could have been, yes.

5       Q.   Do you know one way or the other whether it

6    was?

7       A.   I don't.   I assume that it probably was.

8       Q.   And what do you base that assumption on?

9       A.   Because they searched my camera as well.

10      Q.   Okay.   Any other evidence that you have that

11   your cell phone was searched?

12      A.   Because it was taken by Mr. Gonder, and he's

13   the one who searched my cell phone -- I mean my

14   camera, and I believe he searched my cell phone as

15   well.   I didn't take any pictures on my cell phone,

16   so.

17      Q.   Okay.

18      A.   And he -- and I didn't record anything on my

19   cell phone either, and that's why I think he took

20   it.

21      Q.   Took it because he didn't want you to record

22   anything on it?

23      A.   Took it because he thought I was recording

24   something on it.   I don't even know how to record on

25   my cell phone.

1    Q.   Okay.

2    A.   I've never recorded anything on my cell

3    phone.

4    Q.   Okay.

5    A.   I mean in terms of voice.

6    Q.   And before we I think really take a deep

7    dive here into the substance of your claims, your

8    attorney and I have corresponded about some of the

9    economic damages that you initially were seeking in

10   this lawsuit.  I just want to confirm with you on

11   the record here today that you have abandoned all of

12   your claims for loss of past and future earnings and

13   income in this lawsuit, correct?

14   A.   Yes.

15   Q.   I also want to confirm with you on the

16   record today that you have abandoned all of your

17   clams for loss of future earnings capacity in this

18   lawsuit, correct?

19   A.   Yes.

20   Q.   Have you abandoned your claims -- let me

21   back up a moment.  I understand that you may at some

22   point seek your attorneys fees and costs incurred in

23   connection with prosecuting this lawsuit.  But have

24   you abandoned your claims for attorneys fees and

25   costs that you incurred defending against criminal

1   charges that were brought against you?

2       A.   No.

3       Q.   You have not abandoned those claims?

4       A.   No.

5       Q.   Have you abandoned your claims in this

6   lawsuit for attorneys fees and costs you have

7   incurred defending against an action taken by or on

8   behalf of the Minnesota Lawyers Professional

9   Responsibility Board?

10      A.   No.

11      Q.   You're still claiming those damages in

12  this --

13      A.   Yes.

14      Q.   -- lawsuit?  And if you could let me finish

15  my questions --

16      A.   Mm-hmm.

17      Q.   -- before you answer, I would appreciate it,

18  and I'll give you the same courtesy.  Okay?

19      A.   Thank you.

20      Q.   Have you abandoned your claims relating to

21  injury to your reputation in this lawsuit?

22      A.   No.

23      Q.   But you have abandoned them in so much as

24  you're seeking earnings or income damage, correct?

25      A.   I'm not sure how that relates, no.

1    Q.   So you will seek damages for loss of income

2    or earnings based on damage to your reputation?

3    A.   If that relates to my reputation.

4              MR. PADDEN:  No, no, look --

5              THE WITNESS:  No?

6              MR. PADDEN:  We've made it clear in

7    this case that -- abundantly clear that she is

8    making no claim for loss of earnings, past or

9    future, however you want to categorize that, or

10   earning capacity.  So I guess you can ask a series

11   of questions about it, but I think it's been

12   established on the record, so.

13             MR. TIMMERMAN:  Okay.

14             THE WITNESS:  Right.

15   BY MR. TIMMERMAN:

16   Q.   Talk a little bit about you.  You went to

17   Boston College for undergrad, correct?

18   A.   Yes.

19   Q.   And graduated in 1983?

20   A.   Yes.

21   Q.   And then you went to Suffolk University Law

22   School obtaining a Juris Doctorate in 1986?

23   A.   Yes.

24   Q.   And you've owned and operated the MacDonald

25   Law Firm since 2004, is that correct?

1      A.   Yes.

2      Q.   What do you specialize in at the MacDonald

3  Law Firm?

4      A.   It was primarily family law, but I do a

5  number of other things, estate planning and wills

6  and trusts, those were two of my main

7  concentrations, parallel, so estate planning, wills

8  and trusts, and also family law.

9      Q.   Okay.

10     A.   And then many other general things that come

11 up.

12     Q.   And I see in your interrogatory answers that

13 you were also an adjunct referee in family court for

14 some time?

15     A.   Yes.

16     Q.   When was that?

17     A.   For many years.  I want to say -- I -- I

18 have the dates, like 22 years, maybe a little less

19 than that because they stopped the program.

20 That's -- they stopped the program I believe in

21 January of 2012 maybe or '11.  But I was part of it

22 for twenty something years.  I don't have the exact

23 dates.

24     Q.   And that's okay.  Did your involvement end

25 when they stopped the program?

**Michelle MacDonald Shimota**
**10/20/2016**

1   A.   Yes.

2   Q.   Okay.  And you were also a conciliation

3   court judge for twenty plus years as well, correct?

4   A.   Right.

5   Q.   And that was in Hennepin County?

6   A.   Right.

7   Q.   Why did that relationship end?  Why did that

8   position end?

9   A.   The chief judge wrote me a letter after this

10   incident and said I was no longer needed.

11   Q.   After what incident?

12   A.   The incident in what -- what the defendants

13   did to me.

14   Q.   Okay.  When did the chief judge of the

15   Hennepin County District Court write you that

16   letter?

17   A.   I think it was right afterwards, I want to

18   say November or December.

19   Q.   Do you have any evidence suggesting that

20   your conciliation court judge position was ended

21   because of the allegations in your lawsuit or the

22   conduct in which you allege have engaged in the

23   lawsuit?

24   A.   I believe it did.  The chief judge is

25   cousins with the judge in Dakota County, so I -- I

1   had been a small claims court judge for so many

2   years I can't imagine why except for this incident,

3   why I would get a letter like that.

4        Q.   Okay.   Which chief -- pardon me, which

5   Dakota County judge is --

6        A.   Abrams.

7        Q.   Judge Abrams.   Okay.   And aside from your

8   belief that this relationship ended because they

9   were cousins and that had something to do with it,

10  do you have any other evidence that that was the

11  cause of your conciliation court judge position to

12  end?

13       A.   Not that I can recall.

14       Q.   You also founded Family Innocence in 2011,

15  correct?

16       A.   Yes.

17       Q.   Could you tell me a little bit about what

18  Family Innocence is?

19       A.   Family Innocence is a nonprofit that's

20  dedicated to keeping families out of court and

21  resolving conflicts and injustices peacefully.

22       Q.   And you're in favor of abolishing family

23  court altogether, correct?

24       A.   I did have -- yes, yes, I think litigating

25  families has to end.

**Michelle MacDonald Shimota**
**10/20/2016**

1  Q.  Do you also do mediation at all as an

2  alternative dispute resolution?

3  A.  Yes.

4  Q.  How long have you done that for?

5  A.  25 years.

6  Q.  Is that through family justice or is that

7  separately?

8  A.  It's through -- family justice?  Family

9  Innocence.

10  Q.  Excuse me.

11  A.  It is through Golden Rule Mediation.

12  Q.  Are you still doing that today?

13  A.  Yes.

14  Q.  And lastly, you're also an author, editor,

15  and publisher, correct?

16  A.  Yes.

17  Q.  And it looks like you edited a book called

18  bully to death -- "Bullied to Death:  Chris

19  Mackney's Kafkaesque Divorce"?

20  A.  Yes.

21  Q.  And that was released in 2015?

22  A.  Yes.

23  Q.  It who is Michael Volpe?  Is it Volpe?

24  A.  Michael Volpe is -- yes, he's in Chicago,

25  he's an author and investigative journalist.

1      Q.   And how do you know him?

2      A.   And how do I know him?  He -- I had heard

3  about the upcoming book, I think it was probably in

4  2014, so I called him up.

5      Q.   And offered to edit it?

6      A.   Well, I -- he was looking for a publisher,

7  and I knew somebody who might be able to publish his

8  book.   An attorney and a board member of Family

9  Innocence was starting a publishing company.

10      Q.   What's the name of that publishing company?

11      A.   I don't remember.  I don't remember the

12  name.   It had some meaning.  I just don't remember

13  the name.  I'm sorry.

14      Q.   Is that the same publishing company that

15  published your recent book?

16      A.   No.

17      Q.   Your recent book is entitled, "Sandra

18  Grazzini-Rucki and the World's Last Custody Trial"?

19      A.   Right.

20      Q.   And that was co-authored with Michael Volpe?

21      A.   Right.

22      Q.   Who published that book?

23      A.   Familycourt.com.

24      Q.   And what's Familycourt.com?

25      A.   It's an organization that I guess our

1      first order -- one of our orders of business was to

2      publish that book.

3          Q.   Are you involved in the management of

4      Familycourt.com?

5          A.   I'm the president and board member.

6          Q.   When was that formed?

7          A.   About a year ago.

8          Q.   Any other books that you've authored

9      editored [sic] -- excuse me, authored, edited,

10     published, et cetera?

11         A.   I don't think so.  I'm just -- I've written

12     so much that -- no.

13         Q.   Okay.  This would be a good example of if

14     you think of something later today --

15         A.   Okay.

16         Q.   -- that would be responsive, just feel free

17     to stop and we can go back.  Okay?

18         A.   Mm-hmm.

19         Q.   Let's move on then.

20              MR. TIMMERMAN:  I'd like to mark this,

21     please, as Exhibit No. 2 to the deposition.

22              MR. PADDEN:  Thank you.

23              MR. TIMMERMAN:  You bet.

24              (MacDonald Deposition Exhibit No. 2

25              marked for identification.)

```
 1   BY MR. TIMMERMAN:

 2      Q.   Ms. MacDonald, this has been marked as

 3   Exhibit 2 to your deposition.  Please take a moment

 4   to review it and let me know when you're ready.

 5      A.   I'm ready.

 6                 MR. TIMMERMAN:   Go off the record for

 7   one moment.

 8                 THE VIDEOGRAPHER:   Going off the record

 9   at 9:10 a.m.

10                 (Brief discussion off the record.)

11                 THE VIDEOGRAPHER:   Back on the record

12   at 9:11 a.m.

13   BY MR. TIMMERMAN:

14      Q.   Ms. MacDonald, do you recognize this

15   document?

16      A.   Yes.

17      Q.   Who drafted it?

18      A.   I believe that it was sent to me by this

19   group, the Judicial Election Committee, for editing

20   and that I put it out, I drafted it.

21      Q.   I'm sorry, they -- the --

22      A.   It was -- they started a draft, and then I

23   finished it.  So it was drafted -- you know, by me.

24      Q.   Okay.  And this was -- it says on the last

25   page, prepared and paid for by MacDonald for
```

1   Justice, is that correct?

2       A.   Right.

3       Q.   And this was an official campaign release of

4   MacDonald for Justice?

5       A.   Yes.

6       Q.   And this relates to 2014 Supreme Court

7   election, correct?

