1  this for me today?

2          MR. PADDEN:  Just -- Michelle, just

3  wait for his next question.  Okay?

4      A.  I'm asking you, are you going to --

5          MR. PADDEN:  I'll deal with that.  I'll

6  deal with that.  Just wait for his question, please.

7      Q.  Respectfully, it has been produce --

8      A.  It's hasn't been produced.

9          MR. PADDEN:  Okay.  He's just --

10  Michelle, he's just claiming it's been produced.

11  We're claiming that we can't open it.  We get it.

12  Wait for his next question, please.

13      Q.  I'm about to show you how to access exactly

14  what's produced.  Okay?

15          MR. TIMMERMAN:  Mike, you want to see

16  this, too?

17          MR. PADDEN:  Look, I don't want to have

18  an education session.  Let's continue --

19          THE WITNESS:  I want another copy.

20          MR. PADDEN:  Look --

21          THE WITNESS:  This has been an ongoing

22  month --

23          MR. PADDEN:  I understand that.  Okay.

24  He's going to ask questions about a video.  Let's

25  just stay on task.  Okay?  Thank you.

Michelle MacDonald Shimota
10/20/2016

1    THE WITNESS:  A video he's watched

2  fully and I can't even open.  And I was in -- in

3  a --

4    MR. PADDEN:  I understand, Michelle.

5    THE WITNESS:  -- state.

6    MR. PADDEN:  I understand.  Just wait

7  for the next question, please.

8    THE WITNESS:  Part of the corruption.

9  BY MR. TIMMERMAN:

10    Q.  I'm part of the corruption?

11    A.  Yes, you are.

12    Q.  What evidence do you have of that?  Are you

13  accusing me of corruption on the record?

14    MR. PADDEN:  I think she's --

15    Q.  I want it clarified.  This is important.

16    MR. PADDEN:  Answer the question,

17  Michelle, since you opened the door, answer the

18  question how he's corrupt.

19    A.  You are not providing me with the evidence

20  that I need and pretending to.  And I -- we sat in a

21  meeting with Mr. Grigsby and you said you were going

22  to give me another copy of the video, you said you

23  were going to give me a copy of the September 11th

24  video so I could identify the deputies, and you have

25  not done so.  Another copy.

1    Q.   Let's watch the video.   Here you come in the

2  wheelchair, correct?

3    A.   Okay.

4    Q.   And who is that?

5    A.   That's Melton.

6    Q.   Okay.   And this is the tunnel you were led

7  through, correct?

8    A.   Yes.

9    Q.   And who is that?

10    A.   That looks like Gonder.

11    Q.   He's with another inmate, correct?

12    A.   Looks like it.

13    Q.   Seeing this video does this refresh your

14  recollection of who took you to the jail?

15    A.   It was Gonder and Melton and then somebody

16  else got in the elevator with me, so there were

17  three, three of them.

18    Q.   And then on September 13, 2013 you were

19  escorted to and from court, correct, from the jail

20  to and from court?   Do you recall that?

21    A.   The next day?

22    Q.   Correct.   You appeared before

23  Judge Wermager, correct?

24    A.   Yes, yes.

25    Q.   Do you know the name of the deputy who

1    escorted you to court before Judge Wermager?

2       A.   I don't -- you'll have to show me the video.

3    I think it was Wegner.

4       Q.   Okay.

5       A.   And the escort is a period of time, by the

6    way, it's not these snippets that you're taking.  It

7    started with three deputies escorting me.  And then

8    this is the snippet where one is standing behind.

9       Q.   Okay.

10      A.   Yes.  And most four.  That's why I would

11   like to request on the record that I get that video

12   from you.

13           MR. PADDEN:  We've done that four times

14   now.  Okay.  We get it.

15      A.   And it's been months.

16      Q.   How long were you at the courthouse on

17   September 13th, between the time you were escorted

18   there and the time you were brought back, roughly

19   how much time elapsed?

20      A.   Escorted from one point to the other?

21      Q.   Between the time you --

22      A.   So I went from a cell to -- I don't

23   understand your question.

24      Q.   Sure.  Between the time that you left the

25   jail to be escorted to the courtroom and the time

1     that you returned to the jail from the courtroom,

2     how much time elapsed in between those two

3     benchmarks?

4     A.   It'll show it on the video I'm sure.   I

5     don't know how much time.   It seemed like forever

6     when you're in that condition that they put me in.

7     Q.   And Exhibit No. 6 reflects, if you will,

8     please look at Exhibit No. 6 --

9     A.   Mm-hmm.

10     Q.   -- reflects that inmate released at

11     9-13-2013, 16:20 military time, so that would be,

12     back with military time, 4:20 p.m.?

13     A.   4:20.   I know it was after the media left.

14     So they waited around as far as I know, and after

15     they left they released me.

16     Q.   Okay.   Do you recall what time your

17     release --

18     A.   It was late in the afternoon, as late as

19     they could release me.   Close to 5, right, that

20     would be.

21              (MacDonald Deposition Exhibit No. 7

22              marked for identification.)

23     BY MR. TIMMERMAN:

24     Q.   Ms. MacDonald, this is Exhibit 7 to your

25     deposition.   Have you seen this before?

1      A.   Yes.

2      Q.   Okay.   Any reason for disputing that this

3   photo roster was produced to your former counsel in

4   June of 2015?

5      A.   You gave it to me directly.

6      Q.   Okay.

7      A.   When I was asking for the video, that you

8   still have not produced, you gave me this instead as

9   if I'm supposed to pick from this when swarms of

10   people in uniforms are all over me, I'm supposed to

11   know who they are.   I want to watch the video,

12   please, and then I'll identify these people.   You

13   just identified one person, a woman, right, that

14   frisked me?   So that's how I want to do it.   I want

15   to watch the video --

16          MR. PADDEN:   He gets to do the

17   deposition.   Okay.   It's okay.   We get your point.

18      Q.   And I want to make clear for the record that

19   in June of 2015 I did produce the jail video with

20   directions of how to access the jail video with the

21   specialized player that's required, a copy of which

22   was also embedded in the video that was produced for

23   use and viewing of the video.

24      A.   And I want to make a record that I want --

25      Q.   I'm not done yet.

1    A.   That those directions didn't work.

2         MR. PADDEN:  Let him --

3    Q.   I'm not done yet.

4         MR. PADDEN:  Let him complete his

5    thought.

6    A.   So just acknowledge that I need another copy

7    of the video and get it to me today.  It's right

8    around the corner.  That's all.  Thank you.

9         MR. PADDEN:  And for the record, I

10   would also like to acknowledge I did not represent

11   plaintiff at that time so I'm really not privy to

12   what went on.

13        MR. TIMMERMAN:  You did not.  And I

14   will also represent on the record that I had offered

15   to Ms. Tayari Garrett and Mr. Busch to walk them

16   through playing the jail video if they had questions

17   on how to access it.

18   A.   You had also offered that I could come here

19   and watch it myself, so I will accept that offer.

20   So stop pretending that we can't -- we can't open

21   the video.  That's the bottom line.  Okay?

22   BY MR. TIMMERMAN:

23   Q.   Okay.  Well --

24   A.   So why are you asking me these questions?

25        MR. PADDEN:  It doesn't matter.  He can

1  ask whatever he wants subject to objections, so.

2      Q.  I certainly want to enable you to watch the

3  video.

4      A.  I'm not sure of it because it's been months.

5  So don't pretend you want me to watch the video.  We

6  could go watch it right now or we could watch it

7  right here on the screen afterwards.  All I want to

8  do is watch it.  Thank you.

9      Q.  And you'll have that opportunity for sure.

10     A.  And I want September 11th as well that you

11  promised.

12     Q.  I didn't promise September 11th.  We had

13  discussion --

14     A.  Yes, you did.

15         MR. PADDEN:  Okay.

16     Q.  We're not going to talk about this on the

17  record at your deposition.  If you want September

18  11th, bring a motion to compel.

19         Let's turn to the first individual on this

20  roster, Farrel Byrd.  Do you recognize him?

21     A.  Doesn't look familiar.

22         MR. PADDEN:  Hold on a second, Jeff,

23  where are you referring to?

24         MR. TIMMERMAN:  And, actually, I

25  apologize, this was stapled wrong.

1          MR. PADDEN:  Okay.

2     BY MR. TIMMERMAN:

3          Q.  Do you recall interacting with Farrel Byrd

4     at all at the jail?

5          A.  It doesn't -- he doesn't look familiar to

6     me.  I interacted with all kinds of deputies.

7          Q.  And we have Jennifer Cho.  And we've seen

8     Sergeant Cho in the video, correct?

9          A.  Seen her, yes.

10         Q.  Did you interact with Sergeant Cho at all at

11    the jail to the best of your recollection?

12         A.  Now I know I have, yes.

13         Q.  You interacted with her in the courtroom

14    holding cell.

15         A.  Yes.

16         Q.  I'm asking at the jail.  Did you interact

17    with her at all at the jail?

18         A.  You need to understand also that some of

19    these deputies I see because I come to the Hennepin

20    County court.  So I want to make sure if I'm

21    recognizing them, I'm recognizing them from the

22    video.

23         Q.  And I understand that.

24         A.  So Cho, now I recognize from the video.  But

25    I would have recognized -- when I got this I said,

1  oh, that's a deputy that I've seen before.  Do you

2  see what I mean?  I don't want to -- I want to get

3  them right.

4          MR. PADDEN:  Yeah, Jeff, so --

5      Q.  My questions -- and I can maybe clarify

6  this.

7          MR. PADDEN:  No, and I'm not trying

8  to -- I'm not trying to obstruct your deposition.

9  But just to be clear, is your line of inquiry

10  regarding these folks I take it concerning the

11  circumstances of this litigation?

12          MR. TIMMERMAN:  Correct.

13          MR. PADDEN:  As opposed to --

14          MR. TIMMERMAN:  Correct.

15          MR. PADDEN:  Because she litigates a

16  lot of cases.

17          MR. TIMMERMAN:  And I'll narrow it down

18  even more for you.

19          MR. PADDEN:  Okay.

20  BY MR. TIMMERMAN:

21      Q.  My line of questioning with regard to this

22  roster, which was produced in June of 2015, is

23  whether or not you recall interacting with any of

24  these people at the jail, not at the courtroom

25  holding facility, at the jail specifically.

Michelle MacDonald Shimota
10/20/2016

1      MR. PADDEN:  Thanks for the clarity.

2      Q.  On September 12th or 13th of 2013, do you

3   recall interacting with Sergeant Cho at the jail on

4   those dates?

5      A.  I've just seen the video so now I recall

6   interacting with Jennifer Cho.

7      Q.  What about Deputy Russell Crissman?

8      A.  I would have to look at the video to see if

9   I interacted with Russel Crissman.

10     Q.  Now, you've referenced in your pleadings

11  that a deputy named Chris released you from jail

12  ultimately.

13     A.  Oh, okay.  He wasn't -- he was dressed in

14  different clothing.

15     Q.  Does this look like the guy who maybe

16  released you?

17     A.  I don't know that he was a deputy, because

18  he was dressed in blue clothing.  He was very -- he

19  was short and I thought his name was Chris,

20  everybody called him Chris.  Now, you could answer

21  if everybody calls him Chris, that could be somebody

22  who interacted with me.

23     Q.  Do you recall interacting with Michael Curry

24  at all at the jail on September 12th or 13th, 2013?

25     A.  I'd have to look at the video.

1    Q.  How about Shantell Dillard?

2    A.  Doesn't look familiar.  I'd have to look at

3    the video.

4    Q.  Rhonda Doheny?

5    A.  I'd have to look at the video.

6    Q.  Deborah Fyten?

7    A.  I'd have to look at the video.

8    Q.  Obviously we have Deputy Gonder there, and

9    we spoke about him, correct?

10   A.  Yes.

11   Q.  What about Daniel Hoover?

12   A.  Daniel Hoover, he looks familiar to me.  If

13   he has blue eyes, he looked familiar to me.

14   Q.  Do you recall interacting with him at the

15   jail?

16   A.  I recall -- I'll have to look at the video,

17   but he looked familiar to me from the jail

18   experience.

19   Q.  And what exactly do you recall as you sit

20   here today about your interactions with him?

21   A.  I just remember there was -- when I was in

22   the jail that he -- someone fitting his description,

23   but I'd have to see the video, came to my --

24   purportedly to my aid at the time.  And he was

25   very -- his demeanor was very nice.  He was -- he

1    was trying to be very nice to me.  And then awhile

2    later his demeanor completely changed.  He went from

3    one demeanor to the other the next time he came

4    back.  So I just remember going this -- this person

5    seemed so nice and now all of a sudden he has like

6    evil in his eyes.  Now, that was a blue-eyed younger

7    person.  It might not have been Hoover, and I don't

8    want to blame anybody.  They were -- you know, the

9    departments responsible, but I don't want to name

10   anybody in particular.

11       Q.  And this particular individual that you're

12   talking about with evil in his eyes, what exactly

13   did he do or say to you to make you think that he

14   was evil?

15       A.  Well, there was harassment all night long

16   from all of the deputies, so one after another,

17   particularly Gonder.

18       Q.  We'll talk about that in a minute.

19       A.  So that's -- that's one of the pieces.

20       Q.  Melton, obviously Sergeant Melton, the next

21   page, we've talked about him?

22       A.  Yes.

23       Q.  Did you interact at all with Gary Millbach

24   at the jail?

25       A.  I'd have to look at the video.  He doesn't

1    look familiar.

2        Q.   Napper of course we've talked about.  How

3    about Deputy Lana Opp, did you interact with Deputy

4    Opp?

5        A.   She looks familiar.

6        Q.   Any recollection of interacting with her at

7    the jail?

8        A.   Well, there was a deputy, a female deputy,

9    that was taking my picture in the middle of the

10   night.  I don't know.  It might have been her or --

11   if these are all the female deputies.  It was a

12   female deputy that was taking my picture in the

13   middle of the night.

14       Q.   Okay.  And I'll represent to you for

15   clarification that it was Sergeant Fyten who

16   assisted with photographing you.

17       A.   Sergeant Fyten?

18       Q.   Correct.

19       A.   Where is that?

20       Q.   Bottom left-hand corner.

21       A.   Okay.

22       Q.   And that it was Deputy Hoover who assisted

23   with fingerprinting you.

24       A.   Deputy Hoover, okay.

25       Q.   Okay.  What about Brandon Pitts, Deputy

1    Pitts, any recollection of interaction with Deputy

2    Pitts?

3        A.   He looks familiar now, but it might be from

4    other interactions.

5        Q.   What about Deputy Welin, any recollection of

6    interacting with him at the jail on September 12th

7    or 13th?

8        A.   No, I'd have to look at the video.

9        Q.   What about Deputy Stacy Williams, any

10   recollection of interacting with Deputy Williams?

11       A.   She looks familiar, but I don't recall.  I'd

12   have to look at the video.  Now, you just told me

13   who I interacted with so why are you asking the

14   question when you know who I interacted with?

15       Q.   We'll go over some of more detailed notes

16   here momentarily --

17       A.   Okay.

18       Q.   -- of your interactions.  I just wanted to

19   show you this to get your recollection as you sit

20   here today.

21       A.   So who on this did I interact with other

22   than the ones you mentioned?

23       Q.   Why don't you keep that handy and as we go

24   through some of the other documents that reference

25   the specific individuals you'll have a photographic

1   point of reference as well.

2       A.   Thank you.

3       Q.   And I will note that this document is marked

4   confidential in the lawsuit because -- under the

5   protective order, because these are duty photos

6   of --

7               MR. PADDEN:   That's fine.

8       A.   Right.

9       Q.   -- active correctional staff.

10              (MacDonald Deposition Exhibit No. 8

11              marked for identification.)

12   BY MR. TIMMERMAN:

13       Q.   Ms. MacDonald, this is Exhibit 8 to your

14   deposition produced in this action as DC 00042

15   through DC 00044.   Do you recognize this document?

16       A.   No, I don't.

17       Q.   Would you like to take a moment to

18   familiarize yourself with it?

19       A.   Okay.   I don't --

20       Q.   I'm going to ask you some questions about it

21   and I'm wondering if you'd like to review it.

22       A.   It's somebody else's document, and I don't

23   recall it ever being produced by you.

24       Q.   Did you remain in a wheelchair during your

25   entire stay at the jail?

1    A.  No.

2    Q.  Were you in a wheelchair during the periods

3    of time at the jail when you were in the common

4    areas outside of your cell?

5    A.  I believe so, yes.

6    Q.  So when you were in your cell you were not

7    in the wheelchair, correct?

8    A.  Right.

9    Q.  Fair to say that anytime you were outside of

10   your cell you were in a wheelchair?

11   A.  Yes.

12   Q.  On both days?

13   A.  You mean in the middle of the night?

14   Q.  My question is when you were -- on September

15   12th and 13th of 2013 during the times that you were

16   outside of your --

17   A.  Right, they just regularly brought a

18   wheelchair and I got in the wheelchair.

19   Q.  Okay.  So then during the times you were

20   outside of your cell your testimony is that you were

21   in a wheelchair, correct?

22   A.  Yes.

23   Q.  Is there any reason why --

24   A.  As I was being wheeled, yes.  Yes, I mean,

25   in a wheelchair, I got into the wheelchair.  I

1  remember standing up when I went to court to talk to
2  the judge.  They let me stand up.  Then they put me
3  back in it.

4      Q.  Were you given the option of not using the
5  wheelchair at the jail?

6      A.  No.  They just brought a wheelchair anytime
7  I -- they wanted to deal with me.

8      Q.  Was the handcuff belt removed when you were
9  ultimately brought to the jail?

10     A.  When I went -- the handcuff belt -- which
11 jail are you referring to?  The jail --

12     Q.  The Dakota County jail.

13     A.  They're both adjacent.  So the next door
14 jail?

15     Q.  The next door jail where you spent the
16 night.

17     A.  I believe so, because once I was in my cell
18 I think they finally took my handcuffs off and the
19 belt off, but then they kept putting them back on if
20 they'd take me places.

21     Q.  Okay.  So inside your cell, no cuffs, no
22 belt; outside of your cell, cuffs and belt.  That's
23 your recollection?

24     A.  Well, cuffs and belt inside my cell at --
25 you know, at the -- at one jail.  They brought me to

1    different cells.  So the first cell, cuffs and belt

2    inside the cell.  The next one I think they took

3    them off each time.  They put me in different cells.

4        Q.  Okay.  If you could please look at Exhibit

5    No. 8 on the first page, DC 00042.  Fifth line down

6    under the narrative section it reads, Corporal Byrd,

7    number 1218, approached MacDonald and attempted to

8    ask her questions, but she refused to answer.

9        Now Corporal Byrd is Farrel Byrd upper

10   left-hand corner of page 1.  Does that refresh your

11   recollection at all of interacting with Corporate

12   Farrel Byrd at the jail?

13       A.  No, there were all kinds of deputies on me.

14       Q.  Do you recall Corporal Byrd asking you any

15   questions at the jail?

