1    contempt charge?

2        A.   Yeah.

3        Q.   Okay.

4        A.   I don't understand your question all that

5    well, but that makes sense.

6        Q.   Okay.  I'm just trying to delineate between

7    you're not claiming --

8        A.   Oh.

9        Q.   I guess my broader question is you're not

10   claiming any attorneys fees and costs in other

11   matters relative to your confinement in the

12   courthouse area or the jail, correct?  Those acts of

13   confining you did not cause you to personally incur

14   any attorneys fees and costs, correct?

15       A.   Oh, in this lawsuit, yes.

16       Q.   Okay.

17       A.   So, yes.  Were you trying to have me say

18   that I didn't incur any attorneys fees?

19             MR. PADDEN:  No, no, he's --

20       A.   I'm misunderstanding.  But in this lawsuit,

21   yes.

22       Q.   In this lawsuit you're claiming that, I

23   understand.

24       A.   Okay.

25       Q.   How much money have you paid out of pocket

1    in attorneys fees and costs in connection with the

2    disciplinary action?

3        A.   $10,000 so far.

4        Q.   Paul Ang [phonetic].

5        A.   Yeah, to Paul Ang and something like $1,500

6    to -- to Stephen Grigsby.

7        Q.   How much have you paid out of pocket in

8    attorneys fees and costs to date with this lawsuit?

9        A.   That's all written down.

10            MR. PADDEN:   Time out.   In the context

11   of that question, concerning the attorney/client

12   relationship that I have with my client, I'm not

13   going let her discuss that.   That's certainly a

14   matter that'd be appropriate for a post trial

15   petition, fee petition, whatever, but I don't think

16   it's appropriate to ask in discovery.

17            THE WITNESS:   I think I actually

18   answered that actually.

19            MR. PADDEN:   I think he's talking about

20   this case.

21            THE WITNESS:   Yeah, I did already

22   answered that.

23   BY MR. TIMMERMAN:

24       Q.   You have.   And that's why I asked.   You

25   indicated $32,044.   You've paid $32,044 to date?

```
 1         A.  Right, in this action, mm-hmm, whatever I
 2    said there.
 3         Q.  That's the amount you've paid?
 4         A.  Mm-hmm.
 5         Q.  Sorry.  I wasn't trying to be sneaky.  It's
 6    in the interrogatory answers.
 7              MR. PADDEN:  Yeah.
 8         A.  Yeah.
 9         Q.  In this lawsuit are you claiming or seeking
10    to cover your attorneys fees and costs in any other
11    actions aside from the contempt hearing and ethics
12    complaint?  Contempt charges I should say and the
13    ethics complaint.
14              MR. PADDEN:  You mean my representation
15    of her in the civil rights case, Jeff?
16         Q.  No.  And I understand -- let me back up.  It
17    was a poorly-worded question.  I understand that you
18    may seek to recover attorneys fees and costs in this
19    case.
20         A.  Right.
21         Q.  I guess that.  I'm not questioning you about
22    that.  But you testified today that you're also
23    seeking to cover attorneys fees and costs in this
24    case that you spent in other cases.
25         A.  Right.
```

1    Q.  My question for you is, we've talked about

2    the contempt charges and we've talked about the

3    ethics action.  Are there any other legal actions

4    for which you're seeking recovery of fees and costs

5    in this lawsuit?

6    A.  No, not that I know of.

7    Q.  Clear as mud.  How did your detention at the

8    Dakota County jail on September 12th and 13th of

9    2013 damage your reputation?

10   A.  Just by the fact of it happening.

11   Q.  What about your detention in the courthouse

12   holding area, same thing?

13   A.  Just by the fact of it happening.

14   Q.  Who has knowledge --

15   A.  My complete reputation is different and

16   damaged and needed to be explained all the time.

17   Q.  What proof do you have these incidents,

18   these periods of confinement have damaged your

19   reputation?

20   A.  First of all, it's pretty apparent and

21   obvious, and I gave you some -- you know, the one

22   article that came out from the Minnesota State Bar

23   Association, that article.  No matter how -- I think

24   it was Minnesota Lawyer, that was the first one.