8       A.   Yes.

9       Q.   If you could please turn to the pages with

10  the number 659 at the top of it, flipping over to

11  660.  Who are these individuals that are listed on

12  659 and 660?

13      A.   They were the judicial selection committee

14  at the time.

15      Q.   For the republican party?

16      A.   Yes.  It's made up of there's ten judicial

17  districts, just so you understand, and there's two

18  appointed representatives from each district that

19  wrote this.

20      Q.   And Tim Kinley is listed here.  He's got a

21  show called "Speechless," right?

22      A.   Right.

23      Q.   You've appeared on that show before,

24  correct?

25      A.   Yes.

1    Q.   Did you appear on that show voluntarily?

2    A.   Yes.

3    Q.   And you've discussed this lawsuit on that

4    show, correct?

5    A.   No, I don't know that I -- I mean, I

6    discussed the incident on the show, yes.

7    Q.   You've discussed the allegations in your

8    First Amendment complaint on the show, correct?

9    A.   I hadn't had the lawsuit, the lawsuit wasn't

10   filed at that time.

11   Q.   You discussed your courtroom arrest on

12   Speechless, though, correct?

13   A.   Yes.

14   Q.   And your subsequent incarceration, correct?

15   A.   Yes.

16   Q.   If you could please turn to the page

17   numbered 671 at the top.  First full paragraph on

18   that page starts with Judge Leslie Metzen.  Do you

19   see that?

20   A.   Yes.

21   Q.   And the last sentence of that paragraph

22   reads, "So her husband's camera with 2,000 personal

23   photos has not been returned to her," and the word

24   "husband's" is italicized.  Do you see that?

25   A.   Right.

**Michelle MacDonald Shimota**
**10/20/2016**

1    Q.   So the digital camera that was seized from

2  you on September 12, 2013, was that your husband's

3  camera?

4    A.   He had purchased it, but it was a family

5  camera.   I took all the pictures, not all of them,

6  but he took them, too.

7    Q.   How frequently did you use that digital

8  camera prior to September 12, 2013?

9    A.   Well, I had taken over 3,000 pictures, so

10  pretty regularly.

11    Q.   Why did you bring that particular camera

12  with you to court on September 12, 2013?

13    A.   It happened to be in my bag, my pocketbook.

14    Q.   Why did you decide to use it at the

15  courthouse that day?

16    A.   Because the trial that I was going to had

17  been marked cancelled on a public roster.

18    Q.   The public roster hanging outside of the

19  courthouse -- the courtroom, excuse me?

20    A.   No, online.

21    Q.   The online docket read that the trial had

22  been cancelled?

23    A.   Yes.

24    Q.   So did you intend to photograph the

25  courtroom docket hanging outside of the courtroom to

1   demonstrate that the trial was actually proceeding?

2        A.   I went -- when I went through the -- it was

3   the second day of trial when I went -- did I intend

4   to take a picture -- there is no docket.  I took a

5   picture of the -- at the clerk's office I believe I

6   took a picture of the docket, the paper docket that

7   was there.

8        Q.   Okay.  That makes sense.  And you also

9   photographed Deputy Timothy Gonder that day,

10  correct?

11       A.   Yes.

12       Q.   And that was inside courtroom 1F I believe

13  at the courthouse?

14       A.   Yes.

15       Q.   Why did you decide to photograph Deputy

16  Gonder?

17       A.   He was smiling and waving.

18       Q.   Had you taken photographs inside a courtroom

19  at the Dakota County Judicial Center before

20  September 12, 2013?

21       A.   Yes.

22       Q.   Why?

23       A.   I don't remember why.  It could have been

24  adoption hearings, sometimes with my clients I would

25  take photographs at the courthouse.

1    Q.   Have you taken any photographs inside the

2  Dakota County Judicial Center since September 12,

3  2013?

4    A.   Not that I can recall.

5         MR. TIMMERMAN:   Will you please mark

6  this as Exhibit 3 to the deposition.

7         (MacDonald Deposition Exhibit No. 3

8         marked for identification.)

9  BY MR. TIMMERMAN:

10   Q.   Ms. MacDonald, you've been handed what's

11  been marked as Exhibit 3 to the deposition.   Please

12  take a moment and have a look.

13        Have you had a chance to review this

14  document?

15   A.   I've never seen it before.

16   Q.   Okay.   Do you see --

17   A.   And I'm not going to -- I'll have to review

18  it.

19   Q.   Well, please take a moment.   Do you see in

20  the bottom right-hand corner there is a Bates label

21  that starts with DC and then 00056?

22   A.   Right, yes.

23   Q.   That indicates these were documents that

24  that have been produced by my client in this lawsuit

25  previously.

1       A.   Okay.   I've never seen this.   I can ask my

2   attorney --

3               MR. PADDEN:   No, look, he's just

4   asking.   I think he wants to ask you questions about

5   it, so --

6               THE WITNESS:   Okay.

7               MR. PADDEN:   If you feel like you need

8   to read the whole thing, you know, that's fine.   But

9   if you can just generally familiarize yourself with

10  it I think that's what he would like, and then he

11  presumably will ask you specific questions.

12          Am I right, Counsel?

13              MR. TIMMERMAN:   You're right.

14              MR. PADDEN:   Okay.

15  BY MR. TIMMERMAN:

16      Q.   Just let me know when you're ready.

17      A.   I -- I -- I like to read things carefully,

18  so --

19              MR. PADDEN:   Well --

20      A.   -- ask away.

21              MR. PADDEN:   Do you feel you need to

22  read the whole thing before he asks you questions?

23              THE WITNESS:   I haven't seen this

24  before, and I don't know who it was generated by.

25

1   BY MR. TIMMERMAN:

2       Q.   Well, I'll represent to you if you look at

3   the bottom right-hand corner of the document it

4   says, creation; Christopher T. Melton, September 12,

5   2013.

6       A.   Mm-hmm.

7       Q.   Do you have any reason for disputing that

8   Sergeant Melton created this incident report on

9   September 12, 2013?

10          MR. PADDEN:   I guess lacks foundation.

11  But go ahead and answer.

12      A.   I don't know.  He -- I have no -- I do I

13  guess.  I don't know when this was generated.  I

14  have not seen it before.

15      Q.   Okay.  Could you turn to the second page,

16  please, it's labeled DC 00057.

17      A.   Mm-hmm.

18      Q.   Top of that page, do you see the sentence in

19  the first paragraph that begins with Deputy Gonder?

20      A.   Mm-hmm.

21      Q.   And it reads, Deputy Gonder gave me the

22  camera and I went back to the hallway to speak with

23  Judge Knutson.

24          Do you see that?

25      A.   Yes.

1    Q.  Okay.  Do you have any knowledge regarding

2  Sergeant Melton taking the digital camera to Judge

3  Knutson?

4    A.  No.

5    Q.  Any reason for disputing that it was

6  Sergeant Melton who took the camera to Judge

7  Knutson?

8    A.  I -- he did some testimony on this, and I

9  thought it was both of them.  He testified in court

10  about this, Melton and Gonder.

11    Q.  Okay.

12    A.  So that would be their -- that would be

13  them.  I have no personal knowledge of what took

14  place.

15    Q.  And the next sentence reads, I advised him,

16  him here means Judge Knutson, of the situation and

17  asked if I could have a verbal court order to look

18  at the phone's pictures.  And I think he means

19  camera there because he's talking about the camera

20  in the previous sentence.  He said, yes, and I

21  turned the camera on and observed the picture she

22  had taken of Deputy Gonder.

23        Do you see that?

24    A.  Yes.

25    Q.  Okay.  Do you have any personal knowledge

1   regarding any conversations that occurred between

2   Judge Knutson and Sergeant Melton on that day?

3       A.   Just what they said.

4       Q.   Do you have any reason for disputing that

5   Judge Knutson gave Sergeant Melton permission to

6   search your digital camera?

7       A.   No.

8       Q.   Do you recall Sergeant Melton giving you

9   copies of Minnesota Rule, General Rule of Practice

10  4.01, on September 12, 2013?

11      A.   Yes.

12      Q.   And do you recall Sergeant Melton giving you

13  a copy of Minnesota Statute, Section 588.20 on

14  September 12, 2013?

15      A.   I believe he did.

16      Q.   Now, you've produced Rule 4.01 and Section

17  588.20 in the lawsuit.  Are those the copies that

18  Sergeant Melton gave you that day?

19      A.   They were copies found in my property bag.

20      Q.   So did he physically hand you the rule and

21  the statute that day, copies of them?

22      A.   I don't remember him physically handing it

23  to me, he -- he took it back, he -- I don't recall.

24      Q.   Okay.  He showed it to you and then took it

25  back to the desk --

1    A.   I don't recall exactly how it went, but I
2    recall them bringing me the statute and the rule,
3    and I told them I didn't break a rule or a statute.
4    Q.   Who is Michael Rhedin or Rhedin?  How is it
5    pronounced?
6    A.   Rhedin.
7          MR. TIMMERMAN:  And for the court
8    reporter it's spelled R-H-E-D-I-N.
9    Q.   Who is he?
10   A.   He was Sandra Grazzini-Rucki's boyfriend.
11   Q.   In September of 2013?
12   A.   I don't know that they were dating then.  He
13   was a supporter of hers, but he was -- he was her --
14   he was her boyfriend.
15   Q.   Were they married or just
16   boyfriend/girlfriend?
17   A.   Well, that's between them.  My understanding
18   is they -- they -- no, they weren't married.
19   Q.   On September 12, 2013 after your camera had
20   been taken, do you recall Sergeant Melton informing
21   you that you would be getting a ticket and then you
22   would be released?
23   A.   No, I don't, I don't recall that.
24   Q.   Do you recall Sergeant Melton asking you for
25   your full name, your date of birth, and your

1    address?