16       A.  No.

17       Q.  Do you recall refusing to answer questions

18   that Corporal Byrd asked you at the jail?

19       A.  No.

20       Q.  So when this report says Corporal Byrd

21   approached you and attempted to ask you question but

22   you refused to answer, is this a lie?

23       A.  There were all kinds of deputies around me.

24   I -- they were all over me.

25       Q.  Do you recall --

1    A.  I -- there was -- there was not just one

2    deputy.  There were all kinds of deputies around me

3    at many different times.

4    Q.  Do you recall being pat searched at the

5    jail?

6    A.  I don't recall.

7    Q.  Do you recall Corporal Byrd telling you that

8    you could make a phone call once you'd been booked?

9    A.  They -- throughout the night they said --

10   they -- you -- come get booked and we'll allow you

11   to do this, come get booked and we'll allow you to

12   do that.  And I kept saying booked for what.

13   Q.  Is it your understanding that you were

14   actually booked at the jail?

15   A.  No, I was not booked.

16   Q.  Why weren't you booked?

17   A.  Because the judge said that I didn't have to

18   be booked.

19   Q.  Is it accurate -- accurate to say that

20   before the judge said that you didn't have to be

21   booked that you refused to complete -- excuse me --

22   A.  There was no --

23   Q.  Wait.  May I finish my question, please?

24   I'll start over.  I understand you went before Judge

25   Wermager on September 13th and he said you didn't

1    have to complete the booking process.

2        A.   Right.

3        Q.   Correct?  Prior to that time on September

4    12th and September 13th when you were at the jail

5    where you spent the night, is it fair to say that

6    you refused to be booked?

7        A.   No.  I didn't have to be booked because I

8    didn't commit a crime.  I didn't do anything.

9        Q.   Did you --

10       A.   They booked me.  I don't book myself.  The

11   judge said I didn't have to be booked.

12       Q.   Did they attempt to you book you, the

13   deputies attempt to book you?

14       A.   They kept -- they said like, here, you

15   can -- you have no liberties until you're booked.

16   You can't make a phone call, you can't do anything

17   until you're booked.  That was their statement.  And

18   they kept doing things to me and doing things to me

19   and making things worse and worse and worse.  And I

20   knew I didn't do anything wrong, so I didn't have to

21   be booked.  And then the judge confirmed it.  And

22   they finally released me.

23       Q.   My question --

24       A.   How do you arrest somebody, you know --

25   okay.

1    Q.    My question for you was, did jail staff

2    attempt to book you?

3    A.    Yes, I guess you could say that.

4    Q.    Did you cooperate in the booking process?

5    A.    They -- they don't -- they didn't book me,

6    that's the point.   I didn't -- I don't know what

7    cooperate means.

8    Q.    Did you answer their questions?

9    A.    I answered some questions, yes, and I talked

10   a lot, yes.

11   Q.    What questions did you answer specifically

12   that you recall?

13   A.    It was all through the night, all through

14   the night.   I can't -- I can't recall anything

15   specific.

16   Q.    Explain to me where they took you to be

17   booked at the jail.

18   A.    You'll have to explain it to me, because

19   I -- it was the middle of the night as far as I

20   know, except my room was completely bright.   I felt

21   like it was in -- I was in a dream.   And -- so you

22   tell me.   I remember the next day when they finally

23   took the handcuffs off me after the judge released

24   me, I remember seeing the place and I thought, this

25   must be where they brought me.

1    Q.   I can explain to you.   There is an intake

2  and booking area at the jail.   There's a desk called

3  the booking intake desk.   It's elevated off the

4  floor.   That's where inmates are booked at the jail.

5         Do you recall being taken to that spot to be

6  booked?

7    A.   It didn't feel like that spot at the time,

8  but then now that I look at it they took me there,

9  yeah.   And I didn't know which cell I was in.

10  Again, it didn't seem like it was real.

11    Q.   Did you refuse to answer some of the

12  questions that were asked of you during that booking

13  process?

14    A.   Refuse to answer?   Probably.   I was not

15  talking sometimes.   Sometimes I was crying and

16  trying to talk to have them help me.   It went on and

17  on all -- all night long.   So they can't say I

18  didn't cooperate.   They completely just stripped me

19  of my liberties and I cooperated as much as I could

20  and they were not helping me.   They would not help

21  me at all.   Nobody would hear me.   Nobody would help

22  me.   No matter what I said or did, that was what

23  happened.

24    Q.   You answered all of the booking questions

25  then?

Michelle MacDonald Shimota
10/20/2016

1      A.  So they were not cooperating.  It was awful.

2      Q.  You answered all the booking questions then?

3  That's your testimony?

4           MR. PADDEN:  Objection --

5      A.  I don't recall --

6           MR. PADDEN:  Can I make an objection,

7  please?  Objection; asked and answered.  Go ahead

8  and answer again.

9      A.  I don't recall any -- they asked me all

10  kinds of questions.  They taunted me, like I told

11  you.  I -- I -- I pushed the medical button.  I kept

12  asking them questions.  They weren't answering my

13  questions.  It was just a -- I couldn't believe what

14  was happening at that point.

15     Q.  Now Exhibit 8 here --

16     A.  So for you to wrench out something just

17  doesn't make sense.

18          MR. PADDEN:  Don't comment on how he's

19  asking the questions, Michelle, come on.

20     Q.  Exhibit 8 here, see seventh line from the

21  bottom, sentence on the right-hand side starting

22  with nursing staff, the nursing staff attempted to

23  ask MacDonald some medical questions to find out if

24  she had any medical concerns or possible TB

25  infections.  Do you recall --

1      A.   I don't remember --

2      Q.   Let me ask the question.   Do you recall a

3  jail nurse asking you medical questions, including

4  about TB exposure?

5      A.   I don't recall -- I kind of recall laying in

6  a cell and then somebody coming in.   And I was just

7  exhausted.   And I just -- I was -- might have said,

8  why are you asking me these questions.   That sounds

9  familiar to me.

10      Q.   You just don't know who it was who asked

11  those questions?

12      A.   I don't know who it was.

13      Q.   Did you answer the medical questions?

14      A.   I -- I believe I answered whatever they

15  asked.

16      Q.   Did you answer questions about your

17  potential tuberculosis exposure?

18      A.   I don't remember them asking me about

19  tuberculosis.   I was just in a -- at that point I

20  was really in a daze.   That was the first part.

21  Because I finally when I was in the cell by myself,

22  I was -- I was -- I said, I'm just going to rest

23  here.   I'm just going to -- I can't even believe

24  this is happening.   And I think that's when people

25  came in or I was there thinking I was just going to

1    be here and not be touched or talked to or taunted

2    for a moment, and then somebody came in.  And I

3    thought --

4         Q.   Somebody came in to ask you questions?  And

5    this --

6         A.   I think so, yes.

7         Q.   This report continues, MacDonald refused to

8    answer any medical screening questions.  MacDonald

9    was later informed she would be escorted from R-415

10   to I-327, negative pressure room, due to not

11   answering the medical questions.  It was explained

12   to MacDonald by Corporal Byrd that she was required

13   to be in the negative pressure room and isolated due

14   to nonresponses to a medical questionnaire to

15   prevent the possible spread of tuberculosis.

16        Do you recall Corporal Byrd explaining to

17   you that he was moving you or you were being moved

18   to the negative pressure room because you failed to

19   answer medical questions about potential TB

20   exposure?

21        A.   No.

22        Q.   You don't recall that?

23        A.   No.  I recall when they -- I was somewhere

24   in one cell, and I recall one woman deputy leaving

25   the mattress there and saying she wasn't supposed to

Michelle MacDonald Shimota
10/20/2016

1   do that.  That's what I recall about being moved or

2   something like that.  That when I moved I wasn't

3   supposed to have a mattress and she let me have it.

4   And -- and I thanked her.  That's what I recall.  I

5   remember --

6           MR. PADDEN:  You answered the question.

7   Go to the next -- we'll be here until hell freezes

8   over.  Come on.

9      Q.  Okay.  Let's go back to Exhibit 2 for a

10  second.  Got it?  Exhibit 2, I can help you find it.

11  That's this guy.  Exhibit 3, excuse me, this is 3 --

12  2, page 665.  There we are.

13          Now this, again, Exhibit 2, this is campaign

14  material that you drafted, you testified to that.

15  On page 665 it says, many deputies had handled her

16  to this point.  When one of them came in to ask

17  medical questions, she did not answer, thinking,

18  quote, "I am not sick or in a hospital," end quote.

19          Having seen that in something that you

20  drafted, does that refresh your recollection that

21  you did not actually answer the medical questions

22  the jail staff asked you?

23      A.  I was thinking, I'm not sick or in a

24  hospital, yes, that refreshes my recollection.

25      Q.  So based on your thought that you weren't

1   sick or in a hospital, fair to say that you refused

2   to answer those medical questions, correct?

3       A.   I might have told them, I'm not sick.   I

4   don't know what I -- what they asked me or answered.

5   But when they came to ask medical questions I didn't

6   answer thinking I'm not sick or in a hospital.

7       Q.   Okay.   Including tuberculosis?

8       A.   I don't remember them asking me about

9   tuberculosis.

10      Q.   Would that have been one of the questions

11  you wouldn't have answered because you weren't sick

12  or in a hospital?

13      A.   No.

14      Q.   You didn't have a cellmate at any time when

15  you were confined at the jail, right?

16      A.   Except for the deputies coming in and out.

17      Q.   I'm talking about another inmate.

18      A.   No.

19      Q.   And you were never confined in the general

20  population of the jail, correct?

21      A.   What do you mean?   They kept me in solitary

22  confinement.   So do you mean -- no --

23      Q.   You weren't --

24      A.   -- I wasn't with anybody.   They kept me in

25  solitary confinement.

1    Q.   But you got meals at the jail, right, you

2    received those meals?

3    A.   Yes.

4    Q.   What is your understanding of what a

5    negative pressure room is?   If you know.

6    A.   I have no idea.

7    Q.   What's your understanding of the jail's

8    negative pressure room?

9    A.   I have no knowledge.

10   Q.   At the time did you understand that if you

11   had answered medical questions you might not have

12   moved to a negative pressure room?

13   A.   No.

14   Q.   Any reason to dispute that you were

15   ultimately placed in the jail's negative pressure

16   room?

17   A.   I was placed in a different cell.  I was in

18   a number of different cells.

19   Q.   Do you have any personal knowledge regarding

20   the jail's policies and procedures for placement of

21   inmates who may have potentially been exposed to

22   tuberculosis?

23   A.   No.

24   Q.   Do you have any pol- -- personal knowledge,

25   excuse me, of the jail's placement of inmates who

1    refuse to answer questions regarding potential

2    tuberculosis exposure?

3        A.   No.

4        Q.   Do you have any personal knowledge regarding

5    the normal temperature of the negative pressure

6    room?

7        A.   They should have just let me go, bottom

8    line.

9        Q.   My question, though, is do you have any

10   personal knowledge of the normal temperature of the

11   jail's negative pressure room?

12       A.   No.

13       Q.   Do you have any personal knowledge regarding

14   whether the jail's negative pressure room is warmer

15   or colder than other jail cells?

16       A.   No.

17       Q.   Do you have any evidence that jail staff

18   purposefully lowered the temperature in the negative

19   pressure room when you were confined in that room?

20       A.   Do I have any evidence --

21       Q.   Correct.

22       A.   -- of that?  Being the room was freezing,

23   freezing cold, somebody must have done something.

24   It wasn't as cold when I first got in there.   It

25   froze -- it became more and more cold.

1    Q.   Okay.

2    A.   So somebody must have done that.

3    Q.   You've got your subjective observation.

4  Beyond that do you have any evidence that jail staff

5  purposefully lowered the temperature of that

6  negative pressure room?

7    A.   No.

8    Q.   Do you have any personal knowledge regarding

9  how the jail's negative pressure room is normally

10 lit?

11   A.   No.

12   Q.   Any personal knowledge about whether the

13 negative pressure room lights are to remain on at

14 all times for inmate observation purposes?

15   A.   No.

16   Q.   Any personal knowledge regarding whether the

17 negative pressure room is lit differently than other

18 cells at the jail?

19   A.   No.

20   Q.   Any evidence that you were treated any

21 differently than other inmates who are placed in the

22 negative pressure room with regard to the room's

23 temperature or lighting?

24        MR. PADDEN:   Object to the form; lacks

25 foundation.   Go ahead and answer if you can.

1      A.  No.  Again, they should have let me go or
2  never brought me there to begin with.  That's the
3  bottom line.  They took my liberties away, period,
4  way back when, way back before this.  So whatever
5  happened, the torture that I experienced, is just a
6  little tiny piece of all this.
7           MR. PADDEN:  Michelle, you already said
8  that.  Just try to answer the question, please.
9      Q.  Who fingerprinted you at the jail?
10     A.  I -- as I recall, Gonder came back -- okay.
11 I was at the fingerprint.  I think it was Gonder.
12     Q.  I'll tell you what, let me help you out.  I
13 think this will be the last video we watch today.
14 Bear with me while I find it.  Do you know who this
15 person is?
16     A.  No.
17     Q.  I apologize, this video player does not
18 allow skipping.  Okay.
19     A.  I don't know when this was.  It felt like
20 the middle of the night to me.
21     Q.  So here you are at the fingerprint machine.
22     A.  Mm-hmm.
23     Q.  It is 10:31 almost 10:32 p.m.  Does that
24 ring a bell?
25     A.  I had been mistreated for quite a while by

1      the time this happened.

2          Q.   This is Deputy Gonder.

3          A.   So it could have been the right time.

4          Q.   Sergeant Fyten, Deputy Hoover.  Okay.  Here

5      you're getting fingerprinted.  Do you see that?

6          A.   Yes.  This is booking, correct?

7          Q.   Part of the booking process.

8          A.   Okay.  So after they booked me, why didn't

9      they let me go?  Crazy.

10         Q.   While we're watching this, it's going to

11     take us a little while to get there, but do you have

12     any personal knowledge regarding whether you

13     actually ever completed the booking process?

14         A.   No.  I thought they do the booking process.

15     That's my knowledge.  I thought you don't do the

16     booking process of yourself.  They're the

17     authorities.

18         Q.   Were you given the option --

19         A.   At this point --

20         Q.   Were you given the option to stand to be

21     fingerprinted?

22         A.   No.  At this point I saw Gonder.

23         Q.   Gonder is right here.

24         A.   It felt as if he was way in the back of a

25     line, and I saw him.  And I was telling the woman, I

1    didn't harm anybody, why am I here.  And then I saw

2    Gonder, and I thought, he can help me because he

3    knows I didn't do anything.  At this point I saw

4    somebody familiar, didn't know it was Gonder.  And I

5    said, he was there, he knows I didn't harm anybody.

6         And then Gonder said something like, well,

7    you took a picture of me, but you -- but you didn't

8    get -- you just got my bottom half.  I said, well,

9    you were smiling and waving, I was communicating.

10   And then I said, where's my camera.  And he said at

11   some point, because it felt like he was just -- you

12   know, because I'm in a daze still.  I'm feeling like

13   it's -- I'm recalling it as a dark room with lots of

14   people.  I didn't know there was just a bunch of

15   deputies around me.

16        And he said that, that we're going to keep

17   your camera, we're not going to give it back to you.

18   We're going to -- it's going to go through all the

19   appeals.  And I told him, I have lots of pictures on

20   there.  And then he also said something like -- I

21   said, you didn't interrogate -- you didn't read me

22   my rights.  And he said -- I think he had come back

23   at this point, because he was gone, and he said, we

24   don't have to read you your rights.

25        Q.  You were never interrogated at the jail,

1    correct?

2        A.   Well, I would call what's happening to me

3    interrogated.  They're asking me -- that's

4    interrogation, asking me medical questions, isn't

5    that interrogation?  I would see that -- I say, yes,

6    I was interrogated throughout the whole thing --

7        Q.   It's your position that before booking an

8    inmate into a jail and asking medical question jail

9    staff is required to read Miranda rights?

10       A.   They were interrogating me the whole time.

11       Q.   Now you're being wheeled around to have your

12   photograph taken.  Okay?

13       A.   Okay.  And they took a whole bunch of

14   pictures.

15       Q.   This is Sergeant Fyten taking your

16   photograph, correct?

17       A.   Right.

18       Q.   Originally they tried to take your

19   photograph while you were sitting down in the

20   wheelchair, correct?

21       A.   Right.  And they were successful at it.

22   They took a lot of pictures.

23       Q.   How do you know they were successful?  How

24   do you know they got a successful --

25       A.   Because they just kept taking pictures.

**Michelle MacDonald Shimota**
**10/20/2016**

```
 1        Q.   Do you have any personal knowledge whether
 2    any of the pictures taken of you while you were
 3    seated in the wheelchair were sufficient for
 4    purposes of the booking process.
 5        A.   I think they all were, yeah.
 6        Q.   What's your basis for that belief?
 7        A.   Because they were taking -- they kept taking
 8    them.
 9        Q.   Okay.  And here were you asked at any point
10    in time to stand up to be photographed?
11        A.   No.  They just came over and lifted me at
12    some point.
13        Q.   Why didn't you stand of your own volition
14    during that point in time, because you're about to
15    see --
16        A.   Because I didn't.
17        Q.   You're about to see --
18        A.   Your -- your -- your people captured me.  I
19    was captured by them.  I didn't know what to do.
20    I'd answer a question, that was wrong.  I'd not
21    stand up, that was wrong.  I'd sit down, that was
22    wrong.  They say they have a successful -- it went
23    on and on and on.  See, they're taking pictures.
24    And I'm telling, don't take my picture looking like
25    this, because you can see how good I looked when I
```

1   started out in this process in court, and this was

2   like the middle of the night to me.  And they kept

3   saying, well, you look beautiful.  And there's four

4   of them there.  Even the woman said it.

5       Q.  Okay.  So you were telling them, don't take

6   my picture because I look -- don't look good, and

7   they were saying you look beautiful?

8       A.  I was saying, please don't take my picture

9   looking like this, please don't take my picture.

10      Q.  And that's where the beautiful comment came

11  up?

12      A.  And they said, you look beautiful, you look

13  beautiful.

14      Q.  Okay.  And there you were held up -- let's

15  go back a couple.

16      A.  I thought they were done, because they kept

17  saying, you look beautiful, and taking pictures.  So

18  then they were taking me away and then they put me

19  back to take some more pictures.

20      Q.  Okay.  And they wheeled you back in to take

21  a picture standing up, right?

22      A.  No, they lifted me up --

23      Q.  Now, are you standing of your own --

24      A.  -- grabbed me and lifted me up.

25      Q.  Are you standing of your own free will

1    there?

2       A.  No, they grabbed me and lifted me up.  I

3    might have been standing, but they grabbed me, and I

4    think I am standing at this point, because they

5    grabbed me and lifted me up.

6       Q.  Okay.  Did you feel like you were being

7    cooperative in the fingerprinting and photographing

8    process?