25   It's -- you get -- when -- when something like this

1   happens, it seems like you always get looks and

2   comments and, you know, somebody else might say,

3   some other attorney might say, oh, you know, is that

4   the one.  And I have attorneys that say -- try to

5   say, oh, I explain to them, that you didn't do

6   anything, things like that.  I mean, that's ongoing,

7   even as easily as yesterday.  You know, any people I

8   meet, saying, oh, so and so said you were in

9   trouble.  It goes on and on.

10          I mean, it's kind of, you know, when you're

11   an attorney in the stature that I'm in, and suddenly

12   this happens to you, you're under arrest for 30

13   hours, and leave, and then you're prosecuted, it

14   resonates and it reverberates.  There's nothing I

15   can -- it's so, so obvious, it's like blatant.

16          Q.  The articles you're mentioning, those are

17   about your civil rights lawsuit, right, articles

18   about --

19          A.  Which one?

20          Q.  The Minnesota Lawyer article.

21          A.  No, no, there was a Minnesota Lawyer article

22   after this -- this arrest of mine, said attorney

23   arrested.  And it went on the news, too, on Fox 9.

24          Q.  And before the lawsuit was filed?

25          A.  Attorney arrested.  Oh, long before, when it

1   happened.

2       Q.  It's really your arrest, though, that's

3   damaged your reputation?  But for the arrest, you

4   wouldn't have been confined in the jail, correct?

5       A.  Right.  But for you guys pulling me out of

6   my life and holding me for all of those hours for

7   nothing, I wouldn't have been in jail, yep.

8       Q.  How can you apportion -- we talked about

9   other things that you believe that damaged your

10  professional reputation like the ethics charge, like

11  the republican state fair booth events, et cetera,

12  how can you apportion the percentage of damage that

13  was caused by this lawsuit as opposed to all of

14  these other events that were happening

15  contemporaneously?  Do you have an answer for that?

16      A.  I don't.  I just know that I had no problems

17  until your people did this to me.

18      Q.  Well --

19      A.  I mean, I was just practicing law and doing

20  my thing.

21      Q.  The DUI arrest was before this, though,

22  before my people detained you, correct?

23      A.  And that was another civil rights, you know,

24  violation that I -- the reason they brought that

25  charge against me was because I made a complaint to

1    the police, and then all of a sudden there's charges

2    brought against me for what they did, not following

3    the law, Dan Fluegel chit chatting and giving advice

4    to the cops.

5        Q.  Have you sued the city of Rosemount?

6        A.  No, no, no.

7        Q.  Okay.  All right.  So I don't -- if I'm

8    hearing you correctly, there's no -- really no clean

9    way for us to determine what portion of the damage

10   to your reputation was caused by the events alleged

11   in this lawsuit as opposed to the other events --

12       A.  This --

13       Q.  -- as opposed to the other events going on

14   in your life, correct?  Is that correct?

15       A.  I'm not sure.  This was the first one that

16   was publicized.

17       Q.  The DUI was publicized, right?

18       A.  No, that was after.  This one was the first

19   one, because it was on September -- the DUI arrest

20   was quiet.  Nobody knew about that before this.

21   No -- it wasn't publicized until after this.  You

22   know that, right?

23       Q.  I'm asking you.

24       A.  Yeah, the DUI was not publicized at all.

25   This happened, and then the DUI got publicized.  And

 1   this was advertised on Fox 9 the day it happened,

 2   and that's how -- I never saw that, that's how

 3   Stephen Grigsby found me.  Because he was watching

 4   his TV one night and he called the jail to see how I

 5   was doing.

 6       Q.   We've got all of these different media

 7   outlets to whom you've given or to which you've

 8   interviews, first is the MSBA, Star Tribune, the

 9   Pioneer Press, Lion News.

10       A.   Mm-hmm.

11       Q.   Fletcher Long and the Long Version, I know

12   you've been on his show a couple times talking about

13   your arrest.  Do you agree with me that you've

14   really self-publicized the heck out of this arrest?