2         A.   I recall him asking me for my name.

3         Q.   What about your date of birth and address?

4         A.   I don't remember date of birth or address.

5         Q.   Was it your understanding that you'd be

6    issued a citation and then released if you provided

7    your full name, date of birth, and address?

8         A.   No.

9         Q.   You were never told that at any point by

10   anyone?

11        A.   No.

12        Q.   So Deputy Gonder never told you that,

13   correct?

14        A.   No.

15        Q.   If you look again on page DC 00057, at the

16   paragraph starting at 1010 hours, do you see that

17   paragraph?

18        A.   Mm-hmm.

19        Q.   The fifth line down midway through there's a

20   sentence that begins, I explained.  Do you see that?

21        A.   Mm-hmm.

22        Q.   I explained, this is Sergeant Melton, I

23   explained that she was getting a ticket and then

24   would be released.

25             It's your testimony today that Sergeant

1   Melton never explained that to you?

2        A.   I don't think he explained it in that way.

3   He was ask -- he asked me my name.  I said, you know

4   my name.

5        Q.   How did he explain it to you?

6        A.   He didn't -- he just -- it -- he -- he -- I

7   was saying I didn't do anything.  Then he was

8   bringing me this statute.  I said, I didn't violate

9   it.  It wasn't a statute.  I didn't violate the

10  statute.  I didn't violate it.  That's how the

11  conversation went.

12       Q.   Did you provide Sergeant Melton with your

13  full name?

14       A.   I said, you know my name, that was my

15  answer.

16       Q.   Did you at any point in time provide

17  Sergeant Melton with your full name?

18       A.   No, I think I said, you know my name.

19       Q.   Did you provide any other courthouse staff

20  with your name that day, Deputy Gonder, Sergeant Jen

21  Cho, Deputy Napper, did you give any of them your

22  full name?

23       A.   I announced it in court.

24       Q.   You did?

25       A.   I said, you know, that's what you do when

1    you're in court.  Yes, I announced that I was, you

2    know, Michelle MacDonald representing Sandra

3    Grazzini-Rucki.

4         Q.   Did you provide Sergeant Melton with your

5    date of birth on September 12, 2013?

6         A.   No.

7         Q.   Did you provide him with your address that

8    day?

9         A.   No.

10        Q.   Did you provide Deputy Gonder with your full

11   name, date of birth, or address that day?

12        A.   No.

13        Q.   How about Sergeant Cho?

14        A.   Cho?

15        Q.   Cho.  Female sergeant with whom you

16   interacted in the jail holding cell.

17        A.   I should write that name down.  No.

18        Q.   Did you provide Deputy Napper with your full

19   name, your address, and your date of birth that day?

20        A.   No.

21        Q.   Why not?

22        A.   I don't know.  I don't know.

23        Q.   Why wouldn't you have cooperated with them

24   that day?

25        A.   I was cooperating with them.

1      Q.   But you agree that you weren't providing

2   information that they asked you for, correct?

3      A.   I was cooperating with them fully.

4      Q.   But it's fair to say that you did not

5   provide them with requested information, correct?

6      A.   When they asked me my name I said, you know

7   my name.

8      Q.   And did they ask you your date of birth?

9      A.   I don't recall.

10      Q.   Did they ask you for your address?

11      A.   I don't recall.

12      Q.   So you made the decision rather than telling

13   them your full name just to say you already know my

14   name, something to that effect?

15      A.   They knew my name, yes.

16      Q.   At any point in time was it explained to you

17   that you would be issued a citation and immediately

18   released if you just provided this information?

19      A.   I don't recall them saying just take the

20   citation and you'll be released.  I recall them

21   showing me the statute, almost trying to negotiate.

22   And I said, well -- they brought me the statute,

23   they brought me the rule, and I said I didn't break

24   this rule or this statute.  That was how the

25   conversation went and -- and it was --

1    Q.   Do you recall --

2    A.   That's how it went.

3    Q.   Do you recall Sergeant Melton testifying in

4  court on September 12, 2013 that if you just

5  provided your full name, your address, and your date

6  of birth you'd be issued a citation and released?

7    A.   The -- he testified to what he testified to.

8    Q.   Okay.  Well, let's look at his testimony

9  then.

10        MR. PADDEN:  So is your question, Jeff,

11  whether he said what he said in the courtroom?

12    Q.   I'm asking whether she has any reason for

13  disputing that he testified in open court that you

14  would be issued a citation and released if you

15  simply provided your full name, your address, and

16  your date of birth to courthouse staff.  Any basis

17  for disputing that?

18    A.   His testimony?  The fact that he testified

19  to that?

20        MR. PADDEN:  Just to be clear for the

21  record, are you asking her whether when he said that

22  he was being honest?

23    Q.   What I'm asking, you're saying you don't

24  recall anyone telling you that that day, correct?

25    A.   Right.

```
 1       Q.  And he -- Sergeant Melton testified to
 2   precisely that in court that day.  Were you present
 3   for his testimony?
 4       A.  It wasn't that day.  It was months later.
 5   It was months later when he testified to that.  I --
 6   I --
 7               MR. PADDEN:  Just wait for the next
 8   question.
 9               (MacDonald Deposition Exhibit No. 4
10               marked for identification.)
11   BY MR. TIMMERMAN:
12       Q.  Ms. MacDonald this is Exhibit 4 to your
13   deposition.  Take a moment to familiarize yourself
14   with it.
15               MR. PADDEN:  Have you had a chance to
16   look at it, Michelle?  He's going to ask you
17   specific questions.
18               THE WITNESS:  Yes.
19   BY MR. TIMMERMAN:
20       Q.  Do you recognize this document?
21       A.  Yes.
22       Q.  And this is an affidavit of Judge David
23   Knutson, and an exhibit to that affidavit submitted
24   in the State of Minnesota versus Michelle MacDonald
25   Shimota, correct?
```

1      A.   Yes.

2      Q.   This was the criminal case that was

3    precipitated by your arrest on September 12, 2013,

4    correct?

5      A.   Right.

6      Q.   Okay.   If you could turn please to Exhibit

7    A, page 44 of the partial court transcript here.   Do

8    you see that?

9      A.   Hm.

10     Q.   So at the top of the page, Ms. MacDonald,

11   you say, can I take a break to get a 2011 calendar.

12          And the court says, we'll take our 15-minute

13   morning break at this time, and then a recess was

14   taken.

15          Do you see that?

16     A.   Right.

17     Q.   Does that track your recollection of events

18   that day?

19     A.   Well, actually the judge gave me a break

20   to -- I didn't ask for the break.   He said, good

21   time to take a morning break as I was looking for

22   the calendar.

23     Q.   Okay.   And then after the recess the court

24   says, all right.   We took a break.   Ms. MacDonald

25   wanted a calendar.   What -- what's happened since

1  then, Deputy.

2       And Deputy Melton testified or states on the

3  record, Sergeant Christopher Melton, Dakota County

4  Sheriff's Office.  This morning before court

5  convened Ms. MacDonald was seen taking paragraphs of

6  the courtroom.  To expedite the court process we

7  waited until a break for her to get a misdemeanor

8  citation.  After giving her the citation she was

9  going to be released.  I went up to her during

10  break, told her she was under arrest for the offense

11  of Contempt of Court, told her she was not going to

12  be handcuffed, we just needed to get her name, date

13  of birth, and address for the ticket and she'd be

14  released.  She has refused.  She is still refusing.

15       Were you in the courtroom when Deputy Melton

16  stated this on the record?

17       A.  Yes.

18       Q.  And on the next page Deputy Melton says at

19  the top of the page, and for the record, as soon as

20  she gives me her full name, date of birth, and

21  address, I will give her her citation and she will

22  be released.

23       Do you see that?

24       A.  Right.

25       Q.  Were you in the courtroom for that portion

1   of Deputy Melton's -- excuse me, Sergeant Melton's

2   record talk, testimony?

3       A.  Yes.

4       Q.  You were?

5       A.  Yes.

6       Q.  Does this refresh your recollection that on

7   September 12, 2013 you were told by Sergeant Melton

8   that if you simply provided your full name, your

9   address, and your date of birth you would be issued

10  a citation and released?

11      A.  I was sitting there at this moment when he

12  was saying this in handcuffs with a belt, you know,

13  fastened to a belt around my waist.  They had taken

14  my shoes off, my jewelry, my hair piece, my glasses,

15  and I was sitting there in a wheelchair.  I was

16  already under arrest.  I -- this was a trial.  I

17  was -- all my boxes and paperwork was gone.  That

18  was the context of it.  I wasn't -- that was the

19  context of it.  He didn't give me a ticket.  I don't

20  understand how he could say he is going to give me a

21  ticket and then I would be released and I could be

22  sitting there under arrest at my client's trial.

23      Q.  And I understand that --

24      A.  And so it -- it -- it does and it doesn't.

25  It doesn't make sense to me.  You give -- you just

1  get a ticket.  What is -- what's -- what is

2  happening here.  That -- that was my recollection.

3  I didn't know what was happening.

4      Q.  So it's your testimony that you didn't know

5  you would be issued a citation --

6      A.  He could have just done it right then and

7  there.

8      Q.  May I finish my question, please?  It's your

9  testimony that you were not aware on September 12,

10  2013 that if you simply provided Sergeant Melton

11  with your name, your address, and your date of birth

12  you would be issued a citation and released?

13      A.  It doesn't -- he -- he could have just

14  issued me the citation right then and there and

15  released me.  I don't understand -- if he's saying

16  that, then why doesn't he just issue a citation and

17  release me.  If he's saying that's all I'm going to

18  do, then why doesn't he just do that.

19      Q.  Because you --

20      A.  I was under arrest, that was --

21          MR. PADDEN:  Let me see if I can help

22  here, Jeff.  I think what you're asking her is does

23  she recall hearing this in court, A, and then B,

24  does it refresh her memory that that's what

25  happened.  Is that fair?

1           MR. TIMMERMAN:  Correct.

2           MR. PADDEN:  You have to answer that

3    question, Michelle.  So the first part would be do

4    you recall, remember him saying that in court, and

5    then did it happen before he made that record.  Is

6    that fair?