9       A.  I was doing everything they told me to do.

10   All of my liberties were gone from beginning to end.

11   Whatever I did, they didn't -- they didn't like it,

12   they liked it, I -- you didn't know how to

13   cooperate.  I was very cooperative from beginning to

14   end.  I did everything I was told.  I was quiet.  I

15   talked.  From beginning to end I just did what I was

16   told when all of my liberties were stripped from me

17   down to nothing.

18          MR. TIMMERMAN:  Mark this please, if we

19   could, Exhibit 9.

20          (MacDonald Deposition Exhibit No. 9

21          marked for identification.)

22   BY MR. TIMMERMAN:

23      Q.  Do you recall, Ms. MacDonald, anyone telling

24   you that you needed to complete the booking process

25   before you could be released from the jail?

1      A.   They didn't say it that way.   They said,

2   we'll give you a phone call if you come get booked.

3   We'll give you an att- -- call your husband if you

4   come get booked.   They actually brought me a note

5   with an attorney, they said you can call this

6   attorney if you come get booked.   They never said

7   just come get booked.   You're going to get certain

8   enticements.   You can have a blanket if you come get

9   booked.   We won't take -- that was it.

10      And I was -- they should have just released

11   me.

12      Q.   Why didn't you just get booked then?   I

13   guess that's my question.

14      A.   Because they book me, I don't book myself.

15      Q.   But you have to cooperate in the process to

16   be booked.

17      A.   I did cooperate.

18      Q.   My clients will testify that you refused to

19   answer booking questions, and they can't book you if

20   you won't answer booking questions.   Do you

21   understand that?

22      A.   Well, you're testifying for your clients

23   right now.

24      MR. PADDEN:   Time out.   Is that a

25   question, Jeff?

 1           MR. TIMMERMAN:  That's a question.

 2      A.   What kind of a question --

 3           MR. PADDEN:  What's the question?

 4  BY MR. TIMMERMAN:

 5      Q.   The question is, you understand you can't be

 6  booked if you don't answer booking questions?

 7           MR. PADDEN:  Okay.  You have to answer

 8  that, Michelle.

 9      A.   No, I don't.  I answered their questions

10  that they asked me under the circumstances as best I

11  could.

12      Q.   But we've seen from Exhibit 2 that you

13  refused to answer the medical questions because you

14  weren't in a hospital or sick.  So you didn't answer

15  at least some of those questions, right?

16      A.   They asked me lots of questions that I

17  answered and lots of questions where I was silent

18  and didn't -- and confused and in a horrible state.

19  They put me in a horrible, horrible, state --

20      Q.   The questions --

21      A.   -- from beginning to end.

22      Q.   The questions where you were silent, why

23  didn't you answer them?

24      A.   I -- I -- because I didn't.

25      Q.   Because you --

1      A.   Because I didn't.

2      Q.   Because you chose not to, right?

3      A.   No, because I didn't do anything wrong.   I

4  didn't harm anybody.   There was nothing to be booked

5  for.

6      Q.   So if I'm understanding --

7      A.   And I knew the judge was going to let me

8  out, as soon as I got to a different judge, the

9  judge would just let me out.   And that's another

10 thing I kept asking for, when am I going to go to a

11 hearing, when am I going to go see a judge.

12     Q.   All right.   I'm just --

13     A.   And then they promised me, oh, it's going to

14 be in an hour, and I'd be waiting, when's that going

15 to happen, oh, it's going to be in another hour, and

16 then that's going to happen, promise, promise,

17 promise.   That's part of the frustration, that I

18 knew all I had to do was go see a judge, all they

19 had to do was bring me to go see a judge and they

20 didn't.   They kept me in this physical restraints.

21 So just ask me another question.

22     Q.   Sure.   If I understand you correctly, I'm

23 not trying to put words in your mouth, you refused

24 to answer some of the questions asked of you by jail

25 staff because you felt like you hadn't done anything

1  wrong and didn't need to be booked, correct?

2       A.   That is part of the answer.  I did nothing

3  wrong, not I felt like I did nothing wrong.  I did

4  nothing wrong.  Nothing.  And your people knew it.

5  Your people knew it.  Nothing --

6       Q.   Let me --

7       A.   -- wrong.  Nothing.  And your people knew

8  it.

9            MR. PADDEN:  Michelle, let him ask the

10  next question.

11       Q.   Let me rephrase my question.  If I'm hearing

12  you correctly, you refused to answer some of the

13  questions that were asked of you in the booking

14  process because it was your belief and your opinion

15  that you had done nothing wrong and shouldn't have

16  been incarcerated?

17       A.   I -- I just answered the question, asked and

18  answered.

19       Q.   You can answer the question.

20       A.   Your people --

21       Q.   Would you please answer the question.

22       A.   Your people did this.  You can pick apart 30

23  hours of what I endured all you want.  Answer the

24  question.  Didn't answer a question.  You just pick

25  it apart.  Stop wrenching out things as if that this

1    was okay.  What they did to me was not okay.

2                MR. TIMMERMAN:  Could you read back my

3    question, please.

4        Q.  And I want a yes or no answer.

5        A.  Your questions wasn't even a question.

6                MR. PADDEN:  Okay.  Just read back the

7    question, Madam Court Reporter, and then we will --

8        A.  I just answered your question.

9                MR. PADDEN:  Michelle --

10               (Reporter read pending question.)

11       A.  Right.

12               MR. PADDEN:  That's -- you answered it.

13   Good.

14       Q.  Thank you.  Let's look at Exhibit 9, please.

15   Do you recognize these documents?

16       A.  No, I don't.

17       Q.  Exhibit 9 is Bates labeled DC 00032 through

18   DC 00036.

19       A.  Was this a document that was produced like

20   you say the other ones were that I might not have

21   seen?

22       Q.  This was produced to your lawyer,

23   Mr. Padden.  Were you aware that jail staff were

24   periodically conducting well-being checks on you at

25   the jail?

1    A.  No.

2    Q.  Do you know what well-being --

3    A.  At some point in the evening I understood

4  that.

5    Q.  Do you know what well-being checks are?

6    A.  No.

7    Q.  Do you have any personal knowledge regarding

8  the jail's policies and procedures for inmate

9  well-being checks?

10    A.  No.

11    Q.  Do you have any personal knowledge regarding

12  the Minnesota Department of Corrections' rules

13  regarding well-being checks and the frequency with

14  which they must be performed?

15    A.  No.  But I wouldn't call them well-being

16  checks --

17    Q.  Observations?

18    A.  -- at all.  That's a bad term, because they

19  should have just let me out.  That was -- that's

20  bull.  That's bull.  Just let me out and let me have

21  my well being out in my freedoms.

22    Q.  So this Exhibit 9, the first entry

23  indicates, placed in negative pressure room, will

24  not answer any questions.  Do you see that?

25    A.  Yes.

1      Q.   And that's an entry by Corporal Farrel Byrd.

2  Do you see that?

3      A.   Yes.

4      Q.   And then it shows that -- the various jail

5  staff who observed you and the times at which you

6  were observed.   Do you see that?

7      A.   Mm-hmm.

8      Q.   Okay.   And it looks like you refused your

9  dinner time meal bag on September 12.   Does that

10 sound right?

11     A.   I don't recall.   I recall eating and getting

12 bags and then I -- at some point they -- you put the

13 bag back and I ended up keeping them because I

14 determined I could put them around my feet with the

15 napkins and then put my feet into the rubber

16 slippers that they gave me.   So I started to take

17 the bags.   I don't -- was that the first meal?   I

18 don't recall.

19     Q.   Okay.   Do you have any personal knowledge --

20     A.   Oh, I mean it says -- what are you looking

21 at?   Which one?

22     Q.   23:02.

23     A.   It says refused meal bag and he left it

24 there.

25          MR. PADDEN:   Which one --

1    Q.   I'm looking at 17:29.

2    A.   Yeah, I remember I got a meal.

3    Q.   Okay.   And it was left there for you?

4    A.   Yes.

5    Q.   Okay.   Do you have any personal knowledge

6   regarding what the actual temperature of the

7   negative pressure room was while you were in it?

8    A.   It -- it was freezing.

9    Q.   I'm talking about what a thermometer said

10   the temperature was.

11   A.   It was just freezing, freezing cold like

12   being in a freezer or cold, cold, refrigerator like

13   that -- worse than at a liquor store where they --

14   where you go in and get alcohol.   It was that kind

15   of cold with no clothes on.

16   Q.   The negative pressure you were placed in,

17   did that have a window on the door?

18   A.   Yes.

19   Q.   And did the deputies look through there to

20   observe you periodically?

21   A.   Yes.

22   Q.   Did it also have a flap that closed on the

23   window, do you recall?

24   A.   I don't recall.

25   Q.   Did you ever at one point in time see that

1  flap closed so no one could see in?

2     A.  I don't recall.  What do you mean by flap?

3  A curtain?

4     Q.  A curtain or partition.

5     A.  I remember a curtain, and sometimes that

6  would be closed and sometimes it would open.

7     Q.  So sometimes the curtain was placed over the

8  window and sometimes it was not?

9     A.  Yes.

10     Q.  Thank you.  Do you have any personal

11  knowledge about the jail's policies and procedures

12  dictating what happens when an inmate misuses jail

13  issued items?

14     A.  No.

15     Q.  Do you have any personal knowledge of the

16  jail's policies and procedures dictating what

17  happens when an inmate uses jail issued items for

18  purposes other than their intended purpose?

19     A.  No.  Now, Gonder was on -- okay.  These are

20  your questions.

21     Q.  DC 00033, could you turn to that page,

22  please?

23     A.  DC --

24     Q.  00033.  Same Exhibit.  I'm sorry.  Just flip

25  forward.  Top entry on this page, September 12 at

1    21:01, toilet paper removed from around her head.

2    She told me she is not talking to me.  What happened

3    with your toilet paper?

4         A.   Who was that?

5         Q.   Gonder.

6         A.   Oh, of course.

7         Q.   What happened with the toilet paper?

8         A.   Back to your other question.  So this is how

9    they treat people in jail.  They have policies and

10   procedures --

11        Q.   My question --

12        A.   -- exactly the way they treated me.

13        Q.   Would you answer my question, please?

14        A.   And those got to change.

15        Q.   Your narrative answers are going to keep us

16   here --

17        A.   Especially when they jail somebody --

18             MR. PADDEN:  Michelle, you've got to --

19   please try to answer his questions.

20        A.   -- for no reason.

21        Q.   I understand your position.  I've explained

22   that to you.  My question for you is, what happened

23   with your toilet paper?  Why was it removed?

24        A.   They came in and they ripped it off my feet

25   and they ripped it off my head, or I ripped it off,

1   I don't remember.  They made me rip it off.

2       Q.  Had you --

3       A.  And they ripped it off my body because I was

4   freezing cold --

5       Q.  For --

6       A.  -- that I learned, and I was also using it

7   as a pillow, because I was -- one point it was

8   complete cement, complete cement, no mattress,

9   nothing between me and thin pants and a thin shirt

10  between me and the cement.  So that's what I used

11  the toilet paper for to -- I started to realize

12  there are some things in here that I can use to stop

13  this tortuous treatment of me.  And I also used it

14  to wrap around my head so I could not -- I didn't

15  have to see, because you guys kept the lights on

16  bright and you froze the room.  The room was

17  completely freezing, and you didn't give me a

18  blanket and you took away my mattress.

19      Q.  For lack of a better term, did you mummify

20  yourself with the toilet paper?

21      A.  Oh, mummify myself.

22      Q.  I'm just trying to --

23      A.  Yeah, it was humiliating.

24      Q.  I'm trying --

25      A.  It was humiliating.

Michelle MacDonald Shimota
10/20/2016

1   Q.  I'm trying to think of a --  I'm trying to

2   think of a --

3                MR. PADDEN:  I think what he's --

4   A.  It was humiliating.

5                MR. PADDEN:  Time out.  I think what

6   he's suggesting -- Jeff, I'm helping, she's --

7                MR. TIMMERMAN:  Sure.

8                MR. PADDEN:  I think what he's -- I

9   think what he's asking is were you using the toilet

10  paper in such a way that it might appear like a

11  mummy, but I think you said you were doing it

12  because you were cold?

13               THE WITNESS:  Yeah, they said -- that's

14  what they said.  They said, you're mummifying

15  yourself.

16               MR. PADDEN:  That's what the sheriff

17  deputy said?

18               THE WITNESS:  Like that.  I kept

19  pushing the medical button.

20               MR. TIMMERMAN:  Want to take a break?

21               MR. PADDEN:  Yeah, I think this would

22  be a good time for a lunch break.

23               THE WITNESS:  I wanted to get out of

24  there.

25               MR. PADDEN:  Off the record, Jeff.

1          THE VIDEOGRAPHER:   We're going off the

2    record at 11:57 a.m.

3              (Break from 11:57 a.m. to 12:35 p.m.)

4          THE VIDEOGRAPHER:   We're back on the

5    record.   Time is 12:35 p.m.

6    BY MR. TIMMERMAN:

7      Q.   Ms. MacDonald, when we left off before lunch

8    we were talking about toilet paper being removed

9    from your cell.   And you testified a little bit how

10   you wrapped yourself with it, correct?

11     A.   Mm-hmm.

12     Q.   And it was removed from your cell.   Was it

13   explained to you that it was removed from your cell

14   because you had wrapped yourself?

15     A.   No, they didn't explain anything, they just

16   came and ripped it off me.

17     Q.   At any point in time did you get new or

18   replacement toilet paper?

19     A.   They took the entire roll the second time

20   they came in to rip the toilet paper off me.

21     Q.   So they came in twice?

22     A.   They took the whole roll.

23     Q.   The first time you had --

24     A.   I don't remember when they brought toilet

25   paper after that.   They just took the whole roll the

1    second time.

2        Q.   So the first time they came in did they tell

3    you not to did that, not to wrap yourself with the

4    toilet paper?

5        A.   I don't remember them telling me not to, you

6    know, point blank.  I was just freezing cold and the

7    lights were on, and I was using it to survive in

8    that -- try to survive in the environment that they

9    had put me in.

10       Q.   So you don't know whether or not toilet

11   paper was ever brought back to the cell?

12       A.   I don't know if they -- when they took it if

13   they ever brought it back.  They took the entire

14   roll at one point.

15       Q.   Okay.

16       A.   I'm just trying to remember if somebody

17   later on may have brought the whole roll back.  I

18   don't think so, though.  I don't think so.

19       Q.   You've indicated in your complaint that at

20   one point in time you soiled yourself, is that

21   correct?

22       A.   Yes.

23       Q.   Was that during the night?

24       A.   It was during the whole ordeal.  I'm not

25   sure when exactly.

1      Q.   Was this toilet paper in your cell at that

2   point in time?

3      A.   I don't think so.

4      Q.   Do you know for sure?

5      A.   I wouldn't have -- I don't think so.

6      Q.   At any point in time did you ask jail staff

7   for new toilet paper?

8      A.   Yes, probably.  I kept pushing the medical

9   button to get things.  I was asking to let them let

10  me go.  And the toilet paper was a minimal thing

11  because the room was freezing.  And ultimately I had

12  nothing in that room except cement and -- and that's

13  all.  Cement, and then they had rubber shoes, and

14  that was all I think they had --

15     Q.   Who ultimately --

16     A.   -- for me.  And they took my toilet paper as

17  well.

18     Q.   Who ultimately removed the toilet paper?

19     A.   I know Gonder was in and out of my cell.

20     Q.   Do you know for certainty who --

21     A.   He came walking in and grabbed them.  I'm

22  thinking it was Gonder.  I'll have to look at the

23  video that you promised to allow me to get again.

24     Q.   You ultimately -- you indicted in your

25  responses to my clients' request for admissions that

1  you had a mattress in your room but maybe you tried

2  to wrap yourself with it or crawl under it, is that

3  accurate?

4      A.   Yes.   And it was Gonder when they were

5  bringing me back from taking those pictures that he

6  said he had an idea and he went ahead of the

7  wheelchair, somebody did or maybe he told them the

8  idea, and I -- he pulled the mattress out of my --

9  somebody did.   I'll have to look at the video, but

10  he purposely went in there and took my mattress.   I

11  don't know whether that was before the toilet

12  paper -- I think it was before the toilet paper.

13  Because I was on cement.   It was just cement for a

14  long, long -- for hours and hours.   So the mattress

15  was purposely taken as a -- he went in there and

16  said, I have another idea.

17      Q.   Do you know if jail staff observed you

18  crawling under your mattress at any point in time?

19      A.   I would think they -- that's the sad part,

20  I'm thinking they could see what was happening to me

21  and nobody really was caring.   They probably saw all

22  of my struggles that entire ordeal.

23      Q.   Did you cover yourself with the mattress

24  such that the mattress was entirely on top of you?

25  Or logistically how did that work?

1    A.   I don't remember.  When I had a mattress I

2   was on it, I was off it, I was trying to get

3   comfortable all night long with the tools that I

4   had.  And eventually they took all the tools that I

5   had to get a minimal to try to be comfortable.

6    Q.   Did you have a pillow at any point in time?

7    A.   I didn't think so.  I don't know.  I may

8   have.  They took it.  I just remember one nice,

9   nice, female deputy that -- I was laying on the

10  mattress and she said something like, I'm supposed

11  to take that, but I'll leave it for you, so --

12        MR. PADDEN:  Do you have a Kleenex in

13  here?

14   A.   I don't think I was supposed to have a

15  mattress at all, but she let me have it.  And then

16  the -- Gonder, after that humiliating picture said

17  he had an idea, and then I saw him go into my cell

18  and take it.  That was his idea.  And then I was

19  just in -- on cement.  And I had -- I don't know if

20  that was before the toilet paper, it probably was

21  before the toilet paper, because at that point the

22  cement was freezing cold.  The cement was just

23  freezing cold.  It was like sleeping on ice, a piece

24  of ice.  And the floor was the same as the bed.  And

25  I was trying to go from place to place.

1   Then I thought of the toilet paper.  Then I

2   thought of the toilet paper.  And I had this shirt

3   on and it was thin, and I put it -- it had some

4   holes in it, and I kept thinking of ideas to get --

5   get it comfortable, and nothing was working.  And

6   finally when I thought of the toilet paper, wrapping

7   it around my head so the light was out -- excuse

8   me -- and then around my feet and parts of my body.

9   Then I thought, okay, I can -- can get

10  semi-comfortable.  And then -- then -- then Gonder

11  or somebody else came in and took it away from me.

12  Made me take it all off.  And then -- and then I --

13  and then I didn't have it anymore.  I didn't -- and

14  I kept trying to find different ways, I'm sorry, to

15  be -- to be comfortable.  And -- and -- and --

16        MR. PADDEN:  If you -- are you okay,

17  Michelle?  Should we take a break?

18        THE WITNESS:  No, no, no, no.

19     Q.  Okay.  With respect to the pillow you don't

20  know one way or another whether you ever had one?

21     A.  I don't remember about the pillow.

22     Q.  Okay.

23     A.  I might have had one at some point.  I just

24  remember I had the mattress when I wasn't supposed

25  to.