15       A.   Yes and no.  They call me, and I try to tell

16   what happened.  They're calling me like, what

17   happened.  It's like when people come up on the

18   street, other lawyers, what happened that day.  I

19   have to tell them.  So if I can tell a larger

20   audience about what your people did to me that day,

21   I'm comfortable with it.  It's not publicizing it,

22   it's trying -- it happened, you did this to me.  And

23   I have to figure -- I have to tell people why --

24   not -- that I didn't do anything wrong, that I was

25   wronged by your people, because obviously I was.

1    Q.  You also had a press conference to announce
2  the filing of this lawsuit, correct?
3    A.  My attorney did a press conference to
4  announce the filing.
5    Q.  Which attorney?
6    A.  It was Nathan Busch and M. Tayari Garrett,
7  they had a press conference.
8    Q.  Did you attend it?
9    A.  I did.
10    Q.  How many other people were there?
11    A.  There was several people there.
12    Q.  Who?
13    A.  I don't remember.  I might have --
14        MR. PADDEN:  You mean media, Jeff, or
15  on my client's behalf?
16        MR. TIMMERMAN:  What's that?
17        MR. PADDEN:  You mean media --
18        MR. TIMMERMAN:  Media, yeah, how many
19  other people.  She's testified -- I asked --
20        MR. PADDEN:  I didn't know if you
21  were --
22    A.  I wonder if they did do a press release.
23  I'm not sure that -- I'm pretty sure they did.
24        MR. PADDEN:  You're talking about press
25  conference?

1   BY MR. TIMMERMAN:

2       Q.   Press conference.

3       A.   Press conference, yes, when this first got

4   filed.

5       Q.   They did a press conference?

6       A.   They put out a press conference, yes.

7       Q.   And you're saying a couple of other people

8   attended?

9       A.   Yes.

10      Q.   Do you have any idea how many?

11      A.   Maybe ten.

12      Q.   Do you recall any of their names?

13      A.   No.

14      Q.   What was the purpose of the press

15  conference?

16      A.   You would have to ask my attorney that.

17      Q.   It wasn't your idea?

18      A.   No, it wasn't my idea.

19      Q.   You apparently agreed to go along with it,

20  though, correct?

21      A.   Right.

22      Q.   Again, I mean, if you're worried about

23  publicizing the fact that you were arrested and then

24  detained at the jail, it strikes me as a little

25  incongruous that you would host a press conference

1   to advertise about the fact that you were arrested

2   and detained at the jail.

3       A.   It's not incongruous, because I want to

4   explain what really happened that day.  What's out

5   there is that I got arrested.  I have to explain

6   what really happened that day, okay, what you guys

7   did to me.  That's what that's all about.  Not, oh,

8   guess what, I got arrested.  I didn't want anybody

9   to know that.  They need to know the truth, because

10  it was already picked up by the media.

11                  (MacDonald Deposition Exhibit No. 16

12                  marked for identification.)

13  BY MR. TIMMERMAN:

14      Q.   Ms. MacDonald, this is Exhibit 16 to your

15  deposition.  Do you recognize this?

16      A.   Yes.

17      Q.   MacDonald for Justice is your Supreme

18  Court -- the name of your Supreme Court candidacy,

19  correct?

20      A.   Right.

21      Q.   Who maintains the MacDonald for Justice

22  YouTube site?

23      A.   We don't have anybody, we don't have it

24  connected to MacDonald for Justice right now.  This

25  is it.  I don't have anybody to maintain it.

1      Q.   Ostensibly there's a log-in and password for

2    the MacDonald for Justice YouTube site, is that

3    correct?

4      A.   Yes.

5      Q.   And is that information that you possess?

6      A.   I have it somewhere.  I don't even know how

7    I did this.  I'm not good at it.  But yes.

8      Q.   You created the account?

9      A.   I believe I created this account and put

10   these three videos up, and then this one.

11     Q.   And this is another --

12     A.   I didn't even know I put these up.  I was

13   trying to mechanically do it.

14     Q.   This is another example of you publicizing

15   the fact that you were arrested and detained,

16   correct?