7           MR. TIMMERMAN:  That's fair.

8      A.   I -- I really don't recall.  I just was

9    sitting there in -- in a shock.  I don't know

10   what -- I didn't know what was happening.  I felt

11   like I was in like the twilight zone.  I honestly --

12   I don't recall.  I don't recall.

13     Q.   Well, Deputy Melton --

14     A.   It doesn't refresh my memory even.  I just

15   don't recall.  It doesn't make sense even now

16   reading this.

17     Q.   What doesn't make sense?

18     A.   It doesn't make sense why I would be sitting

19   there in handcuffs and somebody would be saying all

20   we want to do is give her a ticket.  Then give me

21   the ticket.  What are you doing to me here?

22     Q.   But --

23     A.   That -- that's the -- yeah, I was in a total

24   shock of that day.  It was nonsensical to me what

25   was happening.

1    Q.   Sergeant Melton is saying here that he

2    needed your name, your date of birth, and your

3    address to issue you the ticket.  And you testified,

4    at least with respect to your name, you didn't

5    provide it to him and wouldn't, correct?

6    A.   I didn't -- yes, I didn't.  But he knew my

7    name.  It doesn't make sense.  He had already

8    arrested me before that.  He took me out of the

9    courtroom and had arrested me already.  So where's

10   this ticket come in?  He came -- they came at me and

11   arrested me already and brought me to a holding

12   cell.

13   Q.   And we'll talk about that here soon

14   actually.

15   A.   So this ticket thing doesn't even -- it's

16   nonsensical what you're saying.  You can't make

17   sense out of it.

18   Q.   Who removed your court files and belongings

19   from courtroom 1F on September 12, 2013?

20   A.   I don't know.  I came back and they were all

21   gone.

22   Q.   Did you instruct anyone to remove those

23   materials?

24   A.   No, I did not.  I was taken away.  I was

25   just taken away.  My phone was taken, I had no

1    instruction ability.   They just --

2        Q.   Did you later learn who removed --

3        A.   -- removed me --

4        Q.   Did you later learn --

5        A.   -- for nothing.

6        Q.   Did you later learn who removed your court

7    files and belongings from the courtroom that day?

8        A.   I have the video.

9        Q.   Who removed them?

10       A.   My client.

11       Q.   Sandra Grazzini-Rucki?

12       A.   Yes.

13       Q.   Was Dede Evavold also there that day?

14       A.   Yes.

15       Q.   Did she help you move those items?

16       A.   Looks that way.

17       Q.   Was Michael Rhedin there that day?

18       A.   He was.

19       Q.   Did he help remove those items?

20       A.   I don't know if he helped.

21       Q.   Did you have an associate attorney there

22   with you that day?

23       A.   No.

24       Q.   Did you have any of your office staff with

25   you that day?

1      A.   No.

2      Q.   Did you ever attempt to contact Sandra

3   Grazzini-Rucki to get her back in the courtroom on

4   September 12, 2013?

5      A.   I couldn't, I was under arrest.  Your --

6   your deputies took me away and never -- there was no

7   ability.  What are you talking about?  That doesn't

8   make sense.

9      Q.   Do you recall Judge Knutson telling you on

10  the record at the hearing that day that if you

11  needed to make a phone call to get your belongings

12  and your files you could do that?

13     A.   And I said they took my phone.

14     Q.   Did you ask to use the court's phone?

15     A.   No, I didn't.  I was under arrest.  What

16  kind of questions are these?  I was sitting there --

17          MR. PADDEN:  Hey, hey, just --

18     A.   -- under arrest.

19          MR. PADDEN:  Just answer his questions.

20          THE WITNESS:  Okay.

21          MR. PADDEN:  Okay?

22  MR. TIMMERMAN:

23     Q.   Did you ask for your cell phone back so you

24  could call and get your client and your files?

25     A.   I was in a shock.  I was silent.  I was -- I

1  didn't know what to say.

2       Q.  So my question --

3       A.  No.

4       Q.  You did not ask?

5       A.  No, I did not.

6       Q.  Did you at any point in time ask for your

7  glasses or your shoes when you were sitting at the

8  counsel table --

9       A.  No.

10      Q.  -- in the courtroom?

11      A.  No.

12      Q.  I'm sorry, could you let me finish my

13  question?  My question was, did you -- while you

14  were sitting at the counsel table did you at any

15  point in time ask for your glasses or your shoes?

16      A.  No.

17      Q.  Why not?

18      A.  I was in a -- I was under arrest.  I was in

19  shock.  I -- I -- I was -- I didn't even understand

20  what was going on.  I was -- I -- I -- I was in a

21  different form.  I wasn't the attorney on the case.

22  I was in a -- in a -- in a state of -- I couldn't

23  fathom what was happening to me, that's why.

24  You're -- you're -- you're acting as if this is --

25  it's -- yeah.

1          MR. PADDEN:  Is Knutson 4?

2          MR. TIMMERMAN:  Yes.

3          MR. PADDEN:  Okay.

4          (MacDonald Deposition Exhibit No. 5

5          marked for identification.)

6    BY MR. TIMMERMAN:

7       Q.  Ms. MacDonald, this is Exhibit 5 of your

8    deposition.  I presume that you're familiar with

9    this document, correct?

10      A.  Yes.

11      Q.  And these are your amended interrogatory

12   answers in this lawsuit, correct?

13      A.  Yes.

14      Q.  Is that your signature on the last page,

15   page 5?

16      A.  Yes.

17      Q.  Now, with respect to your Fourteenth

18   Amendment claim, it's my understanding that you

19   claim both the conditions of your confinement in the

20   courtroom holding cell on September 12, 2013 and the

21   conditions of your confinement at the Dakota County

22   jail on September 12th and 13th of 2013 violated

23   your substantive due process rights, is that

24   correct?

25      A.  Yes.

1    Q.   Beyond these two periods of confinement, are

2    there any other -- is there any other basis for your

3    Fourteenth Amendment conditions of confinement claim

4    or is it just these two things?

5    A.   I don't know.   I -- I don't know.

6    Q.   If you could turn please to -- actually, you

7    don't need to turn at all.  Do you see interrogatory

8    number 6 on the first page of this document?  Do you

9    see that on the first page?

10    A.   Oh, on the first page.

11        MR. PADDEN:   To which answer?   To which

12    interrogatory, Counsel?

13        THE WITNESS:   6.

14        MR. TIMMERMAN:   Answer to number 6.

15    BY MR. TIMMERMAN:

16    Q.   Do you see that?

17    A.   Yes.

18    Q.   Does your amended answer to interrogatory

19    number 6 set forth in this document identify all of

20    the ways in which you claim your Fourteenth

21    Amendment rights were violated in the courtroom

22    holding cell area on September 12th of 2013?

23    A.   I -- yes, in the sense that you can't write

24    everything down over a 30-hour period.

25    Q.   I'm talking about --

Michelle MacDonald Shimota
10/20/2016

1    A.   These were the main points, yes.

2    Q.   Okay.  I'm talking about the courtroom

3  holding cell area right now.  We'll talk about the

4  jail later.  But right now I'm talking about the

5  holding cell area.  My question for you is, have you

6  laid out in this answer to interrogatory number 6

7  all of the ways in which you claim your Fourteenth

8  Amendment rights were violated in that courtroom

9  holding cell?

10    MR. PADDEN:  Objection; asked and

11  answered.  Go ahead and answer.

12    A.   It's the gist of it, yes.

13    Q.   Explain to me how you ended up in that

14  courtroom holding cell area.

15    A.   The deputies took me away and brought me

16  there.

17    Q.   Was this during a morning recess?

18    A.   The judge called a morning break so that I

19  could get an exhibit.

20    Q.   The exhibit --

21    A.   And when the judge got off the bench the

22  deputies came at me and brought me to the back.

23    Q.   Were you handcuffed when you were brought to

24  the back?

25    A.   No.

1    Q.   How long were you initially back in the

2   courtroom holding cell area?

3    A.   I -- I don't recall the exact time.  It was

4   awhile.

5    Q.   And then at some point you were brought

6   back, correct?

7    A.   Oh.

8    Q.   To the courtroom?

9    A.   Oh, you mean at that point -- yeah they were

10   there, and then they -- they -- yeah, it wasn't that

11   simple.  There's a lot of details, but the -- at

12   some point they just said that's it and they took my

13   clothing and my shoes and my jewelry and my glasses

14   and my earrings and my cross and put me in handcuffs

15   and then put me in a cell.  And I was in a cell in

16   handcuffs.

17    Q.   For how long?

18    A.   I don't recall the length of time.  It

19   seemed like a long, long, time.

20    Q.   Is it fair to say that the video would show

21   when you were in that courtroom holding cell area?

22    A.   Yes.

23    Q.   And when you said that they took your

24   clothing, the only piece of clothing taken from you

25   was your blazer or dress coat, right?

Michelle MacDonald Shimota
10/20/2016

1    A.   Right.

2    Q.   And then your shoes as well, correct?

3    A.   Yes.

4    Q.   So I'm trying to understand big picture

5    here.   You're originally taken back to a courtroom

6    holding cell area and then you're brought back to

7    courtroom 1F.   How many times did you go back and

8    forth in total between the courtroom holding cell

9    area and courtroom 1F?

10   A.   My recollection is they brought me to the

11   holding cell area, handcuffed me, put me in the jail

12   cell, brought me back out to -- for the morning

13   session.   And then the judge took a lunch break,

14   they brought me back in -- into the holding area in

15   the handcuffs and the wheelchair, and then I was in

16   the cell at that point.

17        And then they brought me back out to the

18   courtroom again for the afternoon session.   And then

19   they brought me -- then the judge concluded the

20   trial.   And then they brought me back again to that

21   area.   I'm not sure whether they put me back in the

22   cell or how that all worked, but it was more than --

23   it was back and forth in that condition.

24   Q.   Okay.   Thanks for that.   So it's three

25   visits in total, you went there, you came out, you

1  went there, you came out again, and then you went

2  back?

3       A.  I went there -- they brought me, took me

4  away, put me in the cell, brought me back out, took

5  me away, put me in a cell, brought me back out, and

6  then took me away again.  So, yeah.  Then when the

7  trial was over, I was -- I was in handcuffs from

8  like beginning to end.