1     Q.   What about --

2     A.   The nice woman deputy --

3          MR. PADDEN:   Michelle, look, you can't

4     testify like this.  Should we take a break?  Are you

5     okay?  Try to -- try to -- I don't want to --

6     A.   I already said the woman deputy.

7          MR. PADDEN:   Settle down.

8     Q.   I understand --

9     A.   The woman deputy said she wasn't supposed

10    to, but she was going to let me keep it.

11    Q.   Did you ever have a blanket in the cell at

12    all?

13    A.   No, never.  I don't think I ever had a

14    blanket.

15    Q.   And were you able to use the toilet in the

16    cell?

17    A.   Mm-hmm.

18    Q.   You've indicated in your responses to

19    request for admissions that no deputies or jail

20    staff were in your cell when you used the toilet,

21    correct?

22    A.   When I was sitting on the toilet?

23    Q.   Correct.  No deputy was inside your cell.

24    A.   Not that I recall, no.  Is that on the

25    video?  Did they actually come in?

1      Q.   No.

2                MR. PADDEN:   Michelle, Michelle, come

3      on.  He's just asking a question.  Okay?  We've got

4      to take a break.

5                THE VIDEOGRAPHER:  We're going off the

6      record at 12:44 p.m.

7                (Break from 12:44 p.m. to 12:46 p.m.)

8                THE VIDEOGRAPHER:  We're back on the

9      record at 12 --

10               MR. PADDEN:  Time out.

11               THE VIDEOGRAPHER:  We are back on at

12     12:46 p.m.

13     BY MR. TIMMERMAN:

14        Q.  Just to make clear, there's no indication

15     that any jail staff was inside your cell when you

16     used the toilet.  But you've alleged in this lawsuit

17     that jail staff watched you use the toilet.

18        A.  Yes.

19        Q.  What is the basis of that claim?

20        A.  They left the curtain open.

21        Q.  Did you ever actually observe any jail staff

22     watching you while you were using the toilet?

23        A.  I don't know.

24        Q.  Do you recall one way or another?

25        A.  I don't know.  I'd have look at the video.

1      Q.  Well, there's no video of the cell.  Cells
2  are not videoed, inside of cells are not videoed.
3  So it's important -- this point is important.  Do
4  you recall a deputy ever watching you use the
5  in-cell rest room from the window?
6      A.  I don't recall.
7              (MacDonald Deposition Exhibit No. 10
8              marked for identification.)
9  BY MR. TIMMERMAN:
10      Q.  Ms. MacDonald, this is Exhibit 10 to your
11  deposition.  It is a series of photographs of the
12  negative pressure room where you were kept in the
13  jail.  The first one is labeled DC 00070, and we
14  talked earlier about the little screen or curtain
15  that covered the cell window at times.  Is that the
16  curtain that you recall?
17      A.  I thought it was smaller, but it must be
18  right.
19              MR. PADDEN:  What number is this,
20  Counsel?
21              MR. TIMMERMAN:  70, Exhibit No. 10.
22              MR. PADDEN:  Okay.  Thank you.  There
23  was a 23 on here, so.
24              MR. TIMMERMAN:  Oh, yeah, let me take
25  that.  That's just my internal number.

1      A.   Is the curtain on the outside or -- on the

2    outside, I see it now.

3    BY MR. TIMMERMAN:

4      Q.   Then you see it with the curtain pulled off

5    in the next picture, in 71?   72 is a picture of the

6    cell toilet through the window of the cell.

7      A.   Yes.

8      Q.   And 73 is a picture of the cell toilet from

9    inside the cell.

10     A.   Mm-hmm.

11     Q.   Look at 72 for me.

12     A.   Is this the actual cell I was in?

13     Q.   Yes.   If you look at 72 for me, please.

14     A.   Mm-hmm.

15     Q.   You would agree with me that there's a

16   partition there, correct, in front of the toilet?

17     A.   Mm-hmm.

18     Q.   So even if someone had been watching you use

19   the rest room from the cell window, they would not

20   have been able to see your vagina or your buttocks,

21   would they?

22     A.   I was -- if I was pulling my pants down

23   standing in front of them they would have been able

24   to see that.

25     Q.   Do you know if that ever occurred?

1    A.   I didn't notice.   The window is huge.   It

2  could have occurred, yes --

3    Q.   Do you know if it did or didn't?

4    A.   -- left it open.

5         MR. PADDEN:   I think what he's asking,

6  Michelle, is --

7    A.   I don't know.

8         MR. PADDEN:   -- did you ever see

9  anybody looking out the window, so we can move --

10    A.   I don't know.

11         MR. PADDEN:   Okay.

12    A.   I very clearly recall having that concern.

13    Q.   Do your amended interrogatory answers,

14  specifically your answer to number 6, identify all

15  of the ways in which you claim that your Fourteenth

16  Amendment rights were violated at the jail on

17  September 12th and 13th of 2013?

18    A.   My rights were violated immediately when

19  they took me in from beginning to end, so I tried to

20  list all of the things they did from beginning to

21  end, some of the main things that they did.   But the

22  violation was ongoing from beginning to end.   That's

23  how it works when you violate somebody's civil

24  rights.

25    Q.   I'm just asking you whether or not you

1  listed all the facts pertaining to your conditions

2  of your confinement at the jail that you claim

3  violated your rights.

4      A.   And like I explained, it's hard to put 30

5  hours of facts, but I did my best here, yes.

6      Q.   Is there anything that's not in this answer,

7  amended answer to interrogatory number 6, that you

8  claim somehow violated your rights at the jail?

9      A.   The whole thing violated my rights.

10     Q.   What sexual humiliation were you subjected

11 to at the jail?

12     A.   Just the -- I -- the whole thing for the

13 most part.  The jail area or just the whole thing

14 was a picking on me, because they never would have

15 done this to a man attorney.

16     Q.   What's the basis --

17     A.   Some of the main things were that they could

18 look into my cell, so as I'm getting comfortable I'm

19 basically taking off my clothes.  Because I had a

20 shirt on, I'd have to pull my pants down to try to

21 cover my feet.  I took my bra -- half bra off and

22 wrapped it around my feet so my nipples could show,

23 because I was freezing, through the room.  It was a

24 viewing of sorts being behind a glass of all the

25 ways that I was trying to keep comfortable, get

1  comfortable.  And it was -- anytime they walked in

2  there I was in a humiliating disfigured form.

3      Q.  Any other ways in which you claim you were

4  sexually humiliated at the jail?

5      A.  The whole thing.

6      Q.  What do you mean by that?

7      A.  The whole from beginning to end, coming into

8  my room.

9      Q.  Entering your cell and viewing you through

10  your cell?

11      A.  Entering my cell, taking my toilet paper,

12  watching me in that humiliating fashion.

13      Q.  Anything else that you can recall?

14      A.  Not that I haven't already told you.

15      Q.  You also claim that you were subjected to

16  sleep deprivation at the jail.  How many hours did

17  you sleep?

18      A.  None.

19      Q.  You didn't sleep at all?

20      A.  Not one wink.

21      Q.  Who subjected you to sleep deprivation?

22      A.  The defendants.

23      Q.  How?

24      A.  By taking me out of my life, capturing me,

25  and putting me in a freezing cold room with lights

1   on all night, all night long, not allowing me --

2   not -- no blanket, no nothing.  Isn't that obviously

3   what they did?

4        Q.   Did anyone interrupt you during the night?

5        A.   Yes.

6        Q.   Who?

7        A.   All the time, constantly.

8        Q.   How?

9        A.   Coming to my cell and looking in,

10  answering -- sometimes answering my medical button,

11  sometimes not answering my medical button, sometimes

12  saying that they're going to come back with

13  something and then not doing it.  Constant

14  interruptions throughout the night by particularly

15  Gonder, because he stayed overtime to just --

16       Q.   How do you know he stayed overtime?

17       A.   Because he was there in the morning.  So how

18  was -- why was he there at 3 in the morning or 4 in

19  the morning.  I would think that he stayed -- he

20  certainly came to just do more damage to me.

21       Q.   Do you know what Deputy Gonder's work shift

22  was that day?

23       A.   No.  I would imagine his work shift isn't

24  from 8:30 in the morning all the way until midnight,

25  1 or 2 or 3 a.m. or 4 a.m., however long he stayed.

1     Q.   Do you know one way or another for certain?

2     A.   No, you know that.  Why don't you tell me?

3     Q.   And you claim that no male attorney would be

4   treated that way.  Do you have any personal

5   knowledge regarding how male attorneys have been

6   treated at the jail?

7     A.   If -- if -- no.

8     Q.   Okay.  Thanks.

9     A.   It was an all-men's jail.  That's another

10  humiliation.  This was not even a jail women stayed

11  at.  Thank you very much.

12    Q.   It's your understanding that women are

13  boarded out to the Ramsey County workhouse, right?

14    A.   Right.

15    Q.   But that doesn't happen immediately.  Are

16  you aware of that?

17    A.   Yeah, I would think it would happen within

18  30 hours.  I was the only one in that jail all night

19  long.

20    Q.   How do you know that?

21    A.   Because I asked somebody.  I said that I

22  didn't harm anybody.  I said how many -- I said how

23  many -- and they -- somebody said there are, I

24  forget the number they used, 199 men in this jail

25  and none of them have harmed anybody, what are you

1   talking about, what are you saying you didn't harm

2   anybody, none of them -- none of these people have

3   harmed anybody.

4       Q.   Specifically how do you know there were no

5   other female inmates?

6       A.   Because he said, there are other men in the

7   jail.

8       Q.   Did he say there are no other women in the

9   jail?

10      A.   No, they said there's a hundred -- it was a

11  she I think gave the number, and said there are 198

12  men in this jail that haven't harmed anybody so what

13  are you talking about, there are -- why are you

14  talking about you didn't harm anybody, there are a

15  hundred and something men.  And so then the joke was

16  I slept with a 199 men, something like that.

17      Q.   Who made that joke?

18      A.   It wasn't made that night.

19      Q.   Who made it?

20      A.   I don't remember who made it.

21      Q.   Was it your husband?

22      A.   No.

23      Q.   And you -- again, you don't know --

24      A.   He wouldn't make a joke like that.

25           MR. PADDEN:   What was that?

```
 1        A.   He wouldn't make a joke like that.
 2             MR. PADDEN:   I just didn't hear what
 3   you said.   I'm sorry.
 4        Q.   Again, you don't know who made the decision
 5   to put you in the negative pressure room, correct?
 6        A.   No.   I didn't know of any such thing.   I had
 7   never been in jail.
 8        Q.   Okay.
 9             MR. TIMMERMAN:   I don't have an extra
10   copy of this, Mike.   I'm sorry.   You're welcome to
11   review it.
12             MR. PADDEN:   What is it?
13             MR. TIMMERMAN:   Something she produced.
14             MR. PADDEN:   Okay.
15             MR. TIMMERMAN:   First letter.   This
16   will be Exhibit 11.
17             (MacDonald Deposition Exhibit No. 11
18             marked for identification.)
19   BY MR. TIMMERMAN:
20        Q.   Is this a document you produced in this
21   lawsuit?   Does it look familiar to you?
22        A.   Mm-hmm, yeah.
23        Q.   Something you drafted?
24        A.   I believe so, yes.
25             MR. TIMMERMAN:   May I see it for one
```

```
 1   second, please?

 2               MR. PADDEN:  Sure.

 3               MR. TIMMERMAN:  For a moment?

 4               MR. PADDEN:  Sure.  Go ahead.

 5   BY MR. TIMMERMAN:

 6        Q.  Who did you send this to?

 7        A.  I don't recall.

 8        Q.  And it looks like --

 9        A.  I look like I might have sent it to a lot of

10   people.  That was Sandra Rucki's --

11        Q.  E-mail?

12        A.  -- e-mail at the time.

13        Q.  Thank you.

14        A.  But --

15        Q.  Okay.

16        A.  I'm not sure if it was just her.  It might

17   have been just her.  I was writing her -- I was

18   working on her civil rights case.

19        Q.  Read this sentence right there, please, it

20   starts with, I was.

21        A.  Yeah.  Yeah.

22        Q.  Could you read that out loud?

23               MR. PADDEN:  Do you want her to read it

24   out loud or to herself?

25               MR. TIMMERMAN:  Out loud.
```

1      A.   Oh, I was one of 300 inmates that night.

2  Since it is an all men's jail my husband Tom jokes

3  that I slept with -- so you caught me, I guess he

4  did make that joke.  It was so long ago.  So he made

5  the joke, yeah.

6      Q.   Okay.

7      A.   Yeah.

8      Q.   How were you subjected --

9      A.   That's probably not --

10          MR. PADDEN:  Wait for the next

11  question, please.

12     A.   Okay.

13     Q.   What sensory bombardment were you subjected

14  to at the jail?

15     A.   All kinds, just the walking, the keys,

16  people coming in and out, there were comments made

17  responding to me on the medical button.  There were

18  just the keys.  So as I was seeing it I'm wondering

19  when are they going to come in my room next.  Doors

20  opening and closing.

21     Q.   Anything else?

22     A.   Alarms going off.

23     Q.   Okay.

24     A.   Sirens.

25     Q.   Anything else?

1      A.   I can't think of anything else.

2      Q.   Okay.  And the medical button, you pushed

3   that somewhat, correct?

4      A.   Right.

5      Q.   How many times --

6      A.   That didn't make a noise, but the voices on

7   the other end, they wouldn't identify themselves

8   and --

9      Q.   How many times did you push it?

10     A.   I thought lots and lots of times.  You

11   should have a record of that.  I asked for the audio

12   of it lots of times.

13     Q.   There's no audio recording of medical alert.

14   The siren at the jail, when did that go off?

15     A.   It went off a couple of times as far as I

16   remember.

17     Q.   Any idea why?

18     A.   Because somebody was committing suicide.

19     Q.   According to whom?

20     A.   I -- according to one of the deputies told

21   me that's what it meant.

22     Q.   The suicide siren?

23     A.   Mm-hmm.

24     Q.   Are you aware of anybody actually attempting

25   to commit suicide that night?

```
 1        A.   I was praying for whoever it was because

 2   they told me that somebody was committing suicide.

 3   So I don't know if somebody committed suicide.

 4        Q.   Okay.  And the alarms that went off, what

 5   were those for?  Do you know?

 6        A.   I don't know.

 7        Q.   You've alluded to in your complaint to the

 8   fact that someone at some point had told you that

 9   they had seen a dead body at the jail?

10        A.   Yes.

11        Q.   Could you explain the context of that,

12   please?

13        A.   One of the female deputies told me.  I

14   forget whether she was in my room or not, but she

15   told me that she had walked into a cell and there

16   was a dead person there.

17        Q.   What was the context of that conversation?

18   Did you ask her about that?

19        A.   I don't remember the exact context.

20        Q.   Did she say this to you in a menacing manner

21   or was it more of an inquisitive conversation you

22   were having with her?

23        A.   I don't recall.  I just remember saying that

24   I've seen a dead body in here.  I don't know if it

25   was that night or whenever that she had walked into
```

1    somebody's cell and they were dead.  So I don't know

2    if it was in the context of the alarms going off.

3        Q.   And when --

4        A.   Them wanting to -- to -- thinking I was

5    going to commit suicide at one point, it might have

6    been in that context.  Because at one point they

7    thought I was going to commit suicide.

8        Q.   Why would they think that?

9        A.   Well, they came in and they wanted -- I just

10   remember laying on the -- the cement or the

11   mattress.  And they wanted to -- they asked me if my

12   nylons that I had on were up to my waist or were

13   knee highs.  And I was in such a fog that I didn't

14   even comprehend that I even had nylons on.  I was

15   just -- so -- so -- so then they left, and then next

16   thing you know they came in and took my nylons off

17   me, which was -- they were part of what might have

18   been keeping me warmer, so I was -- I lost

19   another -- another tool that I was trying to use to

20   be comfortable when they took my nylons.

21       Q.   Did a female deputy take those off?

22       A.   I don't remember who it was.

23       Q.   Do you recall at one point in time asking if

24   you would be treated differently if you were

25   suicidal?

1      A.   Yes.

2      Q.   And why did you ask that?

3      A.   Because I was suffering and I thought that

4  if -- I thought that they treated people who were

5  suicidal better.

6      Q.   And you were told that people who were

7  suicidal are stripped down and put into a padded

8  cell, correct?

9      A.   Yes, yes.  They said, are you feeling

10 suicidal.  And I said, what if I was.  And I was --

11 in my thinking I was thinking that if somebody in a

12 jail is suicidal that they would comfort them or try

13 to help them, make them -- you know, just care for

14 them.  But they said that they would strip me down

15 naked and put me in a padded -- in a straitjacket

16 and then throw me in a padded cell.

17     Q.   So you couldn't kill yourself that way,

18 correct?  Do you think that's a --

19     A.   Right.

20     Q.   -- a reasonable precaution to take so

21 someone can't actually follow through?

22     A.   No, I think that's a horrible precaution to

23 take.

24     Q.   Do you have any --

25     A.   I think that maybe a -- a -- a -- being

```
 1    loving and caring to that person in their
 2    circumstance would be a better approach than
 3    stripping them and humiliating them even more and
 4    putting them in a straitjacket and throwing them in
 5    a padded cell.
 6         Q.   Do you have any personal knowledge regarding
 7    Minnesota Department of Correction rules regarding
 8    inmates who are suicidal?
 9         A.   No.
10         Q.   What psychological techniques were you
11    subjected to at the jail?
12         A.   Throughout the whole ordeal.
13         Q.   What techniques?
14         A.   It was -- throughout the whole ordeal there
15    was coercion and horror.
16         Q.   I am asking specifically, though, about
17    psychological techniques, which I think --
18         A.   I -- I -- techniques to -- I mean,
19    techniques to make me talk.  I even pushed the
20    button, I'm like, I want to confess, what am I
21    doing.  This is the whole thing was I didn't -- I
22    didn't know what they wanted me to do.  I did
23    nothing wrong to get in there.  So just the whole
24    thing was just a -- a -- a psychological breakdown.
25    This is what they wanted me to do, taking my stuff,
```

```
 1    stripping me of everything.
 2        Q.   Any other psychological techniques that
 3    you're claiming?
 4        A.   The whole thing was a psychological
 5    technique.
 6        Q.   You've also in your amended answer to
 7    interrogatory 6 that you were also subject to,
 8    quote, "other forms of unconstitutional conduct at
 9    the jail."
10        A.   Mm-hmm.
11        Q.   What other forms of unconstitutional conduct
12    are you referring to?
13        A.   And I'm letting you know again that from --
14    you know, when you take somebody out of their life
15    like that you can't just do it and say, well, I
16    treated you well or I treated you horribly.  That's
17    the constitutional violation right there, when they
18    grabbed me and took me away from that courtroom.
19        Q.   Anything else, any other forms --
20        A.   The whole ordeal.
21        Q.   The whole ordeal, okay.
22        A.   It's one giant civil rights violation that
23    you, my friend, should recognize very clearly.  You
24    don't just pull somebody from their life like that
25    and lock them up for 30 hours.
```

1    Q.   When you were confined at the jail did you

2    ever tell any jail employees that you would sue

3    them?