17     A.   It's another example so the people can watch

18   what happened, and you'll see I didn't do anything

19   in the courtroom to deserve this kind of treatment,

20   nothing.

21     Q.   And you posted these videos yourself?

22     A.   Yes, I did.

23     Q.   And you drafted the commentary accompanying

24   these videos?

25     A.   I did.

1    Q.  And, again, from where were these videos

2    obtained?

3    A.  They were -- the prosecutor gave them to my

4    criminal defense attorney.  I'm still waiting for

5    the ones from you that were subpoenaed on September

6    17.

7    Q.  There's no question.

8             MR. TIMMERMAN:  Exhibit 15?

9             THE REPORTER:  No, 17.

10            (MacDonald Deposition Exhibit No. 17

11            marked for identification.)

12   BY MR. TIMMERMAN:

13   Q.  This is Exhibit 17 to your deposition.  This

14   is a transcript of a motion hearing in your criminal

15   case, the contempt case, the hearing that occurred

16   on November 21, 2013.  Do you see that?

17   A.  Yeah, mm-hmm.

18   Q.  And you were at this hearing, correct?

19   A.  Right.  Oh, I don't think so.  This was -- I

20   think this was on the phone.

21   Q.  It was a phone hearing?

22   A.  I think so.

23   Q.  Were you present for the phone hearing?

24   A.  I don't -- nope, I don't think so.  This was

25   just done by phone.  I'll have to look.  I don't

1   know.

2       Q.   Okay.  So on page 2 Mr. Grigsby says,

3   Stephen Grigsby, Your Honor, on behalf of

4   Ms. MacDonald, who is present before the court.

5       A.   Oh, okay.  Then it must be.  Thank you.

6       Q.   Does that refresh your recollection as to

7   whether this is an in-person or --

8       A.   Yes.

9       Q.   -- a telephone hearing?

10      A.   Yes, it was in person.

11      Q.   It was an in-person hearing, okay.  Okay.

12  On page 5 Mr. Grigsby says, Grigsby, excuse me, in

13  response to my requests for discovery, the

14  prosecutor acknowledged that he's in possession of a

15  DVD, but because the DVD contains portions of events

16  beyond the matter relevant to this case in the

17  courtroom, he says he cannot release the whole of

18  these recordings without an order of the court.  So

19  I think what the court can do is to order its

20  disclosure under some sort of protective order that

21  can satisfy the State's interest and whatever it

22  wants to protect.

23          And Judge Metzen says, do you want to draft

24  a protective order for me that protects what you

25  need to protect?

1      And Mr. Colburn, is that Mr. Fluegel's

2  associate?

3      A.   Yes.

4      Q.   Says, I think the concern, Your Honor, is to

5  what extent events, essentially unrelated to the

6  alleged violation, should or should not be disclosed

7  as part of these DVD recordings.

8          And the court says, what is the DVD, what is

9  it.

10         And Mr. Colburn says, essentially it -- I

11 guess I would call it the surveilliance video of the

12 courtroom where the alleged incident occurred.

13         Mr. Grigsby says, video of the crime

14 itself -- alleged crime itself.

15         And the court says, right, I think that's

16 pretty relevant.

17         And then Mr. Colburn says, mm-hmm, I agree.

18 I certainly agree with the portion of the video

19 pertaining to the alleged violation is certainly

20 relevant, should be discoverable.  Of course, the

21 DVD contains quite a bit prior to and a fair bit

22 after the alleged violation.  And if the court

23 wished to give some direction on that, we can either

24 release it as is with the court's direction, or --

25         And Judge Metzen says, how about -- let's do

```
 1   this.  Let's release it as is to Mr. Grigsby.  I
 2   think he should be permitted to have access to that,
 3   but restrict him in allowing that to be released any
 4   further --
 5          Okay, Mr. Colburn says.
 6          And then Judge Metzen says, without order of
 7   the court.
 8          And Mr. Grigsby says, I fully understand
 9   that.
10          Okay?
11      A.  Right.
12      Q.  So did you understand as of November 21,
13   2013 that Judge Metzen had limited the dissemination
14   of the DVD footage provided to you in your criminal
15   contempt case to Mr. Grigsby?
16      A.  Yes.
17      Q.  Why then did you take that video and post it
18   on YouTube?
19      A.  The case was over.  I just posted it
20   recently.  And you said I could.  You said, any
21   video that's out there is okay.  So that's why.
22      Q.  I never said that --
23      A.  Other people were posting it already.
24      Q.  I never said you could post -- let me
25   clarify for the record.  I indicated to you when we
```