9       Q.  While you were in that courtroom holding

10 cell area, did anyone tell you that you would be

11 released if you provided your full name, your date

12 of birth, and your address?

13      A.  I don't recall.  But I didn't get a ticket.

14 So you just give somebody a ticket.  Isn't that how

15 it works?

16      Q.  So my question --

17      A.  I was under arrest already.

18      Q.  You don't recall, and that's fine.

19      A.  I don't recall.

20      Q.  If Sergeant Melton testifies that you were

21 repeatedly told in the courtroom holding cell area

22 that you would be released if you just provided your

23 full name --

24      A.  But I was --

25      Q.  Let me --

1      A.   -- I was already --

2           MR. PADDEN:  Let him finish the

3  question, Michelle, with all due respect.

4      Q.   If Sergeant Melton testifies, and I think he

5  will in this lawsuit, as will others, that you were

6  repeatedly told in the courtroom holding cell area

7  that if you simply provided your full name, your

8  date of birth, and your address you would be

9  released, do you have any evidence that would refute

10 that testimony?

11     A.   No.  Just doesn't make sense at all.

12     Q.   Who initially took --

13     A.   Because I'm already under arrest and in

14 handcuffs.  That is nonsensical that they're saying

15 just give us your name.  I'm already under arrest.

16 That just doesn't -- it's nonsensical to me.

17     Q.   Who initially --

18     A.   I don't know how that even makes sense.

19     Q.   Okay.  There's no question pending.  Who

20 initially took you to the courtroom holding cell

21 area that first time?

22     A.   I believe it was two of the deputies.  It

23 might have been three.

24     Q.   Do you know their names?

25     A.   I -- at the time I didn't.  It was like

1   swarms of bees, you know, you just -- they're all

2   dressed the same. I wasn't paying any attention to

3   them during the trial. I think on the video it

4   shows it was Gonder and Melton. I'm not remembering

5   if there was a third one.

6      Q. Okay. Now, you claim in the interrogatory

7   number 6 in your answer here, your amended answer,

8   that you were taunted in the courtroom holding cell

9   area. What did you mean by that?

10     A. They taunted me by saying -- you know, like

11   there were -- there were prisoners in the glass

12   area, because there's like a glass area there, and

13   they said things like, well, you're an attorney and

14   you don't know what to do, and these prisoners know

15   what to do. They also said, who do you think you

16   are, Nelson Mandela. When I started to cry they --

17   for my husband, they said, you know, crocodile

18   tears. So that kind of taunting, like you're --

19   you're a nothing, you're a piece of crap, you --

20   you -- you are stupid. That kind of atmosphere was

21   created by them.

22      And this was after we -- I mean, we were

23   talking about -- you know, they brought the -- and I

24   said I didn't do anything. They already knew I

25   didn't do anything. You look at it and you know

1  that I didn't commit a crime, and I didn't violate

2  the rule.  You already know looking at it.  So that

3  they were talking to me, so.  There was nothing that

4  I did criminal obviously.  So it was crazy making.

5      Q.  Did any of the deputies call you a nothing?

6      A.  Not verbally, no.

7      Q.  Did any of the deputies call you stupid?

8      A.  No.  Those aren't the words they used.

9      Q.  Did any of the deputies call you a piece of

10  crap?

11     A.  Those weren't the words they used.

12     Q.  Any other way in which you were taunted in

13  that courtroom holding cell area?

14     A.  Another that I recall at this time it was,

15  you know -- it was -- it was those types of things

16  that were happening.

17     Q.  This Nelson Mandela comment I've seen

18  recycled over and over again here, can you give me

19  some context for how that comment came up, what you

20  said, what they said?

21     A.  I was, again, under arrest or whatever you

22  want to call it.  And that's -- I believe it was

23  Gonder that said that.  Gonder was, who do you think

24  you are, Nelson Mandela.

25     Q.  What was the context of him saying that?

1    A.   The context of him saying it is I'm -- I'm

2    under arrest, I'm -- I'm in a -- I can't even

3    understand what's happening at this point.   That was

4    the context.

5    Q.   Let me try and clarify a little bit.   Was

6    this comment said to you on the heels of the

7    deputies trying to get you to give them their full

8    name -- your full name, excuse me?

9    A.   I don't recall that.   I don't recall.   It

10   was a -- again, like I say, it was a shocking -- it

11   was just absolutely shocking what I was experiencing

12   at that time, because I had done nothing wrong,

13   nothing whatsoever.

14   Q.   Well, you keep saying you did nothing wrong,

15   but Judge Knutson ultimately found that there was

16   probable cause for your arrest, correct?

17   A.   Well, that --

18   Q.   It's a yes or no question.

19   A.   Yes.   But, you know, that I didn't -- I

20   didn't do a crime.   She -- she knew that.   I don't

21   understand what you're talking about there.

22   Q.   And do you understand --

23   A.   I really, it doesn't concern me what --

24   there was no -- I did nothing, absolutely nothing

25   wrong.   I did nothing criminal.   I didn't -- I

1  didn't even violate a civil rule.  I did nothing

2  wrong.

3      Q.  And do you --

4      A.  Nothing.

5      Q.  Do you understand in this lawsuit that Judge

6  Tunheim has concluded previously that there was at

7  least arguable probable cause for your arrest?

8  Correct?

9      A.  I don't recall.

10      Q.  Who removed your jewelry in the holding cell

11  area?

12      A.  I believe it was Melton.

13      Q.  Who removed your hair piece?

14      A.  I believe it was Melton.  You know, I might

15  have taken it off and taken off my hair piece.

16      Q.  What about your glasses?

17      A.  They asked -- they ordered me to strip all

18  of my things.  I was just doing what they were

19  telling me to do at that point.

20      Q.  Well, you've used the word strip here.  I

21  just want to make sure, at no point in time on

22  September 12th or September 13th were you ever

23  stripped searched, correct?

24      A.  They stripped me of all of my glasses and my

25  jewelry.

1    Q.  Got it.

2    A.  Yeah, they stripped -- and my pieces of my

3    clothing.

4    Q.  And you were not strip searched at any point

5    in time on September 12th or 13th, correct?

6    A.  No.  If you mean by strip searched they took

7    my clothes off?

8    Q.  Correct.

9    A.  Is that what they do when they strip search?

10   Q.  That's a strip search.

11   A.  Oh, no.

12   Q.  You were not strip searched?

13   A.  No.

14   Q.  When exactly do you claim that your gold

15   cross pendant was misplaced?

16   A.  When I got home and I looked in my property

17   bag the cross was gone.

18   Q.  Do you know when in the inventory process

19   you claim that it was misplaced precisely?

20   A.  That is their -- for them to know.  I wasn't

21   involved in any type of inventory process, they just

22   took my materials.

23   Q.  Let's, if we could, review this video here.

24   I will -- I will note that this video was produced

25   in this litigation as confidential subject to the

1       protective order.

2               And you recognize this video footage,

3       correct?

4           A.  Yes.

5           Q.  In fact, you produced in this litigation a

6       CD or DVD to me with three videos on it, correct?

7           A.  I subpoenaed it from your office the week

8       following the trial, and it still has not all been

9       given to me, just so you know.

10          Q.  Did you ever obtain a --

11          A.  I subpoenaed all of the -- all of the video

12      from both days and from September 6, and it's

13      been -- your office has not given it to me.  That

14      was in the Grazzini-Rucki federal case.

15          Q.  Did you obtain this video in your criminal

16      case?

17          A.  Yes.

18          Q.  Did you obtain the courtroom video in your

19      criminal case, too?

20          A.  Yes.

21          Q.  It's my understanding that there were three

22      videos in your criminal case that were provided to

23      Mr. Grigsby, the courtroom video, this video, and

24      then another video of the holding cell area?

25          A.  Yes.

1  Q.  Have you ever disseminated that video to
2  anyone?

3  A.  No.

4  Q.  You've never provided a copy to --

5  A.  I -- I -- I was not -- oh, probably, yes,
6  I've provided of a copy of that video.

7  Q.  Who have you provided it to?

8  A.  Of that video?  I had no obstructions with
9  that one.

10  Q.  Of the video you received in your criminal
11  case.

12  A.  The video I received in my criminal case
13  once the criminal case was over I don't even recall
14  who I -- it wasn't a problem to do that, so.

15          MR. PADDEN:  He's not asking that.
16  He's just asking who.

17  A.  Yeah, I don't know exactly who.

18  Q.  More than one person?

19  A.  Perhaps.

20  Q.  Did you provide any of that footage to Terry
21  Nemmers?

22  A.  No, I didn't.  He got it on his own.

23  Q.  How did he get it?

24  A.  I believe he did a public request.

25  Q.  From whom -- to whom I should say?

1    A.   I'm not sure, you'd have to ask him.

2    Q.   Do you recall one person to whom you gave

3  that video?

4    A.   Since then, the two -- in the two and a half

5  years?

6    Q.   Yeah.

7    A.   Yeah, I gave to Sean Dooley, 20/20, it

8  was -- I gave it to my attorneys in your case.   I

9  gave it to -- I guess that might be all.  I don't

10  recall anyone else.

11   Q.   Have you ever posted that video online?

12   A.   No, I haven't.   Oh, I might have just

13  recently, yes.

14   Q.   Where at?

15   A.   I had a -- I'm not sure because the YouTube

16  that I have and I put up the video.   I put up the

17  video.   And that was probably the video that I had.

18  So that is -- it's on YouTube.   I don't know if it's

19  public, but it's on YouTube.

20   Q.   Okay.   Who is Terry D. Nemmers?

21   A.   I -- he is a reporter, Lion News.

22   Q.   Have you met him?

23   A.   No.

24   Q.   Spoken with him?

25   A.   Yes.

1    Q.   Communicated with him by e-mail?

2    A.   I don't know about by e-mail.

3    Q.   Let's look at this video if we could, and

4  I'm going to try my best -- I'm basing my hard stops

5  in this video off of that time stamp at the top.  Do

6  you see it?  So 9-12 of '13, 10:28:49, so 10:28 a.m.

7  and 49 seconds.  And technology is my friend today.

8  I'm going to make it big.  I'm going to skip forward

9  here.

10       What are you talking with Deputy Napper

11  about here?