4    A.   No.

5    Q.   Did you ever threaten a lawsuit while

6    incarcerated?

7    A.   No.

8    Q.   Which jail --

9    A.   Not that I remember.  Because, again, I'm in

10   a -- a state that no one can even -- I couldn't

11   imagine being that -- not that I remember.  I just

12   remember trying to be as cooperative as possible,

13   you know, because anything I said or did they

14   didn't -- you know, they were -- it was a -- a -- I

15   was trapped and I was confined the whole time

16   from -- from taking me out of the courtroom until

17   they finally let me free.

18   Q.   I may have asked you this already, I

19   apologize if I did, but you never saw anyone

20   attempting to commit suicide at the jail, correct?

21   A.   No, I just heard the sirens and then the

22   woman told me that she had seen a dead body in a

23   cell.

24   Q.   And you never saw a dead body?

25   A.   I don't know which one that was.  No, I

1    didn't see a dead body.  I prayed for whoever it

2    was, so maybe they didn't commit suicide.

3        Q.  Do you have any personal knowledge about the

4    jail's policies and procedures for housing female

5    inmates?

6        A.  No.  I was an inmate?

7        Q.  You've alleged in the lawsuit that jail

8    staff taunted you at the jail.

9        A.  Are you saying I was an inmate?

10       Q.  What's that?

11       A.  Forget it.

12           MR. PADDEN:  Just let him ask the

13   questions.

14       A.  I didn't say I was an inmate.  I was asking

15   you a question.  But go ahead.

16           MR. PADDEN:  Go ahead and ask the next

17   question.

18       Q.  Which jail personnel taunted you at the jail

19   that you've claimed in the lawsuit?

20       A.  Many of them.

21       Q.  Who?

22       A.  Well, Gonder for sure.

23       Q.  How did he taunt you?

24       A.  All night long.

25       Q.  How?

```
 1        A.   Any chance he could find.  He took my --
 2   going back was he took my mattress, he told me that
 3   I'd never see my camera again, him and others said I
 4   looked beautiful when they knew darn well they put
 5   me in such a state that I did not look very nice,
 6   the Nelson Mandela comment, the crocodile tears
 7   comment, the we're not going to give you anything,
 8   taking my toilet paper, saying that I was a mummy,
 9   just on and on, on and on, and, you know, things
10   like, you know it's going to get worse for you, that
11   was said at least twice.
12        Q.   Who said it?
13        A.   I believe it was Gonder.
14        Q.   Both times?
15        A.   I don't know if it was Gonder the -- I think
16   he was the first time maybe.  But that was said a
17   few times, things are only going to get worse, and
18   they're only going to get worse.  And they did get
19   worse, they got worse and worse and worse.
20        Q.   Beyond Deputy Gonder are you claiming that
21   anybody else taunted you at the jail?
22        A.   I think regularly they were just taunting
23   me.  I mean, the comments about being beautiful and
24   they knew I weren't and not letting me have things,
25   that to me is not something that you do when you're
```

1    you know, caring for people.

2        Q.   Anything else, any other way in which you

3    were taunted that we haven't discussed?

4        A.   I can't recall at this time.

5        Q.   And we talked a lot about your time at the

6    jail.  Have we discussed all the ways in which you

7    claim that your due process rights were violated at

8    the jail on September 12th and 13th of 2013?

9        A.   The jail, the whole thing is a due process

10   rights violation, if you understand due process at

11   all --

12       Q.   I'm asking you --

13       A.   The whole thing, the whole thing.

14       Q.   I'm asking you if we've discussed all --

15       A.   We can talk about the little particulars

16   that you could have taken me into that jail and just

17   kept me there and gave me all of my refreshments and

18   it's still a civil rights violation.  So get that

19   through your head.

20       Q.   I'm asking you if we have discussed all the

21   ways in which your civil rights were violated at the

22   jail to the best of your recollection.

23       A.   To -- so -- what you're -- there -- and I'm

24   saying I discussed many of the ways my civil rights

25   were violated, but they were violated just by taking

```
 1   me.  They didn't have to taunt me, sexually
 2   humiliate me, you know, take all my -- the limited
 3   provisions that I had.  They didn't have to do that
 4   to violate my civil rights.  It's violated
 5   immediately when they take me into custody.  So I
 6   just want you to understand that.
 7        Q.  I understand --
 8        A.  So in that way I've told you many of the
 9   things that happened to me, the whole thing is a
10   civil rights violation.
11        Q.  Are there any other ways in which you claim
12   that your civil rights were violated at the jail
13   that we haven't discussed?
14        A.  Not that I recall at this time.  I can't
15   even watch -- watch those things, it upsets me, so.
16        Q.  You were never threatened at the jail with
17   physical harm, were you?
18        A.  The whole thing was a physical harm from
19   beginning to end.  The whole thing was a threat.
20   They had guns.
21             MR. PADDEN:  I think -- I think --  I
22   think what he means, Michelle, is I think did
23   someone say unless you do X I'm going to kick your
24   butt or something like that.
25             THE WITNESS:  Not -- not --
```

1          MR. PADDEN:  Wait a minute.  Time out.

2    Is that fair, Jeff?

3          MR. TIMMERMAN:  Yeah.

4          MR. PADDEN:  I'm not trying to --

5          MR. TIMMERMAN:  When threatened with

6    physical harm, I think it's a simple question.

7    A.  Well, it was unless you do X I'm not letting

8    you -- I'm not giving you a blanket, unless you do

9    X, I'm not -- that's kind of unless you do.  That's

10   harm.  Do you get that, that that is harm --

11   BY MR. TIMMERMAN:

12   Q.  I'm talking about --

13   A.  -- when you're freezing cold?

14   Q.  I'm talking about physical harm.

15   A.  They didn't have to threat it, they were

16   doing it.

17   Q.  Nobody at the jail said, I will physically

18   harm you if you don't do that, did they?

19   A.  They just did -- they didn't say that.  They

20   didn't threaten it, they just did it.

21   Q.  I'm asking you whether or not anyone at the

22   jail threatened to hurt you physically.

23   A.  They didn't threaten it, they just did it.

24   Q.  Did anyone at the jail threaten to rape you

25   or sexually assault you?

1    A.   No.

2    Q.   Were you touched inappropriately at all at

3    the jail by any jail staff?

4    A.   Yes.

5    Q.   By whom?

6    A.   By the deputies that were grabbing me.

7    Q.   And grabbing you and --

8    A.   They were not supposed to come into your

9    cell, and they did, in and out.

10   Q.   Did any deputy touch your breast?

11   A.   And the other harm was -- no.  No, they

12   didn't touch my breast that I know.  They grabbed

13   me -- I mean, that I know of, no.

14   Q.   Did any deputy touch your buttocks?

15   A.   That I know of, no.

16   Q.   Did any deputy touch your vagina?

17   A.   No.

18           THE VIDEOGRAPHER:  We're going off the

19   record.  That will be the end of disc two in the

20   deposition of Michelle Shimota.  The time is 1:15

21   p.m.

22           (MacDonald Deposition Exhibits 12-13

23           marked for identification.)

24           (Break from 1:15 to 1:18 p.m.)

25           THE VIDEOGRAPHER:  We're back on the

1  record.   This is the continuation of the deposition

2  of Michelle MacDonald Shimota, the beginning of disc

3  three.   The time is 1:18 p.m.

4  BY MR. TIMMERMAN:

5      Q.   Ms. MacDonald, I placed in front of you

6  Exhibit 13, which is your first amended complaint in

7  this lawsuit.   Do you recognize this document?

8      A.   Yes.

9      Q.   Did you draft it?

10     A.   No.

11     Q.   I'd like to go through some of your

12  allegations.   If you could turn to paragraph 39,

13  please.

14          What evidence do you have that you were

15  placed in a courtroom holding cell to intentionally

16  initiate a plan to persecute and punish you for

17  bring a Section 1983 Case against Judge Knutson and

18  seeking his recusal?

19     A.   You haven't given me the evidence.

20     Q.   What evidence do you believe exists?

21     A.   The deputies were in the courtroom I believe

22  the day before and that day, and were very much

23  aware of my name and that I had filed a lawsuit

24  against Judge Knutson.

25     Q.   Is it your belief --

1    A.   And -- and they also had conversations, as

2    you've mentioned earlier, with Judge Knutson without

3    my knowledge.

4    Q.   Is it your belief that Judge Knutson

5    orchestrated your incarceration on September 12th

6    and 13th?

7    A.   I believe there was a -- there had to be.

8    There had to be.  Because I didn't do anything

9    illegal.  There had to be some kind of a conspiracy

10   between the deputies and him and court personnel,

11   but the deputies are to blame.

12   Q.   My question was, do you believe that Judge

13   Knutson orchestrated it?

14   A.   I believe they all orchestrated it.  So I

15   don't know.  They all orchestrated it.

16   Q.   You've accused Judge Knutson of

17   orchestrating it in bar complaints about him,

18   correct?

19   A.   I made four bar complaints against Judge

20   Knutson, yes.  And he happens to be on the Board of

21   Judicial Standards, so that didn't get anywhere.

22   Q.   And Judge Knutson is still a city judge in

23   Dakota County, correct?

24   A.   He is.

25   Q.   So you say because my clients were in the

1   courtroom on September 12th -- 11th, excuse me, when

2   you informed Judge Knutson that you filed a civil

3   rights lawsuit against him, that knowledge led them

4   to retaliate against you for filing that lawsuit?

5       A.  Right, they all -- they all aligned against

6   me.  That had to be what happened, because why would

7   this happen if that didn't happen, if they all

8   aligned against me.  I did nothing --

9       Q.  Okay.

10      A.  -- wrong.

11      Q.  So aside from the fact that they were in the

12  courtroom on September 11th, what other proof do you

13  have that they all aligned against you?

14      A.  The proof I just told you.  Asked and

15  answered.  That they had conversations obviously

16  amongst each other.  This is -- this is things I

17  found out later, and they had conversations amongst

18  each other.  They violated my rights.  They looked

19  in my phone without a warrant.  They looked at my

20  camera without a warrant.  Just to -- why, I

21  don't -- to try to find -- to find me -- make me

22  wrong about something so that they could do this to

23  me.

24      Q.  Well, you don't know whether they looked at

25  your camera, right?  You testified you didn't know.

1      A.   I assume they did because they took my

2   camera and they looked at my cell phone.

3      Q.   I'm talking about your cell phone.   I'm

4   sorry.

5      A.   I mean, they obviously did.

6      Q.   Let me clean up the record there.   Your

7   camera was searched.   Your cell phone --

8      A.   And they'll lie about it, but they looked at

9   it.   I don't know if they'll lie about it.

10            MR. PADDEN:   Just answer the question,

11   Michelle.

12      Q.   My question is, again, you testified that

13   you believe your cell phone was searched, but you

14   don't know one way or the other, correct?

15      A.   They took my cell phone.   I already answered

16   that.   I don't know one way or another.

17      Q.   Got it.   Thank you.

18      A.   But they took it.   So why did they take it

19   and why did they take my camera, to look at it.

20      Q.   When evidence do you have to support your

21   allegation that you were handcuffed and placed in a

22   wheelchair as retaliation for criticizing Judge

23   Knutson?

24      A.   The whole circumstances.   Why would they

25   handcuff me and put me in a wheelchair and bring me

1   back to the trial.  That's nonsensical.  They have

2   me in their jurisdiction, why would they bring me

3   back out to a trial.  They should have just said,

4   Judge Knutson, we have her under arrest.  What --

5   what was that?

6       Q.  Did Judge Knutson give you the option of

7   going with the deputies or continuing the trial?

8       A.  No, he -- they brought me out and on my

9   trial record as I'm sitting there in a humiliating

10  state, I don't even know what's going on I'm so

11  confused, it doesn't make sense to me, and I had to

12  stay there.  Judge Knutson was going to default my

13  client.  That's what he -- he gave me every option

14  in the book and the one I took was I don't want my

15  client to get a default, so I'm staying here.  There

16  was no option to go with the deputies.  There was

17  no -- they already knew my name.  They didn't give

18  me a ticket.  It was crazy making.

19      Q.  Can we go back to Exhibit 4, page 46 of

20  Exhibit A to Exhibit 4.

21      A.  Yeah.  Yeah, I, the record --

22      Q.  There's no question.

23      A.  Okay.

24      Q.  Judge Knutson says, Ms. MacDonald, you have

25  an obligation to your client.  Do you wish to

```
 1   participate in these proceedings and proceed, do you
 2   want to remain seated in the courtroom, or would you
 3   like to go with the deputies.
 4          So Judge Knutson is giving the option of
 5   staying in the courtroom or going with the deputies,
 6   correct?
 7      A.   Mm-hmm.
 8      Q.   And you made the decision to stay in the
 9   courtroom, correct?
10      A.   Right.
11      Q.   Why didn't you go with the deputies?
12      A.   Because I made the decision to stay in the
13   courtroom so my client wouldn't be defaulted.
14      Q.   Where in this transcript does Judge
15   Knutson --
16      A.   Why doesn't that make sense?
17      Q.   Because where in this transcript does Judge
18   Knutson threaten to default your client?
19      A.   He did it later on.  He mentioned some rule.
20   It's in -- he said --
21      Q.   He said that you were going to proceed,
22   correct?
23      A.   And he mentions rule -- he mentions a rule.
24   I think that's the default rule.
25                MR. PADDEN:  I believe it is in there,
```

1      Jeff, that he said it would be defaulted if she
2      didn't proceed.  I don't know where specifically it
3      is, but I believe I've seen that.
4                  MR. TIMMERMAN:  I know he references a
5      rule, but I don't think any reference to default.
6      Regardless --
7          A.  That rule is the default rule.
8      BY MR. TIMMERMAN:
9          Q.  Regardless, I wanted to clarify that you
10     were given the option to stay in the courtroom or to
11     the leave courtroom and you said you were?
12         A.  Right.
13         Q.  Deputies at no point in time on September
14     12th had their guns drawn, correct?
15         A.  No.
16         Q.  Guns were holstered the entire time,
17     correct?
18         A.  Right.
19         Q.  And in your experience, I understand you've
20     been to Dakota County District Court a lot, it's not
21     unusual for courtroom security staff to have guns,
22     correct?
23         A.  Right.
24         Q.  And that's for safety, right?
25         A.  Whatever they want.  For their safety, hm.

1    Wasn't for the safety of me.

2        Q.  Paragraph 78 of your first amended

3    complaint --

4                    MR. PADDEN:  Page 16.

5        Q.  How did my clients cause you to

6    ineffectively represent Ms. Grazzini-Rucki?

7        A.  Because they arrested me and brought me back

8    to my trial.  I was under their jurisdiction.

9        Q.  Any other way?

10       A.  That's probably enough.

11       Q.  Do you believe that your representation of

12   Ms. Grazzini-Rucki was ineffective on September 12?

13       A.  Yes.  Although I had already -- I had done

14   her case the day before.  This was their case.  So

15   my ineffectiveness was because I was -- I had no --

16   I was brought to an empty courtroom with no -- the

17   deputies brought me back in handcuffs with a belt

18   around my waist with no shoes, no glasses, no

19   jewelry.  I thought I was attached to the

20   wheelchair.

21       Q.  You refused to answer --

22       A.  And I couldn't stand up and my boxes were

23   all gone and I had kind of an empty table.  I

24   remember seeing a pen and a paper.  And I had no

25   materials, so all the materials were gone.  And the

```
 1    deputies brought me back out to finish this trial
 2    while I'm in their jurisdiction, while I'm under
 3    arrest.
 4         Q.   And you refused to answer -- you refused to
 5    answer a lot of Judge Knutson's questions --
 6         A.   I -- I --
 7         Q.   Can I finish my question?  You refused to
 8    answer many of Judge Knutson's questions thereafter,
 9    correct?
10         A.   I thought I did.  I mean, I just thought he
11    would see, you know, that here I am, you know, I'm
12    under arrest, hello, kind of a thing.  I -- I -- I
13    didn't -- it's -- that's why I -- I -- I think there
14    was some wink, winks, must have talked in the back.
15    I couldn't -- I couldn't fathom why I was there if I
16    was under arrest why I'm sitting here, you know, and
17    the judge is saying we're going to default you, you
18    can go with them, you cannot.  I stayed with the
19    case.  I had no -- no choice to stay with the case,
20    or my client would be in default.
21         Q.   Was the decision to file a federal civil
22    rights lawsuit against Judge Knutson during the
23    trial in this family court matter a ploy to get
24    Judge Knutson removed from the case?
25         A.   No, no.
```

1      Q.   You can turn to paragraph 105, please.   You

2   allege in paragraph 105 that the Dakota County

3   Sheriff's Office released a picture of you to

4   reporters?

5      A.   Yes.

6      Q.   What picture?

7      A.   That picture.

8      Q.   Your booking photo?

9      A.   Mm-hmm.

10      Q.   Do you have any personal knowledge regarding

11   the data classification of booking photos in the

12   Minnesota Government Data Practices Act?

13      A.   No.   They released it to -- it says right on

14   there, release, I gave it to you.   They released it

15   to the Pioneer Press and says right on it courtesy

16   of Dakota County Sheriff's --

17      Q.   Do you know whether --

18      A.   -- months later.

19      Q.   Do you know whether the Pioneer Press

20   requested your booking photo?

21      A.   It was on a -- I have no idea why they would

22   request a -- I never got booked on that charge.

23      Q.   You have a booking photo, though, however.

24      A.   I would --

25      Q.   I'll show it to you right now.

```
 1      A.   I gave you a copy of the article.

 2      Q.   This is Exhibit 13 to your deposition.

 3      A.   I don't want to look at that.

 4      Q.   Well, we have to look at it for a moment.

 5           MR. PADDEN:  So what's the question,

 6   Jeff?  Was there a booking photo?

 7      Q.   Correct.  There was a booking photo.  This

 8   is your booking photo here on Exhibit 13.  Do you

 9   have any reason for disputing that?

10      A.   They took that photo of me, yes, in the

11   middle of my torture.  You can see the difference.

12      Q.   You've also alleged --

13      A.   Thank you very much for --

14           MR. PADDEN:  Just wait for the next

15   question.

16      Q.   You've also alleged in your complaint that

17   no inventory was made of your property.  Exhibit 13

18   is exactly that, it's a property inventory sheet.

19   Do you see that?

20      A.   Where does it say --

21      Q.   It's in front of you right now.  This is it.

22           MR. PADDEN:  You want to see the

23   picture?

24      A.   They never gave me that.

25           MR. PADDEN:  How about page 2, Jeff?
```

1    I'm sorry.

2         Q.   This is a property inventory.

3              MR. PADDEN:   Okay.

4    A.   They never gave me that.

5    Q.   So would you agree with me that an inventory

6    actually was made?  In fact, if you turn to the back

7    page you'll see a photograph of items that were

8    taken from you.