1  met back in May that M. Tayari Garrett had posted

2  the courtroom video on her YouTube -- her law -- her

3  now defunct law firm's YouTube website back in April

4  of 2015, and that that was out there.  I knew that

5  that was out there at that time.  How did she get a

6  copy of that video to post?  Do you know?

7       A.  She got it from me.

8       Q.  Okay.  And subsequently --

9       A.  Let me explain.  Let me explain.

10      Q.  I'm asking the questions.

11      A.  I followed this order.

12      Q.  Excuse me.  I'm asking the questions.

13      A.  The case was dismissed.  I could do anything

14  I wanted with those videos once it was dismissed.

15  And that's what Mr. Grigsby told me.  So it was

16  already after it was dismissed that I could finally

17  give somebody the video.

18      Q.  Okay.

19      A.  Okay.  And I gave it to my attorney here.

20  And I gave it --

21      Q.  I understand you gave it to your attorneys.

22  But I am saying notwithstanding the fact that Judge

23  Metzen has placed restrictions on the distribution

24  and dissemination of this video, you decided once

25  the case was dismissed that you could do with it

1   what you please?

2       A.   Right, because I could, kind sir.   So it's

3   not going be covered up anymore.   Okay?

4       Q.   Okay.

5       A.   I could, legally I could.

6       Q.   And do you understand that the videos were

7   produced in this lawsuit?

8       A.   That I couldn't open, yes.   Nothing new was

9   produce in this lawsuit that I could open.   Except

10  for I could get some hallway things.

11      Q.   These three videos on MacDonald for Justice

12  YouTube site were produced to you in this lawsuit.

13  Do you understand that?

14      A.   No, I don't.   These were -- the only reason

15  these exist is because you guys tried to prosecute

16  me with them.   I have been trying to get these

17  videos since September of 2013, all of them, from

18  both days.   Okay?   So you have obstructed me getting

19  my --

20      Q.   You've answered my question.

21      A.   -- my videos.

22      Q.   You've answered my question.

23      A.   You've obstructed federal subpoenas.

24      Q.   Well, federal subpoenas that were quashed by

25  a federal court, no?

1    A.   No, they weren't quashed.   They weren't

2  quashed at all.   You just didn't respond to them.

3  You just wrote letters and decided you weren't going

4  to -- the county was just not going to turn them

5  over.   They're on legal hold right now.   The only

6  reason you have these is I put them on legal hold.

7    Q.   Okay.   So I asked you -- the question I

8  asked you, did you understand that --

9    A.   You are not going to be --

10           MR. PADDEN:   Just wait for the next

11  question, Michelle.   This is not the time.

12    Q.   The question I asked you, do you understand

13  that these videos were produced in this lawsuit and

14  you said no?

15    A.   You had produced these videos in this

16  lawsuit, yes, you did.

17    Q.   You understand.   And do you understand they

18  were designated as confidential in the lawsuit?

19    A.   I did not understand that, because I already

20  had these.   Because I sat at a meeting with you and

21  I said, well, I already have the videos from the

22  criminal matter.   And you said, oh, those don't

23  count.   So I had -- I would have put all the others

24  up --

25    Q.   I said nothing of the sort.

1    A.   -- if I could.  Yes, you did, sir.

2    Q.   I said nothing of the sort.

3    A.   Yes, you did, sir.  You just said it.  I

4  said, I have these.  That's when you said they were

5  going to be confidential.  Because I'm still trying

6  to get them and open them.  You said, well, the ones

7  you have already.  I said, what about the ones that

8  I already have from the criminal matter.

9    Q.   I did not say that.

10   A.   And you said, oh, those --

11   Q.   We can disagree.

12   A.   Why would they be?  I already have them.

13  Why would something you give me that I already have?

14           MR. PADDEN:  Time out.  Time out.

15  Let's go to the next topic.

16   A.   You're not going to accuse me of violating

17  an order, because I didn't.  When you give me

18  something and it's confidential, it's confidential.