12    A.   I think -- I think that's the paperwork they

13  gave me with the rule and the statute.  They brought

14  that to me.

15    Q.   Okay.

16    A.   And they are talking about -- oh, wait a

17  minute.  I -- I -- as I recall they were -- I was

18  just saying I didn't do anything, and they were

19  showing me the statute.  And I was saying, well,

20  look, I didn't -- here's what it says.  And it was

21  kind of like a -- like they were counseling me or I

22  was counseling that I didn't do anything wrong.

23    Q.   This is Jon Napper, right?

24    A.   I believe I'm -- yes.

25    Q.   Who is that?

1    A.   That is -- is that Wegner?

2    Q.   Bob Wegner, okay.

3    A.   And at this point I'm not knowing who's who,

4  because they're just swarms of bees to me.   They

5  just all look the same.   This all --

6    Q.   Now we're starting in the portion of the

7  video where you're starting to take off your jewelry

8  and stuff.

9    A.   Okay.   Okay.

10   Q.   So here you are, looks like you dropped

11  something.   What did you drop?   Do you know?   There

12  go your earrings.

13   A.   I don't recall.   I still have my cross on.

14  All right.   This I don't -- I don't even know --

15   Q.   Where are you putting this?   Into a bag?

16   A.   I don't even have this video.

17        MR. PADDEN:   Just answer his question,

18  Michelle.

19   Q.   Are you putting these materials into a bag?

20   A.   It looks that way, yeah.

21   Q.   Okay.

22        MR. PADDEN:   So is there a question

23  pending, Counsel?   I'm sorry.

24   Q.   Where on the necklace is your pendant at

25  this point?

Michelle MacDonald Shimota
10/20/2016

1    A.   It's on the necklace.

2    Q.   Okay.  We're almost there.  I apologize, the

3  skip ability on this isn't the best.

4         MR. PADDEN:  Are you trying to find

5  something, Jeff?

6         MR. TIMMERMAN:  Yeah.

7         MR. PADDEN:  Okay.

8  BY MR. TIMMERMAN:

9    Q.   And that's Deputy Gonder, correct, who just

10  walked out of the picture?

11   A.   I believe so.

12   Q.   What are you doing with your necklace at

13  this point in time?

14   A.   I'm taking it off.  The deputy is taking it

15  off.

16   Q.   This is Deputy Napper, correct?

17   A.   Yes.

18   Q.   Fair to say that he's helping you remove

19  your necklace?

20   A.   Yeah.  Right.  Okay.

21   Q.   Necklace is off?

22   A.   Right.

23   Q.   And Deputy Napper is taking off your

24  necklace, correct?

25   A.   Right.

Michelle MacDonald Shimota
10/20/2016

1   Q.   And he's placing it in the inventory bag,

2   correct?

3   A.   Right.

4   Q.   Are you aware of whether or not that

5   necklace was ever removed from the inventory bag

6   before you received that inventory bag upon your

7   release from the jail?

8   A.   It wasn't in my bag when I got home.

9   Q.   Okay.

10   A.   That's all I know.

11   Q.   So it's your testimony that the gold cross

12   pendant was affixed to the necklace at this point in

13   time when Deputy Napper helped you --

14   A.   Not affixed, it was a loose like this one, I

15   mean, it just was a necklace that I always wore.

16   See what I'm saying?

17   Q.   It was one piece?

18   A.   No, it wasn't one piece.  I still have the

19   chain.

20            MR. PADDEN:   I think what he's asking,

21   was it on the chain.

22   A.   Oh, yeah, it was on the chain.

23   Q.   It was on the chain?

24   A.   Mm-hmm.

25   Q.   Okay.  So it wasn't permanently affixed, it

Michelle MacDonald Shimota
10/20/2016

1  was more of like a charm on a chain type of --

2      A.   It was, yes, it was on a chain, right.

3      Q.   All right.  Let's fast forward a little bit.

4  Do you know who this is?

5      A.   I don't.  I don't.  It -- that woman?

6      Q.   That's Sergeant Cho.  And she's pat

7  searching you here, correct?

8      A.   Yeah.

9      Q.   Any issues with how you were pat searched in

10 the jail -- in the holding cell area?

11     A.   I have issues with this whole thing.

12     Q.   You're claiming that the pat search violated

13 your constitutional --

14     A.   The whole -- the whole thing.

15     Q.   Let me ask my question.  Are you claiming

16 that this pat search violated your constitutional

17 rights?

18     A.   I don't know.  The whole thing.

19     Q.   Any recollection of what you were discussing

20 with the deputies at this point in time?

21     A.   No.

22          MR. PADDEN:  Did you hear her answer,

23 Madam Court Reporter?

24          THE REPORTER:  Mm-hmm.

25     A.   No.

1    Q.   Okay.  So the video is at 10:45:25.  We're

2  approaching the point where you're going to be

3  handcuffed.  Do you recall being handcuffed at this

4  point in time?  That's what's going on here, right?

5    A.   Mm-hmm.  Yes.

6    Q.   And that's Deputy Napper handcuffing you

7  with the assistance of Sergeant Cho, correct?

8    A.   Yes.

9    Q.   And then at 10:46:00 you're placed in the

10 cell by Sergeant Cho, correct?

11    A.   Yes.

12    Q.   And she removes your shoes, correct?

13    A.   Yes.

14    Q.   Let's skip forward a little bit.  I have one

15 more question about this particular piece of the

16 video.  At the 10:57 mark the cell door is open,

17 correct?

18    A.   Yes.

19    Q.   And you're in the cell, correct?

20    A.   Yes.

21    Q.   And wheelchair approaches at 10:57:45,

22 correct?

23    A.   Yes.

24    Q.   It looks like it's Sergeant Melton --

25    A.   Yeah.

```
 1         Q.  -- and Deputy Napper that assists you in
 2    sitting in the wheelchair, correct?
 3         A.  Four of them.
 4         Q.  Sergeant Napper and Deputy Melton actually
 5    lifted you, correct?
 6         A.  There were four deputies on me at this
 7    point.
 8         Q.  Why were you placed in a wheelchair?
 9         A.  You'll have to ask them.  I -- I was in a
10    shock.
11         Q.  Is it fair to say that you refused to stand
12    up and walk out --
13         A.  I was under arrest and in a cell and in
14    handcuffs and all of my liberties were completely
15    gone to move.
16         Q.  Were you given the option of standing and
17    walking back to the courtroom on your own volition?
18         A.  I don't recall.
19         Q.  Is it fair to say that you refused to stand
20    and walk on your own volition and that's why you
21    were placed in a wheelchair?
22         A.  No, that's not fair.
23         Q.  Why is that not fair?
24         A.  Because I was in circumstances, I just --
25    it's not fair.
```

Michelle MacDonald Shimota
10/20/2016

1    Q.   Did you refuse to stand up?

2    A.   I don't recall.

3    Q.   Did you refuse to walk?

4    A.   I don't recall.

5    Q.   Did you refuse to put your glasses on?

6    A.   I -- they took away all my liberties.  No, I

7  don't recall.  I -- the glasses thing, I was -- I

8  understood -- I think I had a belt around my waist

9  and they came back with the glasses.  What was that

10 going to do?  That was my point.  What was that

11 going to do?  Just let me go.  Just give me all of

12 my freedoms.  What are glasses going to do?  I have

13 to go back and do a trial.  So that was my thoughts,

14 my understanding at the time that again I am in a

15 shock and in a -- and this is nonsensical to me that

16 they're bringing a wheelchair, they have me

17 completely under arrest, and I'm in a cell in

18 handcuffs, and as you can see here, four deputies

19 around me.  What's going on?

20    Q.   Were your glasses --

21    A.   That was my thinking.  I wasn't thinking

22 glasses, I was in -- I couldn't -- I couldn't think.

23 I was in a shock.

24    Q.   Were your glasses offered to you by the

25 deputies?

1    A.  I don't recall.  I -- I -- I -- I -- as I

2  think about it, if they -- I don't know if they

3  brought me my glasses or what happened, but it

4  didn't make sense.  I mean, I'm here in handcuffs in

5  a wheelchair, you're giving me my glasses, I'm --

6    Q.  So you --

7    A.  My hands were tied, how am I going to get my

8  glasses?  It's nonsensical what they were doing.

9    Q.  You didn't want your glasses?

10    A.  I wanted my complete liberties.  I wanted

11  everything.  I wanted to just get lost.  I was not

12  going to get upset.  They were -- they were -- there

13  were four deputies around me.  I don't know what to

14  say.  I don't know what to do.  I'm -- I'm -- you

15  know, they have guns.  They --

16    Q.  That's not my question.

17        MR. TIMMERMAN:  Could you re- --

18        MR. PADDON:  Counsel, she's answering

19  your question, with all due respect.

20  BY MR. TIMMERMAN:

21    Q.  My question is a simple one.  Did you desire

22  not to put your glasses on?

23    A.  I -- I wanted my complete --

24    Q.  That's not my question.

25    A.  -- liberties back, and they were -- there

1   were four deputies around me at this point.

2        Q.  My question is, did you specifically make

3   the decision not to put your glasses on?

4        A.  No, they took my glasses, and they made me

5   take them off.

6        Q.  And you said they were given back to you or

7   at least offered to you.  Did you desire not to put

8   them back on?

9        A.  I couldn't put them back on, my hands -- my

10  hands were in handcuffs.

11       Q.  Did you ask for assistance?

12       A.  That's a nonsensical -- that's a nonsensical

13  question.  But now --

14       Q.  Did you ask for assistance putting your

15  glasses back on?

16       A.  Did I ask for assistance?  I don't recall.

17       Q.  Did you ask --

18       A.  I -- maybe something like, well, you put

19  them on me, because my hands were in handcuffs.

20  I -- why are they giving me my glasses?  Why are

21  they not giving me all of my liberties at this

22  point?  That was -- as I go back, what is going on

23  is my question.

24       Q.  Do you recall --

25       A.  This is just -- for you to justify any of

1   this is outrageous to me.

2       Q.  Do you recall --

3       A.  That somebody like me is supposed to, oh,

4   you didn't ask for your glasses.  This is outrageous

5   to me what you're --

6       Q.  All I'm trying to do --

7       A.  Do you see this picture here, four deputies

8   around me and I'm in handcuffs and a wheelchair and

9   they're binging me back out to do a trial and you

10  think this is okay?  Sorry.  Do you think this is

11  okay?