9    A.   Mm-hmm.

10   Q.   Do you see that?

11   A.   I've never seen this before.

12   Q.   Are these the items that were placed in the

13   bag in the courtroom holding cell area?

14   A.   They had also -- well, yeah, these are the

15   items they took from me, my -- thank you for this,

16   because I have never seen this.  My earrings, hair

17   piece, rings, glasses, and then my necklace, but my

18   cross is missing.

19   Q.   Okay.  So you've alleged in your complaint

20   that there was no property inventory --

21   A.   Oh, here's the other things.  I forgot about

22   these things they took from me.  My cell, legal

23   papers, those were not my legal papers, those were

24   papers they put -- gave to me.

25   Q.   Correct.

1    A.  So that was not my property.  Also what they

2    gave to me was the -- the exhibit I was looking for,

3    the court calendar.

4    Q.  My question --

5    A.  Where did they get that?  That's my question

6    to them.

7    Q.  My question for you is this --

8    A.  That was not my property either.

9    Q.  My question to you is this, you alleged in

10   your complaint that there was no inventory made of

11   your property.  After seeing Exhibit 13 would you

12   agree with me that that allegation is incorrect?

13   A.  Yes.

14   Q.  Thank you.  You've also alleged in paragraph

15   172 that news reporters flocked, quote, "flocked to

16   the jail"?

17   A.  Yes.

18   Q.  Which news reporters?

19   A.  It was the same -- as far as I know, because

20   I was in jail, it was the same news crew that had

21   been there the day before.

22   Q.  Which was who?

23   A.  Fox 9.

24   Q.  Trisha Van Pilsum?

25   A.  Yes.

1    Q.   So there was a reporter, not reporters

2    plural, correct?

3    A.   There was -- you know, as far as I knew, the

4    reporters, yeah, she was the main one.  She had a

5    producer and a camera man and all that.  She had a

6    whole crew.

7    Q.   Are you aware of any other news reporters

8    who were at the jail while you were there?

9    A.   You'll have to tell me, because I'm waiting

10   for that video of the outside that I subpoenaed the

11   following week to see who was out there.  But that's

12   what I was told, that the media was out there.

13   Q.   Okay.  You don't know anyone other than

14   Trisha Van Pilsum you don't know, though, correct?

15   A.   Right.

16   Q.   Thank you.

17   A.   Because I was in jail captured by your

18   people.

19   Q.   And you didn't actually give an interview to

20   Trisha Van Pilsum when you were released, did you?

21   A.   She when I -- right when I got out my phone

22   rang, and it was her.

23   Q.   Did you give her an interview?

24   A.   The phone rang, it was still working, and

25   she said she knew what happened to me.  I talked to

 1    her.   And she said she had to go with her crew, that

 2    she was waiting there all day.   She had to go with

 3    her crew on another story, but she would do another

 4    story.

 5        Q.   And did you ultimately give her an

 6    interview?

 7        A.   No.

 8        Q.   Did you have any visitors at the jail?

 9        A.   No.

10        Q.   Beyond releasing the booking photo to the

11    Pioneer Press, what other ways do you claim that my

12    clients have publicized the fact that you were

13    arrested and detained at the jail?

14        A.   The whole thing, the fact that they did it.

15        Q.   The fact that they did it and the booking

16    photo.   Have my clients in any other way whatsoever

17    publicized the fact you were arrested and confined?

18        A.   The -- not that I'm aware of.

19        Q.   In fact you publicized it quite frequently,

20    correct?

21        A.   Yes.

22        Q.   You --

23        A.   I publicized I did a trial in handcuffs,

24    because you guys had been covering it up for so

25    long.   It's about time somebody knows what happened

1    in that -- on that day.

2        Q.   You self-publicized it, correct?

3        A.   I didn't -- I was asked about it -- well,

4    here's what happened, after the week following what

5    happened, I didn't -- I didn't -- I didn't want to

6    publicize it.  I didn't want anybody to know this.

7    I didn't know how to react.  Fox 11 was already

8    there.  They had said that they were in the

9    courtroom and saw it.  So I don't know.  She said

10   something like, we were there, we saw it, okay.

11            But I had a brief due in appellate court the

12   following week.  I had already asked for an

13   extension.  So I had to write an affidavit and give

14   a reasonable reason why it was extended.  And it was

15   the following week I had to do an affidavit.  And I

16   was just going to say I had a trauma, I -- I -- I

17   was sick, you know, because I was in a state.  And

18   instead my husband said, just tell them what

19   happened.

20            So it took a lot of courage, but at that

21   point I put it on an affidavit what happened, and

22   embarrassed myself with my client, had to explain to

23   her what happened, had to tell the appellate court

24   what happened, you know, and try to explain that I

25   did nothing wrong, it's not my fault.  And then

1   somebody saw that affidavit, somebody out in

2   California and called me.

3       Q.   Who?

4       A.   Her name was Bonnie something or other.  She

5   had a -- she had a website.  And then from there I

6   got a call from Joe Sorge of Divorce Corp who

7   couldn't -- was saying, did this really happen to

8   you.  And then it kind of blossomed.  And then I

9   basically said, well, I might as well talk about it,

10  because it's something that happened to me, that I

11  experienced, so I had no -- I did it.

12      Q.   Okay.  Who ultimately --

13      A.   And most of the time I'm just trying to

14  defend myself because of what you guys did.

15      Q.   Who contact -- who contacted 20/20?

16      A.   20/20 contacted me.  I didn't contact them.

17      Q.   Okay.

18      A.   They just called me up on October 22, 2015.

19      Q.   What personal firsthand knowledge do the

20  following persons have about the facts -- the facts

21  underlying your Fourth and Fourteenth Amendment

22  claims or your claims relating to the lawsuit here

23  pending.  Okay?  I'm going to go through a list.

24  I'd like you to tell me what facts these people have

25  firsthand knowledge of.

1          How about Laurie Cylkowski?

2      A.  She was trying to get me out.  My husband

3  called her.  She's an attorney.

4      Q.  How about Deborah Sampson?

5      A.  And Debbie also was called.  She's my

6  paralegal, and when this happened to me, and was

7  calling frantically.  People were just trying to

8  help me from the outside.  I was inside.

9      Q.  And Sandra Grazzini-Rucki is listed.

10  Obviously she was in the courtroom with you,

11  correct?

12      A.  She was in the courtroom with me.  She was

13  trying to do whatever she could, because she

14  understood I was arrested and --

15      Q.  And she was ultimately convicted of felony

16  child deprivation, correct?

17      A.  Yep.

18      Q.  And you wrote a book about her, right?

19      A.  I did.

20      Q.  What about Dede Evavold, was she also

21  convicted of a felony?

22      A.  Yes, she was.

23      Q.  And she was your campaign manager for the

24  two thousand --

25      A.  By Dakota County, by the way, both of

```
 1    them --
 2        Q.   She was also --
 3        A.   By your people in part of the overall cover
 4    up of a cover-up of a cover-up.
 5             MR. PADDEN:  Just answer the question,
 6    please.
 7        Q.   No, I want to get into this actually.  Are
 8    you accusing my colleagues of corruption?
 9        A.   Yes.
10        Q.   Which colleagues of mine are you accusing of
11    corruption?
12        A.   We'll deal with that later.  The whole --
13    your whole Dakota County's entirely corrupt, okay.
14    So that's another story.
15        Q.   I'm asking you --
16        A.   I'm not doing that in this lawsuit, but
17    yeah.
18        Q.   I'm asking you which colleagues of mine
19    you're accusing of corruption.
20        A.   Do you want me to start -- do you know what
21    corruption means?
22        Q.   I'm asking you --
23        A.   The fact that you're even representing these
24    deputies is corruption.  Okay?  They should have
25    their own representation.
```

1      Q.   I don't need you to define corruption for

2   me.

3      A.   But you're asking me.  So corruption is a

4   broad term.

5      Q.   Okay.   Which -- are you accusing any of my

6   colleagues of breaking the law?

7      A.   Which colleagues?

8      Q.   In the Dakota County Attorneys Office.

9      A.   I'm not going to speak to that right now,

10  because I could say a lot.  Okay?  Let's just talk

11  about this lawsuit.

12     Q.   Are you accusing me of breaking the law?

13     A.   I would like my evidence.  I would like my

14  evidence.  I think you've obstructed.  I talked

15  about that earlier.  Mm-hmm.  And also the fact that

16  you're representing is a huge conflict.  Because

17  you're not supposed -- and I think like regularly

18  you and your colleagues give advice to the sheriffs.

19  They should have their own advice.  There's a

20  problem there, a big problem.

21          In other states they don't -- the sheriffs

22  don't call the county attorneys.  The police don't

23  call the prosecutors for advice.  That's --

24  that's -- that's the foundational corruption in your

25  county.  And that you think all of this is okay is a

1   huge problem, just business as usual.

2       Q.  That sounds like Red Herring Alert.  Do you

3   write as Susan for Red Herring Alert?

4       A.  No, never Red Herring Alert.

5       Q.  Have you ever gone by the name of Susan?

6       A.  I don't do blogs.  I don't -- I write my own

7   stuff and I say who it is.  I say Michelle

8   MacDonald, I wrote this.

9       Q.  The question is have you ever used the

10  pseudonym Susan?

11      A.  No.

12      Q.  Have you ever used the pseudonym Susan

13  Carpenter?

14      A.  No.  If I'm going to write something, it's

15  for me, so know that.  I don't hide.

16      Q.  Dede Evavold was your campaign manager for

17  the 2014 supreme court election --

18      A.  Yes.

19      Q.  -- correct?

20      A.  She was.

21      Q.  Is she your campaign manager this time?

22      A.  No.

23      Q.  What personal knowledge of the facts

24  involved in this lawsuit does Kimberley Bukstein

25  have?

1      A.   Kimberley was -- she's a civil rights

2  specialist, and she's just been following the story.

3      Q.   Does she have any personal knowledge?

4      A.   She was there -- I think she was there the

5  day of my arrest.  She might have been there the day

6  before that.  She's just a civil rights advocate.

7      Q.   How about Steven Erickson, what knowledge

8  and facts?

9      A.   Steven Erickson is a colleague of mine that

10  I told the story to in confidence because I feel

11  like I have to explain that I did nothing wrong.

12  For the last -- it's -- it's -- it's better now, but

13  for the last couple of years -- I mean, I don't know

14  how much better it is now, I feel like I have to

15  explain that I did nothing wrong.  And that's why

16  this is -- what you did to me is so horrific because

17  I have to -- I didn't do anything wrong for you to

18  do all of this, your people.

19      Q.   Are you planning to present any expert

20  testimony at trial?

21      A.   I believe so, yes.

22      Q.   On what subjects?

23      A.   You'll have to ask Mike.

24      Q.   Now, you've --

25      A.   Certainly on -- on all these what happened.

1    I mean, where's the due process in what happened.

2    There will need to be a -- somebody that is an

3    expert in these processes, a sheriff of some kind,

4    so that would be one.

5        Q.  Any other experts?

6        A.  I'm not sure at this time.

7        Q.  Your dad --

8        A.  You'll have to ask my attorney.

9        Q.  Your father is Dr. Charles Lowney, correct?

10   What kind of doctor is he?

11       A.  He's a family practice doctor.

12       Q.  Is he a licensed mental health doctor?

13       A.  No.

14       Q.  Is he a licensed dermatologist?

15       A.  No.

16       Q.  You produced some documentation in this

17   lawsuit about a rash that has been on your body.

18   Number one, I'm going to ask you, is that rash

19   technically called lichen planus?

20       A.  I believe so, yes.

21       Q.  When were you first diagnosed with lichen

22   planus?

23       A.  A few months after this incident.

24       Q.  Some of the medical records you produced in

25   the lawsuit said you had an initial outbreak in 1992

1   and 1993?

2       A.   Yes, yeah, years and years ago is the first

3   time I had it when I was really stressed.   I think I

4   was in law school at the time.

5       Q.   What happened with that initial outbreak?

6   Can you just explain to me what it was like?

7       A.   The initial outbreak?

8       Q.   Yes.

9       A.   It was -- if I recall it was just, you know,

10  everywhere but my hands and my feet.

11      Q.   Did you get treatment for it back in 1992

12  and '93?

13      A.   Yes, there was some creams and then -- there

14  was some creams.   I think I got some light treatment

15  back then to get rid of it.   Sun, being in the sun

16  was one of the treatments.

17      Q.   Did it go into remission?

18      A.   It -- yes, it went -- it was gone.

19      Q.   How many flare-ups of lichen planus have you

20  had since that time?

21      A.   None, except this time.

22      Q.   And then Brookline Dermatology records that

23  you produced in this lawsuit reflect that you saw a

24  doctor for lichen planus on May 26th of 2015.

25      A.   Right.

Michelle MacDonald Shimota
10/20/2016

1  Q.  Okay.  Is that when it reappeared, when the

2  symptoms reappeared?

3  A.  It was before that, because it was -- I was

4  trying -- I was trying the creams and trying to get

5  rid of it, trying to be in the sun, and it wasn't

6  going away.  So it was months before that.

7  Q.  When did it reappear?

8  A.  No, it was once before I went to the doctor.

9  Q.  I'm just trying to pin down the time frame.

10  You go to the doctor in May of 2015.  When did that

11  first reemerge?

12  A.  Maybe about a year before that, nine months

13  before that.  I was trying everything.  And then I

14  was home and my dad, who had sent me the creams and

15  stuff, sent me to a doctor.

16  Q.  Brookline Dermatology?

17  A.  Brookline Dermatology.

18  Q.  And you ultimately saw My Dermatologist here

19  in Inver Grove Heights, correct?

20  A.  Right.

21  Q.  And records reflect that was in July of

22  2015?

23  A.  Right.

24  Q.  And you were treated for lichen planus by My

25  Dermatologist as well, correct?

Michelle MacDonald Shimota
10/20/2016

1    A.  Right.

2    Q.  Is it in remission presently?

3    A.  It's better, yeah.  I think that treatment
4  really helped from My Dermatologist.

5    Q.  Is it in complete remission?

6    A.  It doesn't seem to be popping up, mm-hmm.

7    Q.  And what was the treatment that My
8  Dermatologist prescribed?

9    A.  There were light treatments and creams and
10  sun.  I think the difference was the light
11  treatments.

12    Q.  How much money have you spent out of pocket
13  on treatment for your lichen planus since September
14  13th of 2013?

15    A.  I'm not sure because insurance covered some
16  of it.

17    Q.  Do you have billing records?

18    A.  They would have billing records.  I just
19  paid it as I went.

20    Q.  Do you have payment records?

21    A.  No, not that -- jumbled up in all my other
22  payment records.

23    Q.  Are you claiming in the lawsuit --

24    A.  They would know that.

25    Q.  Are you claiming in the lawsuit that my

1  clients caused your lichen planus to reemerge?

2      A.  The whole -- this whole thing, yes, it's

3  this whole thing.

4      Q.  Has a dermatologist, specifically a

5  dermatologist, ever informed you that your lichen

6  planus flare-up was caused by stress, anxiety,

7  depression, or post traumatic stress disorder?

8      A.  I believe so, yes.

9      Q.  Which dermatologist?

10      A.  Every time I went in they were like -- when

11  I went in they, okay, this is because of stress,

12  period.

13      Q.  Which --

14      A.  My dad as well.

15      Q.  Your dad is not a dermatologist.

16      A.  Right.

17      Q.  What dermatologist has told you that your

18  lichen planus flare-up was caused by stress or

19  anxiety?

20      A.  I think both of them.

21      Q.  By both of them you mean Brookline and My

22  Dermatologist?

23      A.  Yes.  My dad is a general practice.  I mean,

24  back when they started 50 years ago you do

25  everything.  He knows everything about medicine.

1    Q.   Do you have an opinion --

2    A.   He does dermatology.

3    Q.   Have you obtained a written opinion from a

4  dermatologist stating that your lichen planus

5  flare-up was attributable to the stress that you

6  claim to have suffered in this lawsuit?

7    A.   No, I just know it was.  I know my own body

8  and I know it was because of this trauma here.

9    Q.   Has a physician other than a dermatologist

10 ever informed you this flare-up of lichen planus was

11 caused by the stress, anxiety, depression, that you

12 suffered --

13   A.   My dad.

14   Q.   Can I finish my question?

15   A.   Yes.

16   Q.   The stress, anxiety, depression, et cetera,

17 that you claim to have suffered as a result of being

18 arrested?

19   A.   My dad, it's -- it's from stress when you --

20 but -- my dad, yes.

21   Q.   Are you aware of any medical journals,

22 papers, professional publications that link stress,

23 anxiety, or depression as a cause of lichen planus?

24   A.   No.

25   Q.   Are you planning to present expert testimony

1    at trial linking your lichen planus outbreak to the
2    alleged mental and emotional distress --
3         A.   I don't know.
4         Q.   You haven't decided?
5         A.   No.
6         Q.   Prior to September 12th of 2013 had you ever
7    been diagnosed with or treated for post traumatic
8    stress disorder?
9         A.   Prior to when?  No.
10        Q.   September 12th of '13?
11        A.   No, never.
12        Q.   Again, prior to September 12th of 2013 have
13   you -- had you ever been diagnosed with depression
14   or treated for depression?
15        A.   No.
16        Q.   Anxiety?
17        A.   No.
18        Q.   Insomnia?
19        A.   No.
20        Q.   Abnormal weight loss?
21        A.   No.
22        Q.   Prior to September 12th of 2013 have you
23   ever been diagnosed or treated for any mental or
24   psychological disorder or disease?
25        A.   No.

Michelle MacDonald Shimota
10/20/2016

1    Q.   Any physical manifestation of a mental or

2    psychological disorder?

3    A.   No.

4    Q.   Had you ever suffered any of these things

5    prior to September 12, 2013?

6    A.   No.

7    Q.   And by these things I mean PTSD, depression,

8    anxiety, insomnia, or abnormal weight loss?

9    A.   No.

10   Q.   Prior to September 12, 2013 had you ever

11   been treated by a mental professional of any type,

12   including a psychologist or psychiatrist?

13   A.   No.

14   Q.   What mental emotional distress do you claim

15   that Mr. Wegner, Mr. Melton, Mr. Gonder, and

16   Mr. Napper caused you?

17   A.   Well, the whole situation.  They were just

18   the people.

19   Q.   I'm specifically asking --

20   A.   -- the specifics.

21   Q.   -- identify the types of distress that you

22   claim they caused you.

23   A.   The whole situation.  What do you mean the

24   types of distress?