19  So stop, okay, stop.

20   Q.   Excuse me.  Your conduct today has been

21  unbecoming of a lawyer, absolutely unbecoming.

22   A.   I'm a victim.  I'm a victim and a defendant.

23  I'm not your lawyer.

24   Q.   Excuse me.  You've accused me and my

25  colleagues of corruption on the record.

```
1        A.   Right.

2        Q.   Which I think might be a violation of an

3   ethics rule in and of itself.

4        A.   I'm a lawyer.  Okay?

5        Q.   Okay.

6             MR. PADDEN:  Let's get the deposition

7   done, please.

8        A.   Yes.

9        Q.   I'm going to ask you more about that

10  corruption charge, because I want to know exactly

11  what you're accusing me of before we're done today

12  so I can decide whether I have a professional

13  obligation to report you to the state of Minnesota

14  bar.

15            MR. PADDEN:  She's already explained to

16  you --

17       A.   I already explained the corruption.

18            MR. PADDEN:  She's already explained to

19  you.  I'm not saying that anybody necessarily agrees

20  with it, but she's already answered that question.

21       A.   I'm in a legal proceeding.  I can -- do you

22  even -- do you even know the law?

23            MR. PADDEN:  Michelle, Michelle, stop,

24  stop.  Wait for the next question.

25
```

```
 1                    (MacDonald Deposition Exhibit No.  18

 2                    marked for identification.)

 3    BY MR. TIMMERMAN:

 4        Q.   Exhibit 18, this is the book you recently

 5    published, right?

 6        A.   Yes.

 7        Q.   Sandra Grazzini-Rucki and the World's Last

 8    Custody Trial, correct?

 9        A.   Right.

10        Q.   When was it published?

11        A.   A couple weekends ago.

12        Q.   Published by Familycourt.com?

13        A.   Right.

14        Q.   Where can I buy it?  Where is it

15    commercially --

16        A.   Online.

17        Q.   Where is it commercially available?

18        A.   Online.

19        Q.   Where at online?

20        A.   I believe it's on -- you can buy it on

21    Amazon, anywhere you want to buy it, however you buy

22    books online.

23        Q.   Where did you obtain the still shots of the

24    courtroom and the holding cell area that are on the

25    cover of this book?
```

1      A.   From the video.

2      Q.   Okay.   Turn to pages 53 through 55.

3      A.   Yep.

4      Q.   This is another instance -- may I see it for

5   a second, please?

6      A.   Yes.

7      Q.   There's a chapter called, attorney Michelle

8   MacDonald, quote, "Under Arrest," end quote.   And

9   you go on to explain your arrest and subsequent

10   incarceration at the jail in this book?

11      A.   Right.

12      Q.   This is another example of you

13   self-publicizing the fact that you were arrested and

14   detained, correct?

15      A.   It's not self-publicizing, it's trying to

16   explain what really happened that day, kind sir.

17      Q.   But you're still publicizing the fact that

18   you were arrested and detained, correct?

19      A.   And explaining.   I'm not self-publicizing.

20   It's a book that I'm explaining what happened,

21   because I want the truth to go out there what you

22   guys did to me.

23      Q.   Did you obtain Sandra Rucki's permission to

24   include transcript of her police interview in the

25   book?

1      A.   Of her police interview in the book?  No,

2   it's public.  It was obtained by the other writer.

3   He asked the police for it.

4      Q.   Are you planning to present an expert at

5   trial regarding your alleged reputational damages?

6      A.   I believe so.

7      Q.   Who?

8      A.   I don't know.

9      Q.   Okay.

10     A.   You would have to talk to my attorney.

11     Q.   Have you hired a reputational damages

12  expert?

13     A.   No.

14          MR. PADDEN:  The day for disclosure of

15  expert witnesses, Counsel, is December 1.  We'll let

16  you know before then.