12      Q.  My job here today is --

13      A.  They're bringing me back out for a trial and

14  you're asking me about --

15      Q.  We're going to be here all day --

16      A.  -- glasses?

17      Q.  We're going to be here all day.

18          MR. PADDEN:  Just go to your next

19  question, Jeff.

20      Q.  My job here today is to learn the facts that

21  support your claims.  I would appreciate you

22  answering the questions that I ask you.  I

23  understand your positions in this lawsuit.  I get

24  it.  I know what your -- what your position is.

25  Okay?

**Michelle MacDonald Shimota**
**10/20/2016**

1    A.   Well, this speaks for itself in my book.

2    Q.   Okay.

3        MR. PADDEN:  That's okay.  But, Jeff,

4    go ahead and ask her the next question.  And then

5    we'll -- if she's nonresponsive I'll -- I'll --

6    Q.   Do you recall being given the option to put

7    your shoes back?

8    A.   No, I don't recall.

9    Q.   Did you ask to put your shoes back on?

10   A.   I don't recall.

11   Q.   Did you ask to put your glasses back on?

12   A.   I don't recall.  I asked to be -- I wanted

13   to get out -- I wanted to be free.  That's -- that's

14   all I recall, that I was completely debilitated,

15   completely debilitated, so glasses or shoes was not

16   going to make me free, them giving me permission for

17   different things, permission to speak, permission

18   to -- it is -- it's nonsensical.

19   Q.   My clients will say you were placed in a

20   wheelchair because you refused to stand and you

21   refused to walk of your own will.  Do you have any

22   evidence to refute what they will say?

23   A.   They arrested me, and I was immobilized.  I

24   was immobilized.  So however they want to from their

25   perspective, from my perspective I am immobilized.

1   That's my perspective and that's all I can speak to.

2       Q.   What do you mean by immobilized?

3       A.   Immobilized, all of -- every single piece of

4   liberty that I had was taken away that day.  I'm

5   immobilized.  I can't see.  I have -- I have -- I'm

6   in handcuffs.  I'm immobilized.  They immobilized

7   me.  So -- so -- so that's what I mean.  Every

8   liberty was taken away at that moment.  You're --

9   you're -- you're -- you're under duress.

10          MR. PADDEN:  Answer the question.

11  Don't comment on how he's asking the questions,

12  okay, just you answer the question.

13      Q.   Is it fair to say that at this point in the

14  video, 10:58:11, you were being uncooperative?

15      A.   No.

16      Q.   You were cooperative --

17      A.   I was being completely cooperative, because

18  they had completely immobilized me and I

19  immobilized.  I was being completely cooperative.

20  That was the problem.  I cooperated with them

21  putting handcuffs on me.  I cooperated with them

22  taking me in the back.  I cooperated with them

23  wholeheartedly.  Wholeheartedly.  They -- yeah, I

24  cooperated.  That is not --

25          MR. PADDEN:  Wait for the next

1  question, Michelle.

2      Q.  So as you sit here today can you tell me why

3  a wheelchair was used to bring you back to the

4  courtroom?

5              MR. PADDEN:  I guess I'll object to the

6  form of the question.  How is she possibly supposed

7  to know that.

8              MR. TIMMERMAN:  Based on --

9              MR. PADDEN:  That's a question for the

10 defendants.  But based on your knowledge, subject to

11 that objection, please answer.

12 BY MR. TIMMERMAN:

13     Q.  Let me rephase it.  As you sit here today,

14 what is your understanding of why a wheelchair was

15 used to escort you back to the courtroom on

16 September 12, 2013?

17     A.  Because I was immobilized and they had to

18 bring something to put me in.

19     Q.  Were you able to physically --

20     A.  To -- to -- they -- I -- I don't know --

21 yes, no, I'm able to physically walk, physically --

22 I -- that's all I can say.

23     Q.  Were you able to physically stand at the

24 time?

25     A.  I don't recall.

Michelle MacDonald Shimota
10/20/2016

1   Q.   Were you able to physically walk at the

2   time?

3   A.   I don't recall.  I was in a state of

4   immobilization and shock at this point.  I don't

5   know why they brought the wheelchair.

6   Q.   To circle back to my prior question, which

7   you did not answer, if my clients testified you were

8   placed in a wheelchair because you refused to stand

9   or walk of your own volition, do you have any

10   evidence to refute that testimony?

11            MR. PADDEN:  Objection; asked and

12   answered.  Go ahead and answer.

13   A.   Yes, because I have my perspective.

14   Q.   And your perspective, if I'm

15   understanding you correctly --

16   A.   They immobile --

17   Q.   May I finish?

18   A.   They put me in this position.  They

19   immobilized --

20   Q.   May I finish, please?

21   A.   -- me.

22   Q.   Your perspective, as I understand it, is

23   that you were immobilized, correct?

24   A.   Yes.

25   Q.   Thank you.  Let's move --

Michelle MacDonald Shimota
10/20/2016

1       MR. PADDEN:  Can we take a short break,

2   Counsel?  It's been about an hour and 45 minutes.

3   Is that okay?

4       MR. TIMMERMAN:  Certainly.

5       THE VIDEOGRAPHER:  We're going off the

6   record.  That will be end of disc one in the

7   deposition of Michelle Shimota.  The time is 10:25

8   a.m.

9           (Break from 10:25 to 10:38 a.m.)

10      THE VIDEOGRAPHER:  We're back on the

11  record.  This is the continuation of the deposition

12  of Michelle Shimota, the beginning of disc two, the

13  time is 10:38 a.m.

14  BY MR. TIMMERMAN:

15   Q.  Ms. MacDonald, when we left off we had just

16  reviewed a video entitled JDC adult holding number 2

17  and then 9-12-13.  I'd like to look at another video

18  here, and this one is JDC adult cell, the number 2,

19  9-12-13.

20      Were you provided a lunch or a meal of some

21  type in this cell?

22   A.  I believe so, yes.

23   Q.  Now, you've alleged in the lawsuit that

24  deputies callously threw a lunch bag at you.  Do you

25  recall that?

1     A.   Yes.

2     Q.   Could you explain to me exactly what

3    happened?

4     A.   My recollection, you can play the video, is

5    that they opened the door and threw a lunch bag onto

6    that table.   And my hands were in handcuffs around

7    my belt, so they didn't -- they didn't give me the

8    lunch.   They tossed it onto that event.   And then I

9    was also attached to the -- understood I was

10    attached to the wheelchair as well.

11     Q.   Let's look at this here, this video.

12     A.   Yes.

13     Q.   We're at 12:37:10 right now.

14     A.   Mm-hmm.

15     Q.   Your cell door is opened up and there's

16    Sergeant Melton.   Do you see him?

17     A.   No.

18     Q.   He's about to pop his head back in.   Do you

19    agree with me that's Sergeant Melton?

20     A.   Yes.

21     Q.   Okay.   And he's setting a lunch bag down on

22    this silver pedestal here.   Do you see that?

23     A.   Yes.

24     Q.   Okay.   And then he's exiting the cell,

25    correct?

1      A.   Yes.

2      Q.   He didn't throw a lunch bag at you, correct?

3      A.   No.

4      Q.   Would you agree with me that that was not a

5  callous act of throwing a lunch at you, that was

6  setting a lunch down on the pedestal, correct?

7      A.   Well, how am I going to reach it is what I

8  mean by callous.  He didn't intend to -- how am I

9  going to reach it?  I'm in handcuffs and I think

10  there's a belt around my waist and my handcuffs are

11  attached to this belt.  And also at this point I

12  believe I was attached to the wheelchair.  And if

13  you -- oh, you can see it here.  My fear was that if

14  I stood up I would fall and smash my head onto that

15  piece of cement.  So I didn't -- I wasn't able to

16  stand up at this point.  There's a toilet behind

17  here as well.

18      Q.   Okay.  Let's continue watching then.  Your

19  cell door is open at this time, correct?  Now it's

20  closing.

21      A.   Yes.

22      Q.   There's a bit of a pause here, and then at

23  12:38:01 you've lifted up the lunch bag and put it

24  on your lap.  Do you see that?

25      A.   Mm-hmm.

1     Q.  So you're now in possession of the lunch

2     bag, correct?

3     A.  Right.

4     Q.  And then you throw it to the floor.  Did you

5     see that?

6     A.  Yes.

7     Q.  Okay.  So you're the one who threw the

8     lunch?

9     A.  I dropped it.

10    Q.  You dropped it or you threw it?

11    A.  I dropped it.

12    Q.  Let's watch again.  Okay.  We're at 12:38:01

13    again, you picked up the lunch.  Okay.  What are you

14    intending to do with the lunch here?  Set it back on

15    the tray?  Keep it in your lap?  What is your

16    intent?

17    A.  As I recall I was trying to get it on my lap

18    and trying to -- I -- I -- again, I was attached to

19    the wheelchair I thought, and I was trying to get it

20    to do something with it to try to eat it.

21    Q.  Okay.  And so it's your testimony that you

22    dropped the lunch and you didn't throw it, correct?

23    A.  Right.

24    Q.  Okay.

25    A.  And then I went to reach for the milk and I

1    dropped that, too.

2        Q.   Did you ask anyone to pick up the milk or

3    the lunch bag for you?

4        A.   No.

5        Q.   Do you recall Sergeant Melton offering to

6    uncuff you so you could eat the lunch?

7        A.   No.   He could have uncuffed me at any time.

8        Q.   You don't recall --

9        A.   It's his decision to cuff me and his

10   decision to uncuff me.

11       Q.   You don't recall him ever asking -- ever

12   offering to uncuff you, correct?

13       A.   No, never.

14       Q.   Any reason to dispute that you were

15   ultimately returned to courtroom 1F at the direction

16   of court staff?

17       A.   I don't know.   I was just brought there my

18   perspective.   My experience was all of a sudden I'm

19   being brought back to my trial.

20       Q.   Do you recall telling Sergeant Melton that

21   you did not want to go back to court because you

22   were under arrest?

23       A.   I don't recall that.   I may have said that

24   because they had arrested me and I was in their

25   custody and this was humiliating.   And I was just --

1    I may have said, what are you bringing me back here

2    for, what's going on.  I was afraid to say anything.