25                MR. PADDEN:  You mean symptoms, Jeff?

1    A.   You're talking about symptoms?

2    Q.   Anxiety, depression, yes.

3    A.   Yeah, all of that.

4    Q.   All of what?  Can you explain?

5    A.   All the anxiety.  And I don't want to say

6  this sounding like a crazy person when I start to

7  talk about it.  That's what you want me to do, and

8  I'm not going to do it.

9    Q.   I'm not trying to bait you, Ms. MacDonald.

10    A.   No, I -- I can't talk about this without,

11  you know, getting all worked up, either crying or --

12         MR. PADDEN:  He understands that,

13  Michelle.  He's just trying to see if you can

14  verbalize -- it's appropriate for him to ask that,

15  you know, if you can, you know -- you know,

16  obviously something like PTSD, I'm not trying to

17  tell you what to answer, but he's saying are you

18  able to articulate, you know, how it is that what

19  happened -- how you claim what happened has affected

20  you mentally and emotionally.

21         Is that fair, Counsel?

22         MR. TIMMERMAN:  Yep, that's fair.

23  BY MR. TIMMERMAN:

24    Q.   What do you claim to have suffered?

25  Anxiety, depression, et cetera?

1    A.  Anxiety.

2    Q.  What else?

3    A.  Depression.

4    Q.  What else?

5    A.  If you want to put labels on it, just --

6  just the suffering, not being able to sleep, having

7  bad dreams, having to fight through a lot of

8  feelings and emotions when I come here to this

9  courthouse.

10   Q.  Okay.  What else?

11   A.  When I see a deputy.

12   Q.  Anything else?

13   A.  That's all I can recall at this time.  It's

14  been ongoing and constant.

15   Q.  Weight loss?

16   A.  Yep.

17   Q.  Okay.

18   A.  Just not wanting to eat.  Not being able to

19  sleep and trying to just put it -- put it away.  And

20  trying to, you know, just be -- be in the world

21  without having to be judged by this.

22   Q.  Have you ever been diagnosed by a mental

23  health professional with post traumatic stress

24  disorder?

25   A.  Just the person I go to.

1    Q.  Dr. Meyer?

2    A.  Yeah, Dr. Meyer, and my -- my dad, I mean,

3  people tell me, you have it.  It's something you

4  don't lose.

5    Q.  I'm asking you specifically --

6    A.  You're -- you're triggering it right now.

7    Q.  I'm asking you specifically what mental

8  health professional has diagnosed you with PTSD.

9    A.  My dad says I have it and so does that lady,

10  Meyer.

11    Q.  I'll represent to you, and we'll look at

12  these notes in a moment, psychotherapy notes from

13  Dr. Meyer that I obtained in this lawsuit.

14    A.  I didn't ask her for a diagnosis, so.

15    Q.  There is a diagnosis in there, and it's not

16  post traumatic stress disorder.

17    A.  Okay.  Well, then whatever.

18    Q.  To the best of your knowledge have you ever

19  been --

20    A.  I'm fighting through it.

21    Q.  To the best of your knowledge have you been

22  diagnosed with post traumatic stress disorder --

23    A.  No.

24    Q.  -- by any -- by any medical professional?

25    A.  No, it is what it is, is what my dad said

1   and what she said.

2       Q.   It is what -- what do you mean by that?

3       A.   It is what it is, whatever the records show.

4   I just go and try to get help.

5       Q.   Okay.  That's fair.  When did you start

6   suffering from anxiety?

7       A.   After all this happened.  You know, part of

8   the post traumatic stress is the anxiety, right, the

9   whole thing.

10      Q.   How long after this happened?

11      A.   Right away, during.

12      Q.   What about depression, when did you start

13  suffering that?

14      A.   That just goes up and down, I mean.  This --

15  I am not going to let this ruin my life.  Okay?

16      Q.   I understand that.

17      A.   So I'm struggling through it.

18      Q.   How long after --

19      A.   And your people are not going to bring me

20  down.

21      Q.   How long after September --

22      A.   I don't want to be diagnosed with anything.

23              MR. PADDEN:  Just wait for the next

24  question.

25      Q.   How long after September 13th of 2013 were

1    you first diagnosed with depression?

2         A.   I wasn't diagnosed.  I just had it.

3         Q.   You've never been diagnosed with depression?

4         A.   No.  I just experienced it.  I'm

5    experiencing post traumatic stress.  I've been

6    told -- people tell me I have it when they hear me

7    talk about this and it's probably showing up now.

8         Q.   Have you ever been diagnosed with insomnia?

9         A.   No, but I've had insomnia.  I've had

10   depression.

11        Q.   How much weight are you claiming to have --

12        A.   I have anxiety.

13        Q.   How much weight are you claiming to have

14   lost on account of my clients' --

15        A.   I just lost a lot of weight.  And then

16   I gained it back --

17             MR. PADDEN:  Michelle --

18        A.   -- and then I'll lose it --

19             MR. PADDEN:  -- let him finish the

20   question, please.

21        Q.   How much weight are claiming to have lost on

22   account of my clients' actions?

23        A.   At the beginning I wasn't eating, so I don't

24   know how much weight.  I don't weigh myself.  I

25   don't even have a scale at home.  But my clothes

Michelle MacDonald Shimota
10/20/2016

Page 218

1  were hanging off me.

2      Q.   On average how many hours have you slept per

3  night since September 13th of 2013?

4      A.   I don't know.  It's been a lot of years.  It

5  took me many years to get to this point.  That's a

6  stupid question.

7           MR. PADDEN:  Come on, Michelle, you

8  can't -- please --

9      A.   I just don't know.

10          MR. PADDEN:  Let's be respectful.

11  Michelle, you're an attorney --

12     A.   Four, five.

13          MR. PADDEN:  Don't comment on his

14  questions, please.  Okay?  Answer his questions.

15     A.   Four or five.

16     Q.   Are you on any medications for mental

17  health?

18     A.   No.

19     Q.   Have you ever been?

20     A.   No.

21     Q.   Any doctor ever told you you needed to be

22  medicated?

23     A.   No.

24     Q.   Now the records that you produced in this

25  lawsuit indicate that you first saw Dr. Meyer on May

Michelle MacDonald Shimota
10/20/2016

1   7 of 2015.  Does that sound accurate to you?

2        A.  Yes.

3        Q.  Fair to say then that between September 13,

4   2013 and May 7 of 2015 you did not seek treatment

5   from a mental health professional?

6        A.  No, that's not fair to say, because I had a

7   psych eval that you guys made me do that said I've

8   got to see somebody, basically that's what it said.

9        Q.  It was a court ordered psych eval?

10       A.  Right.  That you guys made me do.

11       Q.  When you say, you guys, you mean the court,

12   right?

13       A.  Yeah.

14       Q.  I'm not the court.  I work for the county.

15       A.  The county --

16       Q.  The court works for the state.

17       A.  The county made me do.  And that's when I

18   said I better get some help.

19       Q.  And that was in October of 2014, correct?

20       A.  Yes.

21       Q.  So then you waited until May of 2015 to get

22   help, correct?

23       A.  Right.

24       Q.  Aside -- aside from court ordered psych eval

25   in October of 2014, did you obtain any other mental

1  health treatment or counseling of any type between

2  September 13th of 2013 and May 7th of 2015?

3      A.  Just my dad every day.

4      Q.  Talking to him?

5      A.  Yes.  And praying.

6      Q.  You've also referenced Azber Ansar?

7      A.  Yes.

8      Q.  He's associated with Family Innocence,

9  right?

10     A.  Yes.  Not -- not -- he's been a part of it

11 here and there.

12     Q.  And he referred you to Dr. Meyer?

13     A.  He did.  I knew he was a PTSD doctor, and he

14 referred me to Dr. Meyer, because it wasn't getting

15 any better.

16     Q.  Records I've obtained indicate you saw

17 Dr. Meyer on May 7, 2015 and you've seen her six

18 other times?

19     A.  Yes.

20     Q.  June 13, 2015, July 3, 2015, August 1, 2015,

21 August 24, 2016, September 7, 2016, and September

22 29, 2016.

23     A.  Yes.

24     Q.  Have you seen her since September 29, 2016?

25     A.  I was supposed to see her yesterday, and I

1 blocked out the appointment.

2  Q. You left the appointment?

3  A. Yeah, I blocked it out.  So those are the

4 times that I've seen her.  And I try to see her as

5 often as I can.  But I try not to disrupt as much as

6 you've disrupted my life since that day.  I'm trying

7 to -- but I do go see her.

8      MR. PADDEN:  What's that?

9      MR. TIMMERMAN:  Nothing.

10  A. Yep.

11  Q. Why did you take a one-year gap between

12 August 1st of 2015 and August 24th of 2016?

13  A. Because I was coping with it myself, talking

14 with my dad who has been my doctor since birth, and,

15 you know, going to church, and, you know, just

16 trying not to ruminate about it.  So I was coping

17 with it with myself.  And then it got to the point

18 where I realized I needed to see someone.  I

19 didn't -- you know, I know right away people were

20 telling me I had PTSD, the way I was acting, and I

21 didn't want to acknowledge it.  I just kept coping

22 with it.

23    And then I -- I -- I had that -- I had

24 this -- had your psych eval, and then like -- I'm

25 like, oh, something -- I gotta do something about

1   this, and then it prompted me to do something about

2   it as best I could.  It still takes time away from

3   my life.

4       Q.  Do you recall what type of tests Dr. Meyer

5   administered to you?  Do you know if she

6   administered the MMPI-2?

7       A.  Administered?  She didn't -- I don't think

8   she administered any tests to me.

9       Q.  Never administered the trauma symptom

10  inventory to you?

11      A.  No, not that I recall, no.

12      Q.  Have you ever had a trauma symptom inventory

13  administered to you?

14      A.  No.

15      Q.  Do you know what the trauma symptom

16  inventory is?

17      A.  No.

18      Q.  Do you recall any type of an MSE or mental

19  status exam that Dr. Meyer performed?

20      A.  No.

21      Q.  The diagnosis in Dr. Meyer's psychotherapy

22  notes is, quote, "other specified anxiety disorder,"

23  end quote.  Do you know what that means?

24      A.  No.  I haven't even looked at her notes.

25      Q.  Are you familiar at all with the DSM-5?

1    A.   No.

2    Q.   Are you planning to present any expert

3  testimony at trial regarding your alleged mental and

4  emotional distress?

5    A.   Probably my doctor.

6    Q.   Dr. Meyer?

7    A.   Mm-hmm.

8    Q.   And what will the subject of her testimony

9  be to the best of your knowledge?

10   A.   What -- whatever she said in those notes.

11   Q.   Have you retained any experts in this

12  lawsuit?

13   A.   No.

14   Q.   Have you consulted with any experts in this

15  lawsuit?

16   A.   No.

17            MR. TIMMERMAN:  Take a quick break?

18            MR. PADDEN:  Sure.

19            THE VIDEOGRAPHER:  We're going of the

20  record.  The time is 2:05 p.m.

21            (Break from 2:05 to 2:12 p.m.)

22            THE VIDEOGRAPHER:  Back on the record.

23  The time is 2:12 p.m.

24            (MacDonald Deposition Exhibit No. 14

25            marked for identification.)

Michelle MacDonald Shimota
10/20/2016

Page 224

```
 1   BY MR. TIMMERMAN:
 2      Q.  Ms. MacDonald, this is Exhibit 14 to your
 3   deposition, and this is a document you produced.  Do
 4   you recognize it?
 5      A.  Yes.
 6      Q.  You testified earlier about having a
 7   court-ordered psychological evaluation --
 8      A.  Right.
 9      Q.  -- correct?
10      A.  Right.  And the judge wanted to do it in the
11   contempt motion, too, because the judge thought
12   something was wrong with me.
13      Q.  It looks like I may have gotten my date
14   wrong, it appears this may have occurred on October
15   17, 2014.
16      A.  What?
17      Q.  This evaluation.
18      A.  November 4?  Oh, it's written.
19      Q.  Correct.  If you look at the paragraph
20   starting, following her conviction, interviewed at
21   the ACP offices in Apple Valley October 17, 2014.
22      A.  Right.
23      Q.  Oh, and then you completed testing with
24   MMPI-2 on October 2, 2014?
25      A.  Right.
```

Michelle MacDonald Shimota
10/20/2016

1    Q.   So did you meet with Dr. Hanson multiple

2    times?

3    A.   I believe so.

4    Q.   And he administered the MMPI-2 to you?

5    A.   I believe so.

6    Q.   Do you know what that is?

7    A.   No.

8    Q.   And this evaluation was conducted in the

9    aftermath of your conviction for -- for what?   For

10   the implied consent and --

11   A.   For obstructing legal process.

12   Q.   And refusal to submit to test?

13   A.   Right.

14   Q.   Third degree?

15   A.   Right.

16   Q.   Did those convictions cause you mental and

17   emotional distress?

18   A.   No.

19   Q.   None whatsoever?

20   A.   No.

21   Q.   Did the criminal charges that resulted in

22   those convictions cause you mental or emotional

23   distress?

24   A.   No.

25   Q.   Do you believe that your conviction for test

Michelle MacDonald Shimota
10/20/2016

1   refusal and obstruction of justice damaged your

2   professional reputation?

3        A.   It could have.

4        Q.   Do you have any evidence that it did?

5        A.   Well, it was -- I ultimately got exonerated

6   of DUI, and that was my concern.

7        Q.   Okay.  But my question is, do you have any

8   evidence that your reputation was damaged by this

9   conviction for test refusal and obstruction of

10  justice?

11       A.   I -- I don't know, I mean, what happened is

12  your -- your issue, what your people did to me is

13  very similar to what these people did to me.  But I

14  am -- I was already exonerated of the contempt when

15  this went to trial.

16       Q.   Okay.  Did this conviction for test refusal

17  and obstructing legal process impact in any way your

18  relationship with the republican party of Minnesota?

19       A.   Yes.

20       Q.   How so?

21       A.   They presented an article that I was charged

22  with -- you know, this was old, they printed an

23  article, had an article printed.

24       Q.   The republican party did?

25       A.   Mm-hmm.

1    Q.   And did they ultimately --

2    A.   It was before that article come out I was --

3    I got phone calls that the article was going to come

4    out by -- by people in the republican party that

5    wanted me to revoke my endorsement, and then the

6    article -- there's an article that came out.

7    Q.   Do you think that article hurt your

8    professional relation -- or your reputation?

9    A.   Yes.

10   Q.   Did that article cause you mental or

11   emotional distress?

12   A.   No, because I knew it was false.  I just

13   knew I had to get through it.

14   Q.   And --

15   A.   It didn't cause me mental or emotional

16   distress.

17   Q.   The Minnesota republican party ultimately --

18   did the party rescind its endorsement of you in

19   2014?

20   A.   No, they kept my endorsement.  I was

21   endorsed throughout 2014.  They never rescinded it.

22   Q.   And there was an incident at the state fair

23   that year, correct?

24   A.   Yes, not an incident.  That was the first

25   day of the state fair.  There was an incident, yes,

1  where they -- somebody called me and asked me not to

2  go.  But I had everything set up with my volunteers

3  and it was such an informal request from what I

4  understand, and I showed up.

5  Q.  Was there a confrontation?

6  A.  There wasn't a confrontation that I could

7  see.  I was just showing up and I guess the media

8  was there and they were -- they had a bouncer

9  basically, so I call that a confrontation.

10  Q.  And you were denied access to the tent,

11  correct?

12  A.  Right, right.

13  Q.  Do you think -- that was highly publicized,

14  correct?

15  A.  Right.

16  Q.  Do you think that incident damaged your

17  professional reputation?

18  A.  It could have, yes.

19  Q.  Did that incident cause you to feel anxious?

20  A.  This incident --  you're -- go ahead.

21  Q.  Did that incident at the state fair cause

22  you to feel anxious or depressed or stressed?

23  A.  No.  Your incident is totally different than

24  these incidents.  So you're -- I'm talking about the

25  trauma that I experienced.

Michelle MacDonald Shimota
10/20/2016

1        MR. PADDEN:  Just answer his question.

2    A.   This is -- the personal injury that your

3    people inflicted on me.  This was not that.

4    Q.   On pages 3 and 4 Dr. Hanson discusses your

5    recounting to him of the incidents that make up the

6    allegations in this lawsuit.  And on page 4 at the

7    top of the page Dr. Hanson concludes that despite

8    this her statements did not seem to indicate that

9    here ability to work and to function in her personal

10   and professional life have been compromised by these

11   symptoms of anxiety.

12   A.   Correct.

13   Q.   Do you agree with that statement?

14   A.   I do.  Yes, I do.

15   Q.   Okay.  If you turn to page 5 please under

16   the mental status heading.

17   A.   Mm-hmm.

18   Q.   Dr. Hanson says, Ms. Shimota was polite and

19   cooperative.  She was focused and attentive.  She

20   did not display any indicators of cognitive,

21   emotional, or mental health disturbance.

22        Do you agree with that conclusion?

23   A.   That was his conclusion.

24   Q.   Do you agree with it?

25   A.   Sure.

Michelle MacDonald Shimota
10/20/2016

1    Q.   Next page, please, page 6, under the

2    diagnostic formulation heading, Dr. Hanson says, the

3    following diagnoses are offered in accordance with

4    the criteria set forth in the Diagnostic Statistical

5    Manual of Mental Disorders, Fifth Edition, DSM-5, no

6    diagnosis.

7         Do you see that?

8    A.   Yes.

9    Q.   Is it your understanding that Dr. Hanson did

10   not diagnosis you with any type of mental health

11   disturbance?

12        MR. PADDEN:   Objection; lacks

13   foundation.   Go ahead and answer if you can.

14   A.   I don't know that he did.

15   Q.   You don't know one way or another, correct?

16   A.   I don't think he did.   I think I'm mentally

17   sound.

18   Q.   Then Dr. Hanson says, she does recount a

19   history of what seemed to be mild symptoms of

20   anxiety and post traumatic stress that developed

21   following difficult interactions she had with the

22   criminal justice system, particularly following an

23   incident in September 2013.   Her statements

24   regarding these symptoms suggest that they are

25   subclinical in nature, that they are not

1  debilitating, nor do they interfere with her ability

2  to function in what seems to be a highly demanding

3  career as well as in her personal life.  Though

4  reportedly troubling to her, they do not impress the

5  undersigned as constituting a diagnosable

6  psychiatric disturbance that merits treatment.

7        Do you agree with that statement?

8  A.  If that's what he thinks.

9  Q.  I'm asking if you personally think --

10  A.  I may not -- I've tried to persevere, so.

11  Q.  My question for you --

12  A.  I'm okay with it.

13  Q.  My question is, do you personally agree with

14  that conclusion?

15  A.  Yes and no.  I don't know.  It's his

16  conclusion.

17  Q.  And I'm --

18  A.  I've -- I've experienced it.  So I'm glad

19  that he thinks that I'm good.

20  Q.  That's his conclusion.  I'm simply asking

21  whether you agree with it.

22        MR. PADDEN:  Again, objection; lacks

23  foundation.  It's from a mental health professional.

24  Answer if you can.

25  A.  I think I answered.  I -- it is what it is.

Michelle MacDonald Shimota
10/20/2016

1  And it's -- I think it's good.  I mean, I think

2  you -- you -- I'm persevering in all of this from

3  what you people did to me.  I'm trying my darndest

4  every day.  So if that was his conclusion on that

5  day, then thank you, Doctor.