17          MR. TIMMERMAN:  Okay.

18          MR. PADDEN:  But that's a fair question

19  to ask her.  Today no one has been retained.

20          MR. TIMMERMAN:  Yeah, sure.  Let's take

21  a couple minutes and then wrap up.

22          THE VIDEOGRAPHER:  We're going off the

23  record.  The time is 3:12 p.m.

24          (Break from 3:12 to 3:19 p.m.)

25          THE VIDEOGRAPHER:  We're back on the

1    record at 3:19 p.m.

2              MR. TIMMERMAN:  I just want to confirm

3    our discussion we just had off the record,

4    Mr. Padden, that we're going to schedule

5    Ms. MacDonald's Rule 35 examinations on November

6    11th and 12th of 2016.

7              MR. PADDEN:  Just give me the specifics

8    on where she has to be and time and stuff like that.

9              MR. TIMMERMAN:  Absolutely, I will do.

10             MR. PADDEN:  All right.

11   BY MR. TIMMERMAN:

12       Q.  Ms. MacDonald, we discussed a lot today.

13   Have we discussed all the facts that support your

14   Fourth Amendment claim regarding the search of the

15   digital camera to the best of your recollection?

16       A.  You took my camera unlawfully, yes.  Yes,

17   the basic facts, you took my camera unlawfully and

18   kept it for several months, yes.

19       Q.  Anything you'd like to add from a fact

20   perspective regarding your Fourth Amendment claim?

21       A.  I think the facts speak for themselves that

22   you did that.

23       Q.  Have we discussed all the facts as you sit

24   here to the best of your recollection that support

25   Fourteenth Amendment conditions of confinement

1    claim?

2        A.   Yes.   And 30 hours is hard to explain in

3    a -- but if you understand it's from the first time

4    you snatched me no matter what you did to me after

5    that, and by you I mean your people, the county and

6    all that, then, yes.   Shouldn't do this to people.

7        Q.   Have we discussed today all the facts that

8    support your claim regarding your gold cross

9    pendant?

10       A.   Yes.

11       Q.   Okay.   Any testimony that you'd like to

12   supplement?

13       A.   Not at this time.

14       Q.   Okay.   Any testimony that you'd like to

15   change?

16       A.   Not at this time.   I'm going to read it.

17       Q.   Absolutely.   And you have that right.   Makes

18   sense.

19            MR. TIMMERMAN:   And with that, I think

20   I have no further questions.

21            MR. PADDEN:   Thank you, Counsel.   She

22   will exercise her right to read and sign.   Thank

23   you.

24            MR. TIMMERMAN:   Thank you.

25            THE VIDEOGRAPHER:   We're going off the

1    record.   That will be the end of disc three and the

2    conclusion of the deposition of Michelle MacDonald

3    Shimota.   The time is 3:21 p.m.

4                   (Deposition concluded at 3:21 p.m.)

5                   * * * * * * * * * * * * * * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        REPORTER'S CERTIFICATE


STATE OF MINNESOTA      )
                        ) ss.
COUNTY OF HENNEPIN      )

          I hereby certify that I reported the
deposition of MICHELLE MACDONALD SHIMOTA on October
20, 2016 in Hastings, Minnesota, and that the
witness was by me first duly sworn to tell the whole
truth;

          That the testimony was transcribed by me and
is a true record of the testimony of the witness;

          That the cost of the original has been
charged to the party who noticed the deposition, and
that all parties who ordered copies have been
charged at the same rate for such copies;

          That I am not a relative or employee or
attorney or counsel of any of the parties, or a
relative or employee of such attorney or counsel;

          That I am not financially interested in the
action and have no contract with the parties,
attorneys, or persons with an interest in the action
that affects or has a substantial tendency to affect
my impartiality;

          That the right to read and sign the
deposition by the witness was reserved.


          WITNESS MY HAND AND SEAL THIS 24th day of
October, 2016.




          Amy Kristina Lizotte
          Notary Public, Hennepin County, Minnesota
          My commission expires January 31, 2022.