3        Q.  If you could please flip back to Exhibit 2.

4    I'm sorry, I meant Exhibit 3.  If you could flip to

5    the page DC 00058 at the bottom right-hand corner.

6    Okay.  Third full paragraph on that page starts

7    with, the courtroom 1F court.  Do you see that?

8        A.  Yes.

9        Q.  At courtroom 1F court called me and asked if

10   Ms. MacDonald could be brought back into the

11   courtroom.

12       A.  Mm-hmm.

13       Q.  You said you don't have any knowledge,

14   personal knowledge, about any discussions between

15   Sergeant Melton and court staff, correct?

16       A.  Obviously, no.

17       Q.  So you see two sentences later, I told her

18   that she would be released as soon as she gave her

19   information, period?

20       A.  Mm-hmm.

21       Q.  Do you recall Sergeant Melton telling you

22   that while you were inside the cell --

23       A.  Hm.

24       Q.  -- in the courtroom holding area?

25       A.  No.

1     Q.   She refused to go to court and said she
2  wasn't going, Sergeant Melton says next.  Is that an
3  accurate depiction of your response to the request
4  to bring you back to court?
5     A.   No.
6     Q.   What did you say exactly?
7     A.   I don't -- I don't rem- -- I just said, what
8  are you doing.  If I said anything it was like,
9  release me, let me free.  I -- you've just
10  completely debilitated me.
11     Q.   And in the next sentence?
12     A.   It was -- yeah.
13     Q.   In the next sentence Sergeant Melton says,
14  she said she wasn't going to stand up.  Do you
15  recall ever telling Sergeant Melton that?
16     A.   I don't recall telling him that, no.
17     Q.   And it says, Deputy Gonder got a wheelchair
18  and brought it next to her holding cell.  She
19  refused to stand up and Deputy Napper and I lifted
20  her up by the arm -- by her arms and set her in the
21  wheelchair to take her to court.  Which is what
22  we've seen on the video happening, correct?
23     A.   Right, yes.
24     Q.   In the paragraph starting, the court took a
25  lunch break.  Do you see that paragraph?

1    A.    Mm-hmm.

2    Q.    And this tracks with your recollection, the

3    court took a lunch break and you were brought back

4    to the holding cell area?

5    A.    Mm-hmm.

6    Q.    Sergeant Melton says, she refused to allow

7    me to remove her handcuffs so she could eat and

8    would not cooperate with removing the handcuff belt.

9         Does this refresh your recollection at all

10   about Deputy Melton offering to uncuff you and

11   remove --

12   A.    No.

13   Q.    -- the handcuff belt?

14   A.    No.

15   Q.    You're not claiming that my clients

16   confiscated or removed any of your court papers or

17   belongings from courtroom 1F on September 12th,

18   correct?

19   A.    No.   They had -- they had already taken what

20   they -- they took my phone and other belongings.   I

21   didn't know at the time who took them.   I just came

22   back out to an empty courtroom.

23         MR. PADDEN:   Just to be clear for the

24   record, Counsel, when you're asking that question

25   are you saying -- is your question did the deputies

Michelle MacDonald Shimota
10/20/2016

1  physically take any of her file, is that what --

2        MR. TIMMERMAN:  Correct, any of her

3  court file that she had in the courtroom that day or

4  court papers.

5        MR. PADDEN:  Okay.  Not whether they

6  may have directed somebody to do something but

7  whether they physically took it?

8        MR. TIMMERMAN:  Correct.

9        MR. PADDEN:  Okay.

10 BY MR. TIMMERMAN:

11     Q.  I think you testified that you don't know

12 how they ended up --

13     A.  Not that I'm aware of.

14        MR. PADDEN:  I just wanted to clarify

15 all that.  Sorry to interrupt.

16     Q.  Do you have any personal knowledge regarding

17 how or why Ms. Grazzini-Rucki or Ms. Evavold decided

18 to remove the items from the courtroom that day?

19     A.  No.

20     Q.  So you don't know why they made that

21 decision?

22     A.  Well, they -- my understanding is they --

23 their attorney was arrested and they were told the

24 trial was over and left.

25     Q.  Okay.  And who told them that the trial was

1  over?

2      A.  You'll have to ask them.

3      Q.  You weren't there for that conversation,

4  correct?

5      A.  Obviously.  I was locked up.

6      Q.  Have we discussed all the ways in which you

7  claim your Fourteenth Amendment rights were violated

8  vis-à-vis your detention in the courtroom holding

9  cell area on September 12?

10     A.  My -- they were violated immediately when

11  they took me away.  That -- that's the violation.

12  And that was a 30-hour period.

13     Q.  I'm talking --

14     A.  So, no, there is not a possibility for me to

15  go over 30 hours of that experience.

16     Q.  I'm talking specifically about the courtroom

17  holding cell area, your detention in that courtroom

18  holding cell area prior to the time you were moved

19  to the jail.  Have we discussed all the ways in

20  which you claim your constitutional rights were

21  violated in that the courtroom holding cell area?

22  Or is there anything you'd like to add?

23     A.  They were -- it was an ongoing violation

24  from the beginning.  I'm -- I'm not sure everything

25  has been discussed right now.  It's in my -- it's in

1    my materials.

2        Q.   In your amended interrogatory answers?

3        A.   In amended and the complaint, so I'm -- I'm

4    not -- I'm not going to say I told every single

5    thing.

6        Q.   Okay.  And that's fair.  So --

7        A.   Yeah.

8        Q.   -- if we talk about looking cumulatively

9    here, your testimony today, and if we look to your

10   amended interrogatory answers and to your complaint,

11   does that describe all of the ways in which you

12   claim your rights were violated in this courtroom

13   holding cell area?

14       A.   My rights were violated by the fact of the

15   arrest.  You get that, right?  That's all you need.

16   They were violated immediately.

17       Q.   Okay.  That's not my question, though.  My

18   question was, is it fair to say if I take your

19   testimony today and look at your amended

20   interrogatory answers and your first amended

21   complaint, have we now identified all of the ways in

22   which you claim that your constitutional rights were

23   violated in that courtroom holding cell area?

24       A.   Almost all, yes.

25       Q.   What else is there that we haven't --

Michelle MacDonald Shimota
10/20/2016

1    A.   I -- I -- if you go from beginning to end

2    there's 30 hours of ongoing violations of my civil

3    liberties.   I was arrested and put in handcuffs and

4    brought out into the world in that condition to do a

5    trial.

6    Q.   But again, I'm talking specifically about

7    the courtroom holding cell area.   Is there any other

8    way in which you claim your rights were violated in

9    that holding cell area that --

10   A.   The whole thing was a violation, so I've

11   described to you a few of the incidents.   Thank you.

12   Q.   Okay.   What incidents in that courtroom

13   cell --

14   A.   You'd have to watch the whole video.   The

15   whole thing --

16   Q.   May I finish my question?

17   A.   -- was a violation.

18           MR. PADDEN:   Let him finish the

19   question, Michelle.

20   Q.   In the courtroom holding cell area what

21   other ways are you claiming your due process rights

22   were violated that we haven't discussed?

23   A.   By being in there my due process rights were

24   violated, by just being in there.   So the whole

25   thing, anything that happened in there was a

1   violation.   Every single conceivable thing that

2   happened during that period was a violation of my

3   civil rights.   They just took me out of my life.

4       Q.   Anything else?

5       A.   No.

6               (MacDonald Deposition Exhibit No. 6

7               marked for identification.)

8   BY MR. TIMMERMAN:

9       Q.   Ms. MacDonald, this is Exhibit No. 6 to your

10  deposition.

11      A.   Mm-hmm.

12      Q.   Once again, I'll represent to you that this

13  Exhibit No. 6 was produced by me in this lawsuit, by

14  my clients.

15               THE WITNESS:   Michael, do you have

16  this?   I've never seen it.

17               MR. PADDEN:   I don't know.   Just wait

18  for the question, please.

19  BY MR. TIMMERMAN:

20      Q.   It's Bates labeled DC 00038.   Do you see

21  that in the bottom right-hand corner?

22      A.   Right.

23      Q.   Do you recognize this document?

24      A.   No, I don't.

25      Q.   Okay.   Do you have any basis for disputing

1    the authenticity of this document?

2        A.  I --

3            MR. PADDEN:  Excuse me.  Objection;

4    lacks foundation.  She's never seen it before.

5        A.  I never --

6            MR. PADDEN:  Just let me make my

7    objection.  There's no possible way she could answer

8    that question, Counsel, since she just said she's

9    never seen it before.  All due respect, I think we

10   should just move to the next question.

11   BY MR. TIMMERMAN:

12       Q.  Any basis for disputing that you were moved

13   to the jail at approximately 2:46 p.m. on September

14   12, 2013?

15       A.  I'm trying to think of when the trial was

16   over.  After I finished the trial or -- and the

17   judge got off the bench, they wheeled me to the

18   next -- the next level, the next phase.

19       Q.  To the jail, correct?

20       A.  To the adjacent jail, yes.

21       Q.  And you were transported there via an

22   underground tunnel, correct?

23       A.  Yes.

24       Q.  Okay.  Who transported you to the jail?

25       A.  I'm not sure individually who it was because

1  the video you supposedly provided is inoperable and

2  I can't open it.  Do you have a copy of it here I

3  might be able to look at so I can answer that

4  question more specifically?  I just don't -- there

5  were three deputies that got in an elevator with me.

6  I saw that video.

7      Q.  Okay.  Which three deputies were those?  Do

8  you recall?

9      A.  I know one of them was Napper because I

10 looked and saw Napper on his lapel.

11          MR. TIMMERMAN:  I'm going go back to

12 the video for a second, Mike, please.

13 BY MR. TIMMERMAN:

14     Q.  Okay.  Let me show you how we access this

15 footage.  Okay?  This has been produced to you.

16     A.  It has not, no.

17     Q.  It has.

18     A.  No, it has not.

19     Q.  This video --

20     A.  I would ask that it be produced like today

21 to my attorney in operable form.  We cannot open

22 your -- so it has not been produced.  You can't

23 produce something and say you produced it when you

24 can't even open it.  That is not a production, sir.

25 So I'm asking you today will you reproduce all of