6       Q.  Dr. Hanson continued, the defendant

7  impressions as demonstrating narcissistic

8  personality traits.  Do you see that?

9       A.  Yes.

10      Q.  Page 6.  Have you ever been diagnosed with a

11 narcissistic personality disorder --

12            MR. PADDEN:  Objection; lacks

13 foundation.

14      Q.  -- by a mental health professional?

15      A.  No.  That's a personality test, right?

16 That's not a disorder.  People have personalities.

17 You're probably narcissistic, so is everybody in

18 this room.  It's a piece of a personality.

19      Q.  I mean, there are narcissistic --

20      A.  You can have your judgments about it.

21      Q.  There are narcissistic personality

22 disorders.  That's what I'm asking about --

23      A.  Oh, no --

24      Q.  There's clinical DSM-5 disorders.  And I'm

25 asking have you ever been diagnosed with one, you

1    said no, so we'll move on.

2        A.   No.

3        Q.   In the last sentence of the psychological

4    formulation paragraph Dr. Hanson says, her reactions

5    to law enforcement during both arrest situations may

6    have been intensified to over-personalize, as well

7    as due to some sense of entitlement on her part, an

8    expectation that she might be treated differently,

9    paren, better, end paren, than others in similar

10   circumstances.  When that did not occur, she may

11   have become more reactive as a consequence

12   exacerbating the situation.

13            Do you agree with that statement?

14       A.   No, I don't.

15       Q.   Between September 13, 2013 and the present

16   has your work caused you any anxiety?

17       A.   My work?

18       Q.   Correct.

19       A.   It's busy, yes.  It's not busy sometimes.

20   That would cause me anxiety.  Yeah.  Just like your

21   work causes you anxiety.

22       Q.   What level of anxiety?

23            MR. PADDEN:  We're not concerned about

24   what causes him anxiety.  He's asking about you.

25       A.   I'm just saying that, again, seems like a

1  ridiculous question.  Obviously your work, you know,

2  you're trying to get things done.

3      Q.  What level --

4      A.  Causes you anxiety.

5      Q.  What level of anxiety?  How anxious has your

6  work made you during that time frame?

7      A.  I'm pretty -- I'm pretty -- I kind of

8  hydroplane over that and I just get my work done.

9      Q.  Have either of your Supreme Court campaigns

10  in 2014 and 2016 caused you any mental or emotional

11  distress like anxiety, depression, or stress?

12      A.  No.

13      Q.  Did the Rucki girls' disappearance cause you

14  to suffer any anxiety, depression, or stress of any

15  type whatsoever?

16      A.  No.

17      Q.  None whatsoever?

18      A.  No.

19      Q.  Why not?  I mean, they were -- they were

20  gone for like two years, right, and that's your

21  client.  You didn't -- you weren't stressed at all

22  about that?

23      A.  No, I was just doing my work for her.  The

24  courts already -- I think the day after they went

25  missing Judge Knutson got a letter from my client, a

Michelle MacDonald Shimota
10/20/2016

1   letter from the two girls, and he did nothing about

2   it.  I didn't even know that letter for months, but

3   Judge Knutson knew the whole situation, so.

4        Q.   Knew the whole situation about what?

5        A.   The day -- two days after the girls ran

6   away, Sandra -- Sandra wrote a letter, that I

7   learned of later, and wrote a motion to Judge

8   Knutson on her own, and had two letters from the

9   girls saying they wanted to be with their mom and

10  filed it with Judge Knutson and the appellate court

11  two days after.

12       Q.   When did you start representing Sandra?

13       A.   January 1 -- January 3, 2013 is when she

14  retained me.

15       Q.   Now, I understand that the judicial election

16  committee, I might be using the wrong terms here,

17  recommended your endorsement for the republican

18  party's candidacy for Supreme Court this year,

19  correct?

20       A.   Yes, they did.

21       Q.   But then ultimately the body, the

22  electorate, decided not to endorse any candidate,

23  correct?

24       A.   Right.

25       Q.   And why was that?

1    A.   Well, I'm not sure.   There was a motion made

2  and testimony taken.   And I remember one attorney

3  getting up there on the stand and maybe pointing out

4  this case.   He had a big screen and against me, but

5  it ended up they just decided not to endorse any

6  judges.

7    Q.   The attorney, was that Harry Niska?

8    A.   Yes.

9    Q.   Do you recall Harry Niska circulating a

10  three-page --

11    A.   I want to see that, yeah, I thought he did

12  circulate something, yes, I want to see that.

13    Q.   Have you ever seen it?

14    A.   No, it was there just up on the big screen

15  when I was thinking, I was preparing a speech, I had

16  a speech ready.

17    Q.   Are you aware that it's available online?

18    A.   No, I didn't know it was online.

19    Q.   Do you think that the republican party's

20  refusal to endorse you for Supreme Court in the 2016

21  election has damaged your reputation?

22    A.   No, because the -- well, I think that letter

23  that mentioned my demeanor has damaged my

24  reputation, not in general.

25    Q.   Okay.

1      A.   It's because of what happened to me here

2  that -- this is the source of it.  You know what I'm

3  saying?  This is the source of it.  Because nobody

4  knows the real truth of what you guys did to me

5  here.

6      Q.   I've read the Niska letter.  And --

7      A.   Well, can you get that?  Where is it online?

8  Because I'd like to see it.

9      Q.   Let me look.

10     A.   Well, you could print it off.  Because I

11 want -- the truth has to come out about what you

12 guys did to me here, instead of all this cover-up.

13 And pretending that you didn't do anything and this

14 was all business as usual and that I did something

15 wrong when I didn't.

16     Q.   The document is entitled, Judicial Election

17 Committee Minority Report, by David Asp and Harry

18 Niska.

19     A.   And they have that posted?

20     Q.   Yep.

21     A.   Who posted it?

22     Q.   It's on mngop.com.

23     A.   Okay.

24     Q.   Okay.  So you don't know one way or another

25 whether that report has damaged your reputation?

1      A.   I'm certain it has.  I'm certain it has.

2  Now you're saying it's online.

3      Q.   Has that caused you any mental or emotional

4  distress, this process of not being endorsed by the

5  republican party?

6      A.   No, no, because the truth is that I had

7  every single -- remember I explained the judicial

8  selection committee was made up of the 10 districts

9  and two were appointed.  You know, so there was 20

10  of those, Keith Downey appointed these two lawyers,

11  Harry Niska and someone else, they're thrown into

12  the group, and they're lawyers.  So that's the legal

13  community, right.

14      And they're -- they're the ones that believe

15  this stuff, believe something's wrong, that I have

16  done something wrong.  Do you see what I'm saying?

17  It's the legal community and my reputation that

18  you've destroyed.

19      Q.   Well, one of the things they reference

20  that --

21      A.   That I'm keeping -- I'm always trying to

22  keep -- keep -- keep telling people what really went

23  on so that I can regain my reputation with -- on and

24  on and on.

25      Q.   One of the things referenced in the memo is

1  that you sued the republican party. Is that

2  correct?

3      A. Yeah, it wasn't a lawsuit, it was you do --

4      Q. Administrative?

5      A. It was when -- yeah, it was when a lawyer

6  called me and left a message threatening me,

7  threatening my family, my business, my reputation,

8  if I didn't withdraw my endorsement. Because he

9  knew about this incident. It's another thing. It

10 goes back to this incident. He knew about this

11 incident. I had shared with him the pictures and

12 things like that in confidence, and he was, you

13 know, he was like, this incident is going to come

14 out, so.

15     Q. Who did you share with?

16     A. It was --

17     Q. Keith Downey?

18     A. No, no, no, no. His name was Patrick Burns.

19 So he was an attorney that was very saddened by what

20 happened to me, but he also was part of the

21 republican party somehow. And he's the one who

22 called me and said, this is going to be -- not look

23 good.

24     Q. Okay.

25     A. What you guys did to me, it's not going to

1    look good for the republican party, you guys.

2        Q.  Well, the report also references the video

3    of your test refusal arrest that's available online,

4    correct?

5        A.  Right, right.

6        Q.  Do you think that video being available

7    online has damaged your reputation?

8        A.  I don't think so, no.

9        Q.  Your driver's license was ultimately

10   revoked, correct?

11       A.  I believe so.  Right at the beginning.

12       Q.  For how long?  Do you recall?

13       A.  I was representing myself.  I don't recall.

14   And then they stayed it.  So they never clipped my

15   license or anything, that I remember.  They gave me

16   my license back and then they said it was revoked

17   and they stayed it because I was doing appeals.  So

18   it was never revoked -- it wasn't revoked for that

19   long.

20       Q.  And what -- but it was revoked for some

21   period of time?

22       A.  I believe so.

23       Q.  Did that cause you any mental or emotional

24   distress?

25       A.  No, I just had to get rides.

1  Q.  Do you think that damaged your reputation at

2  all?

3  A.  It wasn't -- I would hope not.

4  Q.  It was a reported case in the Minnesota

5  Court of Appeals, correct, on the revocation of your

6  driver's license?

7  A.  Yes.

8  Q.  So that information was out there, correct?

9  A.  Right.

10  Q.  Do you think that hurt your reputation?

11  A.  It could have.  It could have.  But when

12  you're arrested in court, I think that's like huge

13  and that's probably hurt my reputation worldwide.

14  So that's why it needs to be exposed what you guys

15  did to me.

16  Q.  There's also a lawsuit by Great Southern

17  Bank.  Are you aware of that?

18  A.  Yes.

19  Q.  Against -- who is Eldorado Commercial LLP?

20  A.  Eldorado Commercial LLP is my -- owns the

21  building that my husband owns.

22  Q.  Is your husband a shareholder or?

23  A.  Tom Shimota, he's a partner.

24  Q.  Partner in Eldorado?

25  A.  Yeah.

Michelle MacDonald Shimota
10/20/2016

1    Q.   Is Eldorado still around?

2    A.   No, not really.  I mean, it owns the

3  building.  He -- and I think if you found that, you

4  also found his affidavit.  His brother died a year

5  and a half ago, who was the -- and he was the last

6  surviving, quote, partner, and two partners before

7  that filed bankruptcy, so he's struggling with that.

8    Q.   Sure.  Now, I did see that there was a

9  judgment entered against your husband jointly and

10  severally in the amount of $1,104,079.28, is that

11  correct?

12    A.   Right.

13    Q.   Is that judgment still outstanding?

14    A.   That is, you know, if you know anything

15  about foreclosure, that -- yeah, I mean, they had

16  to -- we worked with the bank attorney, who was

17  very, very nice by the way, so that he could speed

18  up the process.  So the judgment is just because

19  there's a foreclosure sale coming up.

20    Q.   Okay.  And --

21    A.   They had to get a judgment because they had

22  to have a value for the business --

23    Q.   The judgment indicates that if the property

24  sells for less than the amount of the judgment, that

25  the defendants will be jointly and severally

1    reliable for the residual, correct?

2        A.   Does say that, yes.

3        Q.   Does that cause you any stress?

4        A.   No, not at all.  It causes me great unstress

5    to get that building taken care of.

6        Q.   Okay.  Hasn't caused you any emotional or

7    mental stress whatsoever?

8        A.   No, that's my husband's piece.

9                 (MacDonald Deposition Exhibit No. 15

10                marked for identification.)

11   BY MR. TIMMERMAN:

12       Q.   Ms. MacDonald, this is Exhibit 15 to your

13   deposition.

14       A.   Mm-hmm.

15       Q.   Presumably you recognize this document,

16   correct?

17       A.   Yes.

18                MR. PADDEN:  Jeff, I'm not sure I'm

19   going to allow any questions from this petition.

20   This matter is still being adjudicated.  I just

21   don't think it's really appropriate for this to be

22   covered in a discovery deposition.  My client's

23   represented by counsel also on this, and I don't

24   know.  What do you plan to ask about this?

25                MR. TIMMERMAN:  Questions about when it

1   was filed, when she first learned when that was

2   coming, and if it's caused her any distress.

3           MR. PADDEN:  Okay.  Fair enough.

4           MR. TIMMERMAN:  I'm not going to delve

5   into the merits of this.

6           MR. PADDEN:  That's fine.

7   BY MR. TIMMERMAN:

8       Q.  So when did you learn that the Lawyers

9   Professional Responsibility Board Panel was --

10  was -- had filed an ethics complaint against you?

11      A.  You're mixing that up.  Judge Knutson, based

12  on what your people did here, he's the one who

13  filed.  And it was sometime -- I think I got notice

14  of it sometime in February, April of 2014.

15      Q.  Of Judge Knutson's ethics --

16      A.  Judge Knutson made the complaint, he wrote

17  to the lawyer's board about this incident.

18      Q.  You've also filed ethics complaints against

19  Judge Knutson, you testified about that --

20      A.  I did.

21      Q.  -- correct?

22      A.  Yes.

23      Q.  Do you understand what relief the

24  Professional Responsibility Board is seeking against

25  you in this action?

1     A.   I don't know.

2     Q.   Do you believe this petition for

3  disciplinary action and the fact that you are part

4  of an active ethics charge has harmed or damaged

5  your professional reputation?

6     A.   Right now, yeah, absolutely, yes.  Yes, this

7  just got filed after this election.

8     Q.   Because this has been publicized, correct?

9     A.   It just got publicized, yes.

10    Q.   Star Tribune has published it.  Minnesota

11 Lawyer has published it.

12    A.   Yeah.  Right after the -- I won the

13 primaries in the election.  They decided to file

14 this and make it public.

15    Q.   Has this caused you -- the fact that you're

16 subject of this Professional Responsibility Board

17 action before the Supreme Court of the state of

18 Minnesota, has that caused you mental or emotional

19 stress?

20    A.   Yes.

21    Q.   How significant?

22    A.   Well, if you read it, it's all about what

23 you -- your people, your defendants did to me.  It

24 all stems from that, kind sir.

25    Q.   Well, I mean --

1      A.  Okay.

2      Q.  --- I'll admit it's somewhat about that.

3      A.  So now -- now this is -- on top of

4  everything else now there's this.  On top of

5  everything that stems from that day, September 12,

6  2013, now there's this.

7      Q.  This indicates that you were disciplined

8  in -- with an admonition in August of 2012, is that

9  accurate?

10     A.  Not really.  I wasn't disciplined.  I'll

11 show you the materials on that if you need it.

12 This -- you could -- it's a flowery way of saying

13 what really happened.

14     Q.  Were you given a formal admonition?

15     A.  No, I wasn't.  It was a private admonition.

16     Q.  Okay.  You were given an admonition, it just

17 wasn't public?

18     A.  It was private.  And it was an attorney, his

19 name was Brian Thompson, who had worked for me.  He

20 left my law firm, started his own practice, took a

21 case with him.  It was the Whitehead case.  He was

22 working on it I guess, and he -- they filed against

23 him and then he died.  This is how crazy this is.

24 He died, and they filed against my law firm, and --

25 you know, because he used to work for me.  And I had

1  an attorney there who said they can't do that, but

2  they were doing it anyway.

3         And they -- I think there was -- it was

4  determined there was some like $200, some small

5  amount in my trust account that this client had

6  gotten bills for, you know, showing you have this

7  amount.  So they found that.  And I said, oh, yeah,

8  I can give him back that money that Brian didn't

9  take with him or left in trust.

10        And then there was -- what else happened

11 there.  Yeah, they said nonlawyer.  I didn't

12 understand that.

13    Q.   Okay.

14    A.   Conduct of a nonlawyer, because he was a

15 lawyer.

16    Q.   Are you concerned that you're going to be

17 disbarred?

18    A.   I hope -- I'm not, no.  I don't think.  I

19 mean, unless you know something -- I think they --

20 they want to punish me somehow because of what

21 happened in that courtroom, because I sued a judge,

22 because you guys arrested me and I'm speaking out on

23 it.

24    Q.   Fair to say that you're --

25    A.   I think they would like that.  I don't know

1  why this is even brought.

2     Q.  Fair to say that there are other matters

3  that are referenced in this complaint, correct?

4     A.  Yes, other -- the whole matter.

5        MR. PADDEN:  I don't want to get --

6     A.  Okay.  I'm not going to get into the matter.

7        MR. PADDEN:  He's just -- what he's

8  trying to ask you is whether this is causing mental

9  and emotional distress.

10    A.  And I'm saying yes.

11       MR. PADDEN:  Okay.  Thank you.

12    Q.  Since you're claiming your attorneys fees

13 and costs associated with other matters, how much

14 did you pay out of pocket in attorneys fees and

15 costs in connection with Mr. Fluegel's prosecution

16 for your court arrest -- courthouse arrest, excuse

17 me?

18    A.  For the -- for the contempt?

19    Q.  Correct.

20    A.  I believe I gave you those numbers.  I think

21 that Stephen Grigsby didn't charge me for that.  He

22 didn't charge me for the courthouse arrest.

23    Q.  Okay.  So he represented you for free?

24    A.  He did.

25    Q.  So you did not incur any costs --

1    A.  I might --

2    Q.  Did not incur any attorneys fees or costs in

3 connection with Mr. Fluegel's prosecution of you for

4 the contempt charge?

5    A.  I'm not sure.  I gave you those numbers.  So

6 they're in my interrogatories.  What I'm trying to

7 say is he didn't want to charge me, and I -- I

8 didn't think that was fair.  Because he is the one

9 who had called the jail and saw on the news that I

10 was arrested.  So when I called him, which was a few

11 weeks later, he said since I called the jail I

12 shouldn't charge you, and I said that doesn't

13 sound fair, I should pay you something, so.

14    Q.  In your interrogatories you have, defense

15 related matters, Stephen Grigsby $14,250.  What

16 would that have been for?  Was that your DUI charge

17 or was that your contempt charge?

18    A.  He represented me in the petition for

19 disciplinary action.  I can't imagine it being that

20 much for the DUI.

21    Q.  Well, that case went to trial and it was

22 appealed and then cert was sought, correct?

23    A.  Right.  So I'll have to distinguish that for

24 you, but I -- you're -- you asked me one question,

25 let me just answer it.  I don't think he charged me

1    for the contempt.

2       Q.   Okay.

3       A.   I think he did not charge me.  I think I had

4    other costs.  I had to pay for the other things,

5    but.

6       Q.   Court costs?

7       A.   Court costs, and things like that, and time

8    away from my job, which you keep insisting to have

9    happen.

10       Q.   How much have you paid out of pocket --

11    strike that, please.  That's -- let me rephrase

12    that.

13          You would agree with me I think that your

14    confinement in the Dakota County jail and in the

15    courthouse holding area didn't cause you to suffer

16    any attorneys fees or costs, correct?  It was your

17    arrest that caused that, correct?

18       A.   My arrest -- from beginning to end?

19       Q.   Correct.

20       A.   And then what?

21       Q.   The arrest caused you to be charged, not

22    your conditions of confinement in the jail, correct?

23       A.   Caused me the charge of what?

24       Q.   Caused you to incur attorneys fees -- I

25    guess no attorneys fees, but court costs